

**Stoel Rives** LLP

October 15, 2025

Whitney A. Brown
510 L Street, Suite 500
Anchorage, AK 99501
D. 907.263.8413
whitney.brown@stoel.com

Six Mile NIKA JV, LLC
c/o Corporation Service Company
8585 Old Dairy Road, Suite 208
Juneau, AK 99801

To Whom It May Concern:

Attached find copies of the following for service upon Six Mile NIKA JV, LLC:

- Complaint with Exhibit Nos. 1 and 2; and

- Summons and Notice to Both Parties of Judicial Assignment.

Sincerely,

Whitney A. Brown

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
AT ANCHORAGE

KING & GEORGE, LLC

                 Plaintiff(s),

vs.

SIX MILE NIKA JV, LLC

                 Defendant(s).

CASE NO. 3AN-25-09462CI

**SUMMONS AND
NOTICE TO BOTH PARTIES
OF JUDICIAL ASSIGNMENT**

To Defendant: <u>SIX MILE NIKA JV, LLC</u>

You are hereby summoned and required to file with the court a written answer to the complaint which accompanies this summons. Your answer must be filed with the court at 825 W. 4th Ave., Anchorage, Alaska 99501 within 20 days* after the day you receive this summons. In addition, a copy of your answer must be sent to the plaintiff's attorney or plaintiff (if unrepresented) <u>James E. Torgerson and Whitney A. Brown</u>, whose address is: <u>c/o Stoel Rives LLP, 510 L Street, Suite 500, Anchorage, AK 99501</u>.

If you fail to file your answer within the required time, a default judgment may be entered against you for the relief demanded in the complaint.

If you are not represented by an attorney, you must inform the court and all other parties in this case, in writing, of your current mailing address and any future changes to your mailing address and telephone number. You may use court form *Notice of Change of Address / Telephone Number* (TF-955), available at the clerk's office or on the court system's website at https://public.courts.alaska.gov/web/forms/docs/tf-955.pdf to inform the court. - OR - If you have an attorney, the attorney must comply with Alaska R. Civ. P. 5(i).

NOTICE OF JUDICIAL ASSIGNMENT

TO: Plaintiff and Defendant

You are hereby given notice that:

☑ This case has been assigned to Superior Court Judge <u>Nesbett</u> and to a magistrate judge.

☐ This case has been assigned to District Court Judge _____.

CLERK OF COURT

<u>10/08/2025</u>
Date

By: _____
Deputy Clerk

I certify that on <u>10/08/2025</u> a copy of this Summons was ☑ mailed ☐ given to ☐ plaintiff ☑ plaintiff's counsel along with a copy of the ☐ Domestic Relations Procedural Order ☐ Civil Pre-Trial Order to serve on the defendant with the summons.
Deputy Clerk <u>vlk</u>

* The State or a state officer or agency named as a defendant has 40 days to file its answer. If you have been served with this summons outside the United States, you also have 40 days to file your answer.

CIV-100 ANCH (10/17)(cs)
SUMMONS

Civil Rules 4, 5, 12, 42(c), 55

**Exhibit A - Page 2 of 85**

James E. Torgerson, (Bar No. 8509120)
Whitney A. Brown, (Bar No. 1906063)
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
jim.torgerson@stoel.com
whitney.brown@stoel.com

Laura Golden Liff
*(pro hac vice forthcoming)*
Matthew L. Devendorf
*(pro hac vice forthcoming)*
MILES & STOCKBRIDGE P.C.
1751 Pinnacle Drive, Suite 1500
Tysons Corner, VA 22102
Telephone: 703.903.9000
lliff@milesstockbridge.com
mdevendorf@milesstockbridge.com

*Attorneys for Plaintiff King & George, LLC*

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main 907.277.1900 Fax 907.277.1920*

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

KING & GEORGE, LLC,

Plaintiff,

v.

SIX MILE NIKA JV, LLC,

Defendant.

Case No. 3AN-25-____________CI

## COMPLAINT

Plaintiff, King & George, LLC ("King & George"), by counsel, brings this Complaint against Defendant, Six Mile NIKA JV, LLC ("SMN JV"), and alleges as follows:

## PARTIES

1. King & George is a Texas limited liability with its principal office located at 320 Hemphill Street, Fort Worth, Texas 76104.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900   Fax 907.277.1920

2.     SMN JV is an Alaska limited liability company. Its principal office is located at 3900 C Street, Suite 100, Anchorage, Alaska 99503.

3.     SMN JV is a joint venture between Six Mile LLC ("Six Mile") and NIKA Technologies, Inc. ("NIKA").

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over SMN JV pursuant to AS 22.10.020 and the parties' contractual agreement.

5.     Venue is proper in the Third Judicial District because the Defendant maintains offices and may be served in Anchorage, Alaska.

## FACTS

**I.     SMN JV approaches King & George to provide qualifications which SMN JV lacked in order to successfully bid on the USCG Contract.**

6.     SMN JV sought to submit a bid for the United States Coast Guard ("USCG"), SILC-Base Support (Shore Infrastructure Logistics Center) Base Operations Support Services for USCG Base Kodiak, AK (the "USCG Contract").

7.     However, the USCG Contract involved certain work with which SMN JV had no experience (*i.e.*, "past performance").

8.     Because SMN JV lacked the necessary past performance to submit a competitive bid for the USCG Contract, SMN JV needed to team with another business that did have SMN JV's missing experience.

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 2 of 22

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

9.    In other words, SMN JV, on its own, was not qualified to perform the USCG Contract.

10.    To address this deficiency, SMN JV teamed with PAE Applied Technologies, LLC ("PAE") in submitting its bid for the USCG Contract.

11.    PAE agreed to provide the necessary past performance to SMN JV's bid for the USCG Contract.

12.    Without this past performance SMN JV would not have been able to submit a competitive bid for the USCG Contract.

13.    However, on or about December 8, 2021, PAE backed out of its teaming arrangement with SMN JV.

14.    SMN JV was, again, without the necessary past performance to submit a competitive bid for the USCG Contract.

15.    It was imperative that SMN JV find a partner to fill in the missing past performance in SMN JV's bid for the USCG Contract.

16.    After learning that PAE backed out of the teaming relationship, SMN JV immediately contacted King & George, because it knew King & George had the experience necessary to fill the past performance missing from SMN JV's bid.

**II.    The Parties enter into the Teaming Agreement.**

17.    On or about December 13, 2021, SMN JV promised King & George that if King & George teamed with SMN JV on its bid for the USCG Contract and included King

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900 Fax 907.277.1920

& George's past performance that SMN JV was lacking, then if SMN JV was awarded the USCG Contract, it would also give King & George a subcontract with 30% workshare.

18. SMN JV prepared a Teaming Agreement (the "TA") which incorporated the workshare percentage the Parties discussed.

19. On December 13, 2021, the Parties executed the TA. A true and correct copy of the executed TA is attached as **Exhibit 1**.

20. Under the TA, the Parties agreed to jointly pursue the USCG Contract.

21. The parties agreed to undertake a mutual effort in preparation of the proposal for the USCG Contract (the "Proposal").

22. King & George agreed to provide support to SMN JV in preparing the Proposal including, but not limited to, providing relevant past performance project qualifications to be submitted as part of SMN JV's proposal.

23. SMN JV would ultimately submit the Proposal to procure the USCG Contract as the prime contractor.

24. King & George would be listed as a "substantial subcontractor." Listing King & George in SMN JV's Proposal as a "substantial subcontractor" allowed King & George's past performance to be considered in the evaluation of SMN JV's bid.

25. If successful, after receiving the award for the USCG Contract, SMN JV would award King & George a subcontract allotting 30% of the total contract labor value to King & George and dividing all non-labor contract values such as ODCs and reimbursable expenses with 70% going to SMN JV and 30% going to King & George.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

26.    Under its terms, the TA would expire upon execution of the subcontract contemplated by the TA.

27.    With the benefit of King & George's support and critical past performance, SMN JV received the award for the USCG Contract which was effective on April 1, 2024.

28.    The ceiling value of the USCG Contract at the time of the award was $159,922,133.39.

29.    As of April 2024, SMN JV represented King & George to the government as a partner in performing the USCG Contract, with King & George's Operations Manager, Mike Giacona as one of the primary points of contact.

30.    Prior to commencement of SMN JV's work under the USCG Contract Mr. Giacona, and Senior Vice President of Operations, Robert Carlos, conducted two site visits, accompanied by SMN JV representatives, including Six Mile's Chief Operations Officer, Ryan Kegley and NIKA's Senior Operations Manager, J.P. Stout.

31.    During a site visit on April 27, 2024, Mr. Giacona and Mr. Kegley discussed how work would be divided under the USCG Contract.

32.    Mr. Giacona expressed concerns regarding the profit margin King & George would realize under SMN JV's proposed arrangement. He requested 30% of the IDIQ[1] portion of the Prime Contract, in addition to 30% of the contract labor.

---

[1] "IDIQ" in this context means "Indefinite Delivery, Indefinite Quantity." It is a mechanism under government contracting that provides flexibility to the government by allowing for a variable amount of goods or services to be provided over a specific period.

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 5 of 22

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900 Fax 907.277.1920

33. Mr. Kegley would not agree to allocating any of the IDIQ potion of the Prime Contract to King & George.

34. However, Mr. Stout told Mr. Giacona that King & George could realize a greater profit margin by staffing fewer than 44 positions.

35. Mr. Stout assured Mr. Giacona that this would be possible because not all 44 positions were needed to complete the work allocated to King & George under the USCG Contract.

36. In fact, as of April 27, 2024, the work that would be assigned to King & George was being performed by only 23 incumbent employees.

37. Based on this discussion, SMN JV ultimately assigned "approximately 44" positions to King & George under the USCG Contract.

38. On May 22, 2024, Mr. Giacona received a list of the 23 incumbent employees performing the work that would be transitioned to King & George.

39. Mr. Giacona conducted a second site visit on May 27, 2024.

40. During the second site visit, Mr. Giacona confirmed that the work being transitioned to King & George was not enough to keep 44 employees busy.

41. Moreover, Mr. Giacona learned that SMN JV did not have enough equipment to allow 44 employees to safely work simultaneously.

42. For example, in August of 2024, SMN JV's insufficient number of vehicles limited work on utilities. There were only 2 vehicles for 8 personnel, which slowed inspections.

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 6 of 22

43. In September of 2024, King & George requested that SMN JV provide additional vehicles. SMN JV denied this request.

**III.    The Parties enter into the Subcontract.**

44. Based on the needs of the USCG Contract, SMN JV offered King & George a subcontract providing King & George with "approximately 44" positions and a minor reduction in payment if King & Goerge staffed fewer than 39 positions.

45. SMN JV and King & George executed the Kodiak Base Operation Support Services King & George, LLC Subcontract Agreement (the "Subcontract") on August 5, 2024 and July 31, 2024, respectively. A true and correct copy of the Subcontract is attached as **Exhibit 2**.

46. The effective date of the Subcontract was June 6, 2024.

47. Attachment (1) to the Subcontract sets forth King & George's statement of work under the Subcontract. *See* Ex. 2 at 18.

48. The Subcontract provides:

an approximate total of 44 employees will be provided by [King & George] based on the current revision of the PWS, provided that, if at any time [King & George] provides fewer than 39 employees, [SMN JV] reserves the right to make a line-item-by-line-item reduction to the firm-fixed-price, monthly amount invoiced by [King & George].

Ex. 2 at 18.

49. Section 3.6 of the Subcontract governs termination of the agreement.

50. Section 3.6(b) provides that "In the event [King & George] *consistently* fails to meet staffing requirements, [SMN JV] shall have the right to terminate this Subcontract

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 7 of 22

or any Task Order issued under this Subcontract at any time for its convenience." Ex. 2 at 11 (emphasis added).

51. Additionally, SMN JV may terminate the Subcontract pursuant to Section 3.6(c) in the event that King & George:

(1) fails to perform any of the other provisions of [the] Subcontract in accordance with the terms, and in either of these two circumstances does not cure such failure within a period of ten (10) days (or such longer period as [SMN JV] may authorize in writing) after receipt of notice from [SMN JV] specifying such failure; or

(2) If [King & George] becomes insolvent or the subject of proceedings under any law relating to bankruptcy or the relief of debtors or admits in writing its inability to pay its debts as they become due.

Ex. 2 at 11-12.

52. King & George began performing under the Subcontract in July of 2024.

**IV. SMN JV develops a pretext for terminating the Subcontract.**

53. From the beginning of this relationship, SMN JV planned to remove King & George from the Subcontract.

54. SMN JV had no intention of honoring its April 27, 2024 promise to King & George that King & George would be allowed to staff fewer than 44 employees under the Subcontract.

55. In July of 2024, before SMN JV and King & George executed the Subcontract, a representative from King & George visited the USCG Contract jobsite.

56. During that visit, Kyle Henson, a NIKA employee, informed King & George that Mr. Kegley never wanted King & George as subcontractor on the USCG Contract.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900  Fax 907.277.1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

57.     At the outset of the USCG Contract, both SMN JV and King & George had difficulties hiring staff due to a significant increase in personnel required under the USCG Contract and the number of union employees working on the project at that time.

58.     Despite these difficulties, during King & George's first two months of performance, it hired over 30 employees, filling 34 positions in July and August of 2024.

59.     Further, given these difficulties, King & George transferred one of its own employees to SMN JV to fill a necessary position in August of 2024.

60.     Still, at no point did the government provide any indication that King & George or SMN JV's performance did not meet the USCG Contract's requirements.

61.     However, in September of 2024, SMN JV imposed a new requirement on King & George's hiring process which was not included in the Subcontract.

62.     SMN JV required King & George to obtain SMN JV's approval before hiring its own employees under the USCG Contract, despite the fact that no such requirement is listed in the Subcontract.

63.     On information and belief, SMN JV imposed this requirement to interfere with King & George's hiring efforts, using King & George's separately hiring a father and son as a pretext.

64.     Specifically, SMN JV took issue with King & George filling a LOWS position with an individual, Mr. Olson, whose father would be his direct supervisor.

65.     King & George explained to SMN JV that it gave careful consideration before hiring Mr. Olson.

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 9 of 22

66.     Mr. Olson was neither King & George's first choice for the LOWS position nor the first employee King & George hired for that position.

67.     Rather, Mr. Olson replaced another individual who was hired but never reported to the job site when he was scheduled on July 1, 2024.

68.     The LOWS position remained open for 2 months before King & George received another application.

69.     While Mr. Olson's father was his direct supervisor, his father had no hiring authority.

70.     In all respects Mr. Olson was a qualified candidate for the position.

71.     With respect to seniority among workers on the USCG Contract, Mr. Olson filled the lowest level position.

72.     Additionally, there were no other LOWS positions at Mr. Olson's level; therefore, there was no possibility for favoritism among peers.

73.     Indeed, there was no legitimate reason *not* to hire Mr. Olson.

74.     Regardless, in an effort to maintain an effective working relationship, King & George acquiesced to SMN JV's request that King & George obtain SMN JV's approval before hiring employees to work on the USCG Contract, which made it more difficult to hire employees quickly.

75.     Despite SMN JV's taking King & George's employees and imposing a new approval process for hiring employees on the Subcontract, King & George was able to hire 37 employees in September 2024.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900   Fax 907.277.1920

76.     Because King & George staffed fewer than 39 employees in September of 2024, SMN JV, pursuant to the Subcontract's statement of work, reduced King & George's invoice for that month accordingly.

77.     In October of 2024 only 5 of King & George's positions under the USCG Contract remained open.

78.     Still, by SMN JV's own admission through Mr. Joshua Hite, King & George "met the 39-employee minimum" for October 2024 and received no reduction in compensation per the Subcontract's statement of work.

79.     King & George maintained 39 employees working on the Subcontract in November and December 2024 and was paid the full amount invoiced to the government.

80.     However, in December of 2024, SMN JV froze King & George's hiring and ordered that open positions remain unfilled.

### V.     SMN JV improperly terminates the Subcontract.

81.     On January 13, 2025, SMN JV sent King & George a notice of termination of the Subcontract.

82.     In its January 13, 2025 letter, SMN JV refers to Section 3.6(b) of the Subcontract which allows SMN JV to terminate the Subcontract if King & George "consistently fails to meet staffing requirements." Ex. 2 at 11.

83.     SMN JV notes that the Subcontract requires King & George to staff "approximately 44 positions" under the USCG Contract, and that King & George staffed

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 11 of 22

34 positions in July and August of 2024, 37 positions in September of 2024, and 39 in October and November of 2024.

84. Based on these figures, SMN JV asserted that King & George "consistently failed to meet staffing requirements."

85. SMN JV terminated the Subcontract, ostensibly because King & George did not staff *exactly* 44 positions on the USCG Contract during the first 4 months of performance under the Subcontract.

86. SMN JV's termination letter ignores the fact that the Subcontract requires King & George to staff *approximately* 44 positions, and it specifically contemplates King & George staffing less than 39 positions.

87. During the course of King & George's performance, SMN JV applied the provision in the Subcontract allowing SMN JV to reduce King & George's payment if it staffed fewer than 39 employees.

88. Yet, consistent with Mr. Kegley's statement that he did not want King & George on the USCG Contract, SMN JV chose to terminate the Subcontract in bad faith.

**VI. The Parties attempt to resolve their dispute.**

89. The Subcontract requires the Parties to exercise their best efforts to settle disputes not involving the Government by mutual agreement.

90. Following SMN JV's January 13, 2025 termination of the Subcontract, the Parties exchanged multiple letters discussing the termination.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900   Fax 907.277.1920

91.    On January 24, 2025, counsel for King & George responded to SMN JV's notice of termination setting forth King & George's position.

92.    SMN JV responded in writing on February 5, 2025.

93.    On February 28, 2025, King & George replied to SMN JV's February 5, 2025 letter.

94.    Following their exchange of written correspondences, the Parties, through counsel, met on March 18, 2025 in an attempt to resolve their dispute.

95.    That effort was unsuccessful. This action followed.

## COUNT I – BREACH OF CONTRACT
### (WRONGFUL TERMINATION)

96.    All allegations made in the foregoing paragraphs are reasserted and realleged as if set forth fully herein.

97.    The Subcontract is a valid and enforceable contract.

98.    The Subcontract is governed by Alaska law.

99.    King & George fully performed its obligations under the Subcontract by providing an approximate total of 44 employees to the USCG Contract.

100.    Section 3.6 of the Subcontract governs termination of the Subcontract based on King & George's performance.

101.    SMN JV may terminate the Subcontract at its convenience if King & George *consistently* fails to meet staffing requirements.

102.    The Subcontract also allows SMN JV to terminate the Subcontract for default if King & George fails to perform "any of the other provisions of [the] Subcontract" and

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 13 of 22

any such default is not cured within a period of 10 days after receipt of notice from SMN JV specifying such failure.

103. In SMN JV's haste to remove King & George from the USCG Contract, SMN JV wrongfully terminated the Subcontract before enough time passed for King & George to *consistently* fail to meet staffing requirements.

104. Regardless, King & George never failed to meet the staffing requirements set forth in the Subcontract.

105. The Subcontract requires King & George to provide "an approximate total of 44 employees."

106. During each month of King & George's performance under the Subcontract, King & George provided *approximately* 44 employees, as contemplated by the Subcontract.

107. Moreover, the Subcontract specifically allows King & George to provide fewer than 39 employees.

108. If King & George provides fewer than 39 employees, then SMN JV may reduce payments to King & George in accordance with the number of employees King & George provided.

109. Indeed, SMN JV applied this provision to King & George's October 2024 payment.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900  Fax 907.277.1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900   Fax 907.277.1920

110.     SMN JV never sent a notice to King & George specifying a default under the Subcontract, nor did SMN JV ever provide King & George with a 10-day notice to cure any alleged default.

111.     Moreover, the government never sent any notice indicating that either Party's performance under the USCG Contract was deficient.

112.     There is no indication that King & George did not satisfy the requirements of its portion of the work issued under the USCG Contract.

113.     Regardless, SMN JV submitted to King & George a termination letter on January 13, 2025 which stated that the Subcontract would be terminated effective January 31, 2025.

114.     Because King & George satisfied its requirements under the Subcontract, SMN JV had no right to terminate the Subcontract.

115.     SMN breached Section 3.6 of the Subcontract by improperly terminating the Subcontract.

116.     As a result of SMN JV's breach of Section 3.6 of the Subcontract, King & George suffered lost profits that King & George would have received but for SMN JV's breach.

## COUNT II – BREACH OF CONTRACT
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

117.     All allegations made in the foregoing paragraphs are reasserted and realleged as if set forth fully herein.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

118.    At all times relevant to this litigation, SMN JV was in a contractual relationship with King & George.

119.    Pursuant to SMN JV's contractual relationship with King & George, SMN JV owed a duty to King & George to act in good faith and deal fairly with King & George.

120.    SMN JV breached that duty by abusing its position as the prime contractor and misapplying the language of the Subcontract providing King & George with "approximately 44" positions to impose a requirement that King & George staff *exactly* 44 employees under the USCG Contract.

121.    SMN JV's breach of the Subcontract constitutes a violation of the duty of good faith and fair dealing inherent in the Subcontract that it owed King & George.

122.    As a result of SMN JV's breach of the covenant of good faith and fair dealing inherent in the Subcontract, King & George suffered lost profits that King & George would have received but for SMN JV's breach.

## COUNT III – VIOLATION OF ALASKA UNFAIR TRADE PRACTICES ACT (AS 45.50.471)

123.    All allegations set forth in the foregoing paragraphs are reasserted and realleged as if set forth fully herein.

124.    Through the Subcontract, SMN JV engaged in trade or commerce.

125.    SMN JV acted both unfairly and deceptively in its operations under the Subcontract.

126.    Through its unfair and deceptive actions, SMN JV terminated King & George from the Subcontract.

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 16 of 22

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

127.    This termination resulted in substantial harm to King & George.

128.    SMN JV promised 30% workshare under the USCG Contract to King & George, which ultimately came to "approximately 44" positions as set forth in the Subcontract.

129.    In exchange for this workshare, King & George provided its assistance to SMN JV in supporting the Proposal and agreeing to be included as a significant subcontractor in the bid.

130.    Once SMN JV obtained the benefit of King & George's assistance, SMN JV applied an inequitable assertion of power under the Subcontract in order to unilaterally terminate King & George from the Subcontract.

131.    SMN JV's inequitable assertion of power under the Subcontract deprived King & George of receiving its benefit of the Parties' bargain.

132.    In violation of AS 45.50.471(12), SMN JV utilized fraud, false pretense, false promise, misrepresentation, or knowing concealment in order to obtain King & George's services in bidding on and beginning performance of the USCG Contract.

133.    Further, in violation of AS 45.50.471(14), SMN JV misrepresented to King & George that the subcontract conferred rights that SMN JV did not intend to confer to King & George.

134.    Specifically, SMN JV advised King & George that it would be able to achieve greater profits by staffing fewer than 44 employees under the Subcontract.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900   Fax 907.277.1920

135.     Despite the Subcontract assigning "approximately 44" positions to King & George, SMN JV terminated King & George on the pretextual basis that King & George failed to staff exactly 44 employees on the Subcontract.

136.     In doing so, SMN JV abused its position as the prime contractor under the Subcontract.

137.     As a result of SMN JV's unfair and deceptive actions, King & George incurred $11,310,947.00 in lost profits.

## COUNT IV – FRAUDULENT INDUCEMENT
### (In the alternative)

138.     All allegations made in paragraphs 1-95 are reasserted and realleged as if set forth fully herein.

139.     As early as December 2021, SMN JV promised King & George 30% of the workshare under the USCG Contract in exchange for King & George's assistance with the Proposal and agreement to be included as a significant subcontractor in the bid.

140.     SMN JV needed King & George to sign on as a substantial subcontractor and include its critical past performance in the Proposal that SMN JV lacked, to comport with SMN JV's representations to the government in its bid for the USCG Contract.

141.     After SMN JV was awarded the Prime Contract, King & George requested 30% of the IDIQ workshare in addition to 30% of the total contract labor workshare.

142.     During the April 27, 2024 site visit, SMN JV's representative, Mr. Stout, informed Mr. Giacona that though King & George would not receive 30% of the IDIQ

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 18 of 22

work, King & George could increase its profit margin by not filling all 44 positions under the Subcontract.

143. During the May 27, 2024 site visit, Mr. Giacona learned that SMN JV did not have enough equipment to support 44 employees working simultaneously. Mr. Giacona also learned that only 23 incumbents were currently performing the work allocated to King & George under the Subcontract.

144. SMN JV induced King & George to enter into the Subcontract by promising King & George 30% of the total contract labor workshare, and by promising King & George that it could realize a greater profit margin by staffing fewer than 44 employees under the Subcontract.

145. King & George reasonably relied upon SMN JV's April 27, 2024 promise as it was unnecessary to staff 44 employees to perform the work allocated to King & George under the Subcontract and the Subcontract expressly permits staffing to be less than 44 employees.

146. However, SMN JV had no intention to fulfill this promise.

147. As evidenced by Kyle Henson's statements to King & George in July of 2024, SMN JV *never* wanted King & George working on the USCG Contract.

148. From the beginning, SMN JV planned to induce King & George to team with SMN JV on the bid for the USCG Contract and induce King & George to execute the Subcontract to satisfy SMN JV's representations to the government in its bid.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900 Fax 907.277.1920

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 19 of 22

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900    Fax 907.277.1920

149.    However, despite promising King & George 30% workshare under the USCG Contract, SMN JV's true intentions were to remove King & George from the Subcontract at the earliest opportunity.

150.    SMN JV began taking steps to remove King & George as early as September of 2024.

151.    SMN JV manufactured a false narrative regarding the employees King & George staffed pursuant to the Subcontract.

152.    While the number of employees King & George provided satisfied its requirements under the Subcontract, SMN JV still terminated the Subcontract based on an improper reading of the Subcontract's terms.

153.    Ultimately, the fraud SMN JV perpetrated on King & George culminated in its failure to provide King & George with 30% of the workshare under the USCG Contract, as SMN JV promised to King & George in December of 2021 and on April 27, 2024.

154.    SMN JV's conduct in perpetrating this fraud against King & George was outrageous, done with malice, bad motive, and reckless indifference to the interests of King & George.

155.    SMN JV's conduct was motivated by financial gain.

156.    At all times during which SMN JV undertook its fraudulent actions against King & George, SMN JV was fully aware that its conduct would cause serious harm to King & George.

157. Moreover, SMN JV was fully aware that SMN JV would benefit substantially from its fraudulent behavior, because SMN JV would be able to capture the profits that would have gone to King & George had SMN JV upheld its promise to King & George.

158. As a result of SMN JV's fraud, King & George suffered lost profits that King & George would have received had SMN JV satisfied its promises to King & George.

159. An award of punitive damages is appropriate in this case, as it stands to deter persons in similar situations from undertaking similar actions.

## PRAYER FOR RELIEF

WHEREFORE, King & George respectfully requests relief as follows:

A. Direct damages constituting lost profits King & George would have realized had SMN JV upheld its promise in the amount of $11,310,947.00 pursuant to AS 45.50.531;

B. Treble damages pursuant to AS 45.50.531(a);

C. Punitive damages pursuant to AS 09.17.020(g);

D. Pre- and post-judgment interest and costs as permitted under Alaska law;

E. An award of King & George's attorneys' fees incurred in litigating this action; and

F. Any and all additional relief to which King & George is entitled that the Court deems equitable and appropriate.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main 907.277.1900   Fax 907.277.1920

DATED: October 6, 2025

STOEL RIVES LLP

By: /s/ James E. Torgerson
    James E. Torgerson (Bar No. 8509120)
    Whitney A. Brown (Bar No. 1906063)

MILES & STOCKBRIDGE P.C.

Laura Golden Liff
*(pro hac vice forthcoming)*
Matthew L. Devendorf
*(pro hac vice forthcoming)*

*Attorneys for Plaintiff King & George, LLC*

150655990.1 0085141-00001

COMPLAINT
*King & George, LLC v. Six Mile Nika JV, LLC*; Case No. 3AN-25-_____CI
Page 22 of 22



## TEAMING AGREEMENT

By and between

### SIX MILENIKA JV, LLC and King & George, LLC

This Agreement made as of this 13th day of December 2021, between **SIX MILE NIKA JV, LLC**, a state of Alaska Limited Liability Company, with its principal place of business at 1001 E. Benson Boulevard, Suite 201, Anchorage, AK 99508 (hereinafter "Six Mile NIKA", **"Team Leader" or "Prime Contractor"**), and **King & George, LLC**, a state of Texas Limited Liability Company, with its principal place of business at 320 Hemphill Street, Fort Worth, TX 76104 (hereinafter "K&G", **"Team Member", or "Subcontractor"**), both hereinafter also referred to collectively as **"Team"**.

## RECITALS

WHEREAS, the above parties, because of their complementary capabilities, have determined that they would benefit from a team arrangement between their respective organizations, to jointly pursue the **United States Coast Guard (USCG), SILC-Base Support (Shore Infrastructure Logistics Center) Base Operations Support Services for USCG Base Kodiak, AK** (hereinafter the "Program" or "Opportunity"), in response to Solicitation No: 70Z08421DOL930001 (hereinafter the "Solicitation"), to be procured by Team Leader through a contract issued by the U.S. Government ("Client"), pursuant to the Solicitation (hereinafter the "Prime Contract"); and

WHEREAS, each of the parties has concluded that a mutual effort in preparation of a proposal in response to the Solicitation (hereinafter the "Proposal") would enhance the likelihood of Prime Contract award to the Team Leader; and

WHEREAS, it is anticipated that the Team Member shall be responsible for the role and requirements described; and

WHEREAS, the Team Leader shall be responsible for the conduct of the entire Program, including overall Program management,

NOW THEREFORE, in consideration of the mutual covenants and promises set forth herein, and other good and valuable consideration, the parties agree as follows:

ARTICLE I – PROPOSAL EFFORT and ROLES AND RESPONSIBILITES

1.1     Team Member shall, in a manner consistent with the parameters set forth, (i) prepare and submit to Team Leader such data as required for use in preparation of that part of the Proposal which covers the work identified (hereinafter the "Work") and (ii) provide all other reasonable assistance to enable Team Leader to fully respond to the Solicitation in a timely manner, including without limitation post-submittal efforts such as oral presentations. Failure of Team Member to respond to Team Leader's reasonable request for assistance and information by such date required by Team Leader or, if unspecified by Team Leader, such date

1

Ex. 1, p. 1 of 16
**Exhibit A - Page 25 of 85**
Case 3:25-cv-00311     Document 1-1     Filed 11/05/25     Page 25 of 85



as would reasonably allow Team Leader to fully respond to the Solicitation by its due date, constitutes a material breach of this Agreement.

1.2　Team Leader will be the Prime Contractor and Team Member will be its Subcontractor with respect to all matters related to the pursuit and award of the Contract. As such, it is expected and understood that Team Leader will have customary responsibilities, rights, and obligations as the Prime Contractor, and will work in collaboration with Team Member across all areas of the Contract as appropriate and required. as a proposed subcontractor.

1.3　Team Leader will lead the proposal strategy and development process and will rely on Team Member for proposal support to include but not limited to:

1.3.a　Participate in proposal strategy development and planning prior to formal proposal kick-off.

1.3.b　Participate in formal Team proposal kick-off meeting and periodic proposal development calls and meetings throughout proposal development phase.

1.3.c　Provide relevant past performance project qualifications to be submitted as part of Team Leader's proposal.

1.3.d　Provide content for certain operational processes that may be relevant to the Opportunity PWS, such as specific technology used to carry out the requirements, and/or best practices that are relevant to the operations related to the Opportunity, etc.

1.3.e　Support technical content requirements to include providing existing content for RFP sections that are gaps for the Team Leader.

1.3.f　Share examples of past proposals relevant to this pursuit, or relevant sections of said proposals to enhance Team Leader's chances of winning.

1.3.g　Support KEY personnel resume requirements as assigned or necessary.

1.3.h　Assign "named member" of Team Member to support color team reviews.

1.3.i　Provide general pricing strategy support and guidance based on similar past opportunity experience and expertise.

1.3.j　Authorize Team Leader to mention our teaming arrangement with Customer POC's to further enhance Team Leader's chances of winning.

1.3.k　Provide Basis of Estimate (BOE) for labor, materials, vehicles, equipment, and other direct costs to perform requirements outlined in the Scope of Work.


1.4    Upon award of the Opportunity to the Team Leader, Team Member will assign a Program Manager/Lead for the Contract who will work closely with Team Leader's Program Manager with regards to contract administration matters.

1.5    Team Leader's Program Manager and Team Member's Program Manager/Lead will confer about the team configuration for executing the work on which Team Member will participate.

1.6    RESERVED

1.7    Six Mile NIKA shall award K&G a Subcontract containing a scope of work that equates to 30% of the total contract labor value. Additionally, the Parties agree to a 70%/30% workshare target for all non-labor contract values such as ODCs and reimbursable expenses. In the event that non-labor contract values are not aligned with the workshare allocation, the Parties agree to re-set the 70%/30% workshare for non-labor contract values in accordance with the final labor value allocations. Both Parties agree to work in good faith to execute the Subcontract Agreement and not unreasonably delay/hold up or hinder finalization of the Subcontract Agreement. Six Mile NIKA shall award K&G a Subcontract modification for any Option Period that is awarded to Six Mile NIKA as long as K&G remains in compliance with Contract and performance requirements. Both parties agree that a semi-annual review of the actual level of effort labor value being performed will be complete to determine if workshare needs to be re-aligned in order to achieve the 70%/30% workshare target.

1.8    It is understood that Team Leader's ability to allocate work to Team Member, under any circumstances, is dependent on the amount and nature of work forthcoming in the resultant Prime Contract, as well as Team Member's ability to provide staffing with the required level of expertise.

1.9    This Agreement has been structured to address the release of the subject Opportunity as a 8(a) Small Business Set Aside.

## ARTICLE II – RELATIONSHIP OF THE PARTIES

2.1    The parties shall act as independent contractors and the employees of one shall not be deemed the employees of the other. This Agreement shall not constitute or create a joint venture, partnership, or formal business organization of any kind, the rights and obligation of the parties shall be only those expressly set forth herein. Notwithstanding the above, if the Client is the United States government,



the parties intend this to be a contractor team arrangement as defined in FAR 9.601(2).

**2.2    RESERVED**

2.3    All contact with the Client relative to the Solicitation and its subject matter shall be conducted by Team Leader, unless specifically directed otherwise by Team Leader. Team Leader will exclusively lead all opportunities on the Contract.

2.4    Specifically relating to Task Orders (if applicable) that Team Member will lead, Team Leader will collaborate and work with Team Member in a partner like fashion in assessing and executing Task Order requirements.

## ARTICLE III – CONFLICT OF INTEREST

3.1    Team Member must immediately notify Team Leader if, at any time during the term of this Agreement, Team Member becomes aware that it has an actual or potential conflict of interest, including without limitation a relationship of any nature which may impair or which may reasonably appear to impair Team Member's objectivity or ability to perform the Work ("Conflict of Interest").

3.2    As a material obligation hereunder, Team Member agrees that it will avoid, during the term of this Agreement, forming a relationship which could result in a Conflict of Interest (COI). Team Member agrees to promptly notify Team Leader in the event such a transaction occurs and to diligently pursue all efforts to mitigate the potential Conflict of Interest. If Team Member fails to notify Team Leader within five business days of the potential COI, or if Team Member fails to mitigate or resolve identified potential COI, then Team Leader may terminate Team Member for its convenience at its own discretion. Team Member shall provide mitigation resolution and plan to Team Leader in writing within five business days of time COI is identified.

## ARTICLE IV – COSTS

4.1    Each party shall bear its own costs, expenses, and liabilities caused by or arising out of this Agreement, its performance, amendment, or expansion and neither party shall be liable for any such costs, expenses, or liabilities incurred or other obligations undertaken by the other party.

## ARTICLE V - PROPRIETARY INFORMATION


5.1 The parties anticipate that performance of this Agreement may require the parties to disclose to each other information of a proprietary nature. Therefore, as an integral part of this transaction, the parties agree to abide by the terms of the Non-Disclosure Agreement (NDA) included and incorporated herein as Attachment A.

5.2 The period during which the parties' obligations of nondisclosure, non-use and safeguarding of Proprietary Information, shall expire three (3) years from the effective date of this Teaming Agreement.

5.3 The Parties expressly consent to the following:

(a) Proprietary Information disclosed by either party may be used by the other party in performing its obligations under this Agreement. Receiving Party's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; of (d) is disclosed by Receiving Party with Disclosing Party's prior written approval. Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors, and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests, it in writing.

(b) Proprietary Information disclosed by Team Member may be included in the Proposal to be submitted to the Customer, with appropriate restrictive legends as specifically requested by Team Member and permitted by the Customer's regulations.

(c) Team Leader may only disclose Team Member's Proprietary Non-Financial Information to another Team Member for purposes of the Program with Team



Member's prior consent and further provided said Team Leader agrees in writing to appropriately protect such information and to use such information only for the purposes of this Agreement.

## ARTICLE VI – CLIENT RIGHTS IN INTELLECTUAL PROPERTY

6.1    The Client may require written justification for any restrictions placed on its rights in any technical data, software, reports and other intellectual property to be delivered under the Prime Contract.  Team Member agrees to provide such written justification, if requested, for any such restriction asserted by Team Member in relation to the Program.  Such justification shall be provided at no cost to Team Leader.  Team Member shall cooperate with Team Leader in every reasonable manner to resolve the Client's questions or assertions regarding the restrictions and validity of Team Member's assertion of intellectual property rights.

## ARTICLE VII – RIGHTS IN INVENTIONS

7.1    Inventions conceived in the course of performance of this Agreement shall remain the property of the originating party.  Inventions conceived jointly by both parties shall belong to both parties with their specific rights and obligations to be negotiated in good faith.

## ARTICLE VIII – SUBCONTRACT NEGOTIATION

8.1    Team Leader shall keep Team Member reasonably informed of all communications with the Customer concerning preparation for, timing of, and status of any contract negotiations, including, but not limited to, negotiations relating to areas of work attributable to Team Member.

8.2    In the event Team Leader is awarded a Prime Contract for **BASE OPERATION SUPPORT SERVICES for USCG BASE KODIAK AK**, Team Leader shall issue a Master Subcontract Agreement ("MSA") for the Work to be performed, by Team Member, under any awarded future task orders (if applicable) under the Original Awarded Prime Contract.  The Team Leader will give consideration to the Team Member to participate in increased work and options to extend performance directed by the Government to the extent relevant to the MSA scope of work.


8.3 The MSA shall include, among other appropriate provisions, the following:
   (i) The MSA shall not be Terminated for Convenience (T4C) unless the Prime Contract is terminated.
   (ii) The MSA Period of Performance shall be extended (by Option or otherwise) when the Prime Contract is extended.
In addition, MSA shall include those provisions of the Prime Contract which by their terms should be passed on to the subcontractor. A redacted copy of the Prime Contract shall be shared with the Team Member based on information contained within the Prime Contract that is relevant to the Team Member.

8.4 The MSA shall be negotiated at a fair and reasonable price, within sixty (60) days of award, to be established after cost or price analysis in accordance with the requirements of the Client.

## ARTICLE IX – EXPIRATION/TERMINATION OF AGREEMENT

9.1 This Agreement shall automatically expire upon the happening of any one of the following events, whichever shall first occur:

(a) Official announcement from the Client of the award of the Prime Contract to a party other than Team Leader, but only if the award is not protested. If the award is protested, this Agreement shall remain in effect until all protested-related proceedings are completed and award to a third party is finalized.

(b) The execution of a subcontract agreement between Team Leader and Team Member following award of the Prime Contract to the Team Leader.

(c) Failure of the parties, despite their good faith efforts to finalize the outstanding terms and conditions of a subcontract not already negotiated in this Agreement, within sixty (60) calendar days of award of the Prime Contract award to Team Leader.

(d) The elapsing of twelve (12) months from the date of this Agreement unless the award of the Prime Contract remains under consideration by the US Government, in which case the term of this Agreement shall be extended until the award is finalized. Official notification by the Client of cancellation of the Solicitation.

7

Ex. 1, p. 7 of 16
**Exhibit A - Page 31 of 85**
Case 3:25-cv-00311  Document 1-1  Filed 11/05/25  Page 31 of 85


(e) A written notification by the Client that either party is ineligible for participation in the Program due to a conflict of interest.

(f) Where the Client is a local, state, federal or foreign governmental agency, Team Member or Team Leader is ineligible for award due to debarment or suspension.

9.2 This Agreement may be terminated or extended by mutual, written agreement of the parties.

9.3 In the event that, during the term of this Agreement, Team Member has a Conflict of Interest, Team Leader may unilaterally terminate this Agreement, so long as Team Leader has notified Team Member of its intent to terminate due to the Conflict of Interest and allowed Team Member no fewer than seven (7) calendar days prior to the effective termination date in which to cure same.

9.4 Either party may unilaterally terminate this Agreement for any of the following reasons, so long as the terminating party has notified the other party of its intent to terminate, the reason for such termination, and allowed the other party no less than seven (7) calendar days prior to the effective termination date in which to cure the stated reason:

(a) Actual failure of the other party to fulfill its obligations hereunder;

(b) Anticipated failure of the other party to fulfill its obligations hereunder, or anticipated inability of the other party to perform the Work, due to (i) inadequate financial capability or (ii) loss or material degradation of corporate capabilities which are essential to the Program requirements, including without limitation loss or unavailability of the other party's key employees;

(c) The insolvency of the other party or the filing by or against the other party of a petition, arrangement, or proceeding seeking an order for relief under the bankruptcy laws of the United States, a receivership for any of the assets of the other party, a composition with or assignment for the benefit of creditors, a readjustment of debt, or the dissolution or liquidation of the other party.

9.5 This Teaming Agreement will survive the sale or merger of all or a substantial portion of the assets of either party or the sale or merger of the division or group charged with performing the Work.

8

Ex. 1, p. 8 of 16
**Exhibit A - Page 32 of 85**
Case 3:25-cv-00311    Document 1-1    Filed 11/05/25    Page 32 of 85


## ARTICLE X – NOTICES

10.1    All notices required or permitted hereunder shall be in writing and shall be deemed delivered when delivered in person, sent by electronic submission or confirmed facsimile to the facsimile number below, or one calendar day after being sent by confirmed overnight mail to the address below.

**If to Six Mile NIKA:**
2000 Tower Oak Blvd, 6th Floor
Rockville, MD   20852
Attention: Scott Bailey
Main Phone: 301-770-3520
Direct Phone: 301-679-6552
 E-mail: sbailey@nikasolutions.com

**If to K&G:**
320 Hemphill Street
Ft. Worth, TX 76104
Attention: Carla Shupp
Phone: 817-820-0881
Cell Phone:
E-mail: carla.shupp@kinggeorge.us

## ARTICLE XI – MISCELLANEOUS

11.1    Commitments
Nothing in this Agreement shall grant to either Team Leader or Team Member the right to negotiate or make commitments of any kind for or on behalf of the other party without the prior written consent of the other party.

11.2    No Assignment
With 60 days advance notice, in writing, either Party shall have the right to assign this Agreement to any successor of such Party by way of merger or consolidation or the acquisition of substantially all of the entire assets of such Party relating to the subject matter of this Agreement; provided, however, that such successor shall expressly assume all of the obligations of such Party under this Agreement.

11.3    Publicity
Team Member shall not issue a news release, public announcement, advertisement or any other form of publicity concerning its efforts in connection with this Agreement without obtaining the prior written approval of Team Leader. The Parties further agree that news releases made by either of them shall recognize the participation and contributions of the other Party.

11.4    Compliance with Laws

In the course of performance hereunder, the parties shall comply with all applicable local, state and federal laws and regulations.

11.5    Survival

9

Ex. 1, p. 9 of 16
**Exhibit A - Page 33 of 85**
Case 3:25-cv-00311    Document 1-1    Filed 11/05/25    Page 33 of 85


The terms of Article II "Relationship of the Parties" (except 2.2), Article IV "Costs", Article V "Proprietary Information", Article VI "Client Rights in Intellectual Property", Article VII "Rights in Inventions" and Article XI "Miscellaneous", shall survive the expiration or earlier termination of this Agreement.

11.6    Waiver

Neither party shall be deemed to have waived any right or remedy unless such waiver is made expressly and in a signed writing.

11.7    Governing Law/Choice of Forum

This Agreement shall be governed by the laws of the state of Maryland, and all controversies or disputes arising out of this Agreement shall be heard in the State of Maryland without giving effect to any choice or conflict of law provision or rule. Each party irrevocably submits to the exclusive jurisdiction of the courts of the State of Maryland sitting in Montgomery County or the United States District Court for the District of Maryland (Greenbelt Division) and the appellate courts having jurisdiction of appeals in such courts.

11.8    Severability

Each provision of this Agreement is severable. If one provision is declared void, illegal or unenforceable, the remaining paragraphs shall retain their full force and effect.

11.9    Indemnity

Team Leader, Team Member, and their respective employees, agents, subcontractor, and consultants shall obey all pertinent laws, rules, and regulations with respect to federal procurements, which shall include but is not limited to those relating to safeguarding classified information and all applicable U.S. export control laws and regulations. Each Party agrees to indemnify and save harmless the other Party from and against all claims by third parties for:

a.  Damages, losses, injury or fines that result from that Party's violation of any law, rule or regulation.

b.  Property damage or personal injury (including death) of any of the other Party's employees or agents, which is caused by any act or omission to act, including negligence, of the indemnifying Party's employees or agents in connection with performance under this Agreement.


11.10    Subcontractor reserves the right to submit their own data, without restrictions, for use in the preparation of proposals created by competitors to Six Mile NIKA in response to the Solicitation. Subcontractor will abide by this Agreement and ensure compliance with all terms contained herein, including but not limited to Proprietary Information.

11.11    <u>Entire Agreement</u>

The foregoing Article contain the entire Agreement between the parties which supersedes any prior oral or written agreements, commitments, understandings, or communications with respect to the subject matter of this Agreement.  No change, modification, alteration, or addition to the terms and conditions of this Agreement shall be binding unless in writing and signed by authorized representative of both parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first hereinabove written.

**SIX MILE NIKA JV, LLC**

Signature: _____

Name: <u>Kyle Henson</u>

Title: <u>EVP Strategy and Growth</u>

Date: ___15 DEC 2021___

**KING & GEORGE, LLC**

Signature _____

Name: <u>Scott King</u>

Title: <u>President & Co-Founder</u>

Date: ___15 DEC 2021___


**ATTACHMENT A**

**NON-DISCLOSURE AGREEMENT BETWEEN**
**SIX MILE NIKA JV LLC**
**and**
**KING & GEORGE, LLC**

THIS AGREEMENT (hereinafter referred to as the "Agreement") made effective this 13th day of December 2021, by and between **SIX MILE NIKA JV, LLC**(hereinafter referred to as **"Six Mile NIKA"**), an Alaska limited liability company, with its principal place of business at 1001 E. Benson Boulevard, Suite 201, Anchorage, AK 99508, and **King & George, LLC**, (hereinafter referred to as **"K&G"**), a Texas limited liability company located at 320 Hemphill Street, Fort Worth, TX 76104 each or both of which shall also hereinafter be referred to as the "Party" or "Parties", respectively.

WHEREAS, the Parties represent that they each possess or may in the future possess certain technical, business, financial and other information which it considers proprietary to it; and

WHEREAS, it is recognized that, in order to consider multiple future business opportunities that may be of interest to the Parties and in connection with any current or future contractual relationship between the Parties, it may be both necessary and desirable that the Parties exchange the above-described information.

NOW. THEREFORE, in consideration of these premises, and of the mutual promises and covenants contained herein, the Parties hereto agree as follows:

1. That during the term of this Agreement, the Parties hereto may exchange ideas and concepts, as well as technical, financial, strategic, and operational information and other data which is considered by the disclosing Party to be proprietary. In order for such information and data to be subject to this Agreement (hereinafter "Proprietary Information"), it shall either be: (i) identified in writing at the time of the disclosure by an appropriate legend, marking, stamp or other positive written identification or (ii) identified as proprietary to the receiving Party orally at the time of disclosure and in writing within fifteen (15) calendar days after such disclosure.

2. Notwithstanding the above requirement for marking or other identification of Proprietary Information, the parties agree that all drafts, revisions, and final documents that, in whole or in part, comprise or include proposals, proposal information, financial data or strategic plans of the Parties shall be deemed "Proprietary Information" and handled as such, without the requirement of marking or other form of identification.

12
Ex. 1, p. 12 of 16
**Exhibit A - Page 36 of 85**
Case 3:25-cv-00311    Document 1-1    Filed 11/05/25    Page 36 of 85



3. That neither Party has an obligation to supply Proprietary Information hereunder, nor shall anything in this Agreement be deemed to grant a license directly or by implication, estoppel or otherwise, whether under any copyright, patent, patent application or otherwise, to any Proprietary Information disclosed pursuant to this Agreement.

4. THE DISCLOSER PROVIDES PROPRIETARY INFORMATION ON AN "AS IS" BASIS. Nothing in this Agreement shall be construed as a warranty, representation, assurance, guarantee, or inducement with respect to the content or accuracy of documents and Proprietary Information transmitted or exchanged under this Agreement. The Discloser will not be liable for any damages arising out of use of its Proprietary Information. Disclosure of Proprietary Information containing business plans is for planning purposes only. Therefore, use of such information is at the Recipient's own risk.

5. That the exclusive points of contact for the Parties with respect to the exchange of Proprietary Information are as follows:

| **If to Six Mile NIKA** | **If to K&G** |
|---|---|
| Six Mile NIKA JV, LLC | King & George, LLC |
| 2000 Tower Oaks Blvd, 6th Floor | 320 Hemphill Street |
| Rockville, MD   20852 | Ft. Worth, TX 76104 |
| Attention: Kyle Henson | Attention: Scott King |
| Phone: 301-770-3520 | Phone: 817-820-0881 |
| Direct Phone: 301-679-6559 | E-mail: scott@kinggeorge.us |
| E-mail: khenson@nikasolutions.com | |
| | |
| CC: Scott Bailey, Sr. Contracts Manager | Alt Business POC: |
| Phone: 301-679-6552 | Title: Carla Shupp |
| Email. sbailey@nikasolutions.com | Cell Phone: 817-820-0881 |
| | E-mail: Carla.shupp@kinggeorge.us |

Either Party may change its point of contact designation by written notice to the other.

6. That for a period of three (3) years from the date of receipt of the Proprietary Information, the receiving Party shall safeguard and hold in strict confidence such Proprietary Information and prevent disclosure thereof to third parties, without the written consent of the disclosing Party. The receiving Party shall further restrict disclosure of such Proprietary Information to only those employees who have a need



to know and who have executed a nondisclosure agreement substantially similar to this Agreement.

7. That such Proprietary Information delivered by the disclosing Party to the receiving Party shall be for the purpose of:

   **Discussions regarding Base Operation Support Services for US Coast Guard Base Kodiak AK**

   During the abovementioned three-year period, no other use of the Proprietary Information is granted without the written consent of the disclosing Party. In the event the disclosing Party gives its approval for the receiving Party to disclose Proprietary Information to the U.S. Government, the receiving Party shall ensure that, to the extent specifically requested by the disclosing Party, all such disclosures are marked with appropriate legends, as required or permitted under Government regulations, in order to preserve the proprietary nature of the information and the disclosing Party's rights therein.

8. That the obligations with respect to disclosing and using Proprietary Information, as set forth in Paragraphs 5 and 6 of this Agreement, are not applicable if the same is:

   (a) Shown by the receiving Party to be in the public domain at the time of receipt or that it came into the public domain thereafter through no act of the receiving Party in breach of this Agreement or of any other party in breach of any other obligation of confidentiality owing to the disclosing Party, or

   (b) contained in written record of the receiving Party's files prior to the date of its receipt from the disclosing Party, or

   (c) disclosed or used with the prior written approval of the disclosing Party, or

   (d) demonstrated in written record by the receiving Party to have been developed independently of disclosures made hereunder, or

   (e) lawfully disclosed on an unrestricted basis to the receiving Party by a third party under conditions permitting such disclosure, or

   (f) disclosed by the receiving Party in response to a legal mandate by order of a court or administrative body, after receiving Party promptly notifies the disclosing Party and provides a reasonable opportunity to oppose such order.


9. This Agreement is made effective as of the date set forth above and may thereafter be terminated by either Party upon the giving of thirty (30) days written notice to the other Party of its intention to terminate. Upon termination of this Agreement and the written request of the Disclosing Party, the Receiving Party shall promptly return to the Disclosing Party all materials and copies containing Proprietary Information.

10. That the Parties acknowledge that unauthorized disclosure, use or sale of the Proprietary Information, in whole or in part, or the disclosure, use or sale of any information or material created from, based upon or arising out of the Proprietary Information will give rise to irreparable injury to the disclosing Party inadequately compensable in damages. Accordingly, the disclosing Party may seek or obtain injunctive relief against any such undertakings, in addition to all other legal remedies which may be available to it.

11. The Parties hereto are and shall remain independent contractors. This Agreement shall not constitute, create, give effect to, or otherwise imply an employment relationship, teaming agreement, joint venture, pooling arrangement, partnership, or formal business organization of any kind, nor does this Agreement or the disclosure or receipt of any Proprietary Information hereunder constitute an offer, acceptance, promise or obligation by either Party to enter into any additional contract, subcontract, amendment, agreement or other business relationship with the other Party. The Parties expressly agree that this Agreement is solely for the purpose of exchanging Proprietary Information, and unless otherwise agreed in writing, each Party shall perform hereunder solely at its own cost and expense.

12. Intentionally omitted.

13. The rights and obligations set forth in Articles 5, 6, 7, 8, and 9 with respect to Proprietary Information supplied hereunder prior to termination of this Agreement, shall survive such termination.

14. Each provision of this Agreement is severable. If one provision is declared void, illegal or unenforceable, the remaining paragraphs shall retain their full force and effect.

15. This Agreement shall be governed by the laws of the state of Maryland, with the exception of its conflict of law provisions, and all controversies or disputes arising out of this Agreement shall be heard in the courts of the State of Maryland sitting in Montgomery County or the United States District Court for the District of Maryland (Greenbelt Division) and the appellate courts having jurisdiction of appeals in such courts.



16. <u>No Transfer or Assignment.</u>  This Agreement may not be transferred or assigned by either Party without the express written consent of the other Party.

17. This Agreement contains the entire understanding between the Parties relative to the protection of Proprietary Information and supersedes all prior and collateral communications, reports, and agreements between the Parties in respect thereto.  No change, modification, alteration, or addition to any provision hereof shall be binding unless in writing and signed by authorized representatives of both Parties.

**SIX MILE NIKA JV, LLC**

By: _____

Name: <u>Kyle Henson</u>

Title: <u>EVP Strategy and Growth</u>

Date: <u>15 DEC 2021</u>

**KING & GEORGE, LLC**

By: _____

Name: <u>Scott King</u>

Title: <u>President & Co-Founder</u>

Date: <u>12-15-21</u>



**USCG KODIAK BOSS**

## SIX MILE NIKA JV, LLC
## 2-0002-08
### KODIAK BASE OPERATION SUPPORT SERVICES
### KING & GEORGE, LLC
### SUBCONTRACT AGREEMENT

| | |
|---|---|
| **Prime Contractor:** | Six Mile NIKA JV, LLC |
| | 3900 C Street, Suite 100 |
| | Anchorage, Alaska 99503 |
| | |
| **The Subcontractor:** | King & George, LLC |
| | 320 Hemphill Street |
| | Fort Worth, TX 76104 |
| **Prime Contract Number:** | 70Z08424DKODI0002 |

**Contract Title**     Base Operation Support Services at USCG Base Kodiak, AK

This Subcontract is made this June 6, 2024 (the "Effective Date") by and between Six Mile NIKA JV, LLC (hereinafter referred to as "Prime Contractor") and King & George, LLC (hereinafter referred to as "Subcontractor").

WHEREAS, the Prime Contractor has entered into a contract designated as 70Z08424DKODI0002 (the "Prime Contract") with the United States Coast Guard ("Client") to perform Base Operation Support Services at USCG Base Kodiak, AK; and

WHEREAS, the Prime Contractor desires to contract with the Subcontractor for assistance in performing designated portions of the Prime Contract, and the Subcontractor desires to provide Facility Support Services under NAICS Code 561210.

NOW THEREFORE, in consideration of the promises, covenants and the terms and conditions contained herein, the parties hereby mutually agree:

## SECTION 1: SCOPE OF WORK

**1.1. Description / Specifications**

(a) Subcontractor shall provide labor to support the roads and grounds/heavy equipment shop, fuels and general maintenance workers operations at USCG Base Kodiak, AK, as further described in Attachment (1) and in Task Orders issued pursuant to Section 1.2 of this Subcontract.

(b) In no event shall the portion of the Subcontractor's work violate C.F.R. Title 13, Chapter I, Part 125, Section 125.6 Prime contractor performance requirements (limitations on subcontracting).

(c) The specific support to be provided by the Subcontractor for each task shall be identified in a Task Order, as further described in Section 1.2 below. The Subcontractor shall provide only those services specifically described in the Task Order and shall initiate work only when so directed by a Task Order.

**1.2. Task Orders.** Task Orders will be issued in the following manner:

Ex. 2, p. 1 of 45
**Exhibit A - Page 41 of 85**
Case 3:25-cv-00311     Document 1-1     Filed 11/05/25     Page 41 of 85

(a) Prime Contractor's Technical or Contractual Point of Contact will solicit proposals ("Task Order Requests") from the Subcontractor's Technical Point of Contact, identifying any services to be performed by the Subcontractor, the time frame for completion, any end-product/deliverable(s) required, any funding or price ceiling amount (if applicable) and a detailed statement of work.

(b) Upon receipt of a Task Order Request, the Subcontractor shall respond within ten (10) business days with a proposal ("Task Order Proposal") that defines the activities and identifies the resources required to complete the Task Order, including labor hours and associated costs, and other direct costs and with following information:

  (1) Task Order Number and Contract Number;

  (2) Task Title;

  (3) A Task Order type for performance of the Task Order, if applicable;

  (4) Burdened Labor by Contract Labor Category including fee, if applicable;

  (5) Material and Other Direct Costs sufficiently detailed to allow for evaluation; and

  (6) Travel detailed by airfare, per diem, and car rental to allow for evaluation.

(c) If Prime Contractor accepts the Subcontractor's Task Order Proposal, the Prime Contractor's Contractual Point of Contact will approve the Task Order in writing and forward the Task Order to the Subcontractor. The Subcontractor shall execute the approved Task Order upon receipt of the approved Task Order from Prime Contractor. Neither party shall be bound by any Task Order Request or Task Order Proposal until an approved Task Order is signed by both Prime Contractor and the Subcontractor.

(d) The Subcontractor shall proceed in accordance with the specifications of the approved Task Order. The Subcontractor is not authorized to start work until the receipt of a written Task Order from the Prime Contractor's Contractual Point of Contact and execution of that written Task Order by the Subcontractor. No work is authorized other than that which is expressly set forth in the Task Order. The Subcontractor is not authorized to perform work outside that which is expressly stated in the Task Order. Should the Subcontractor elect to perform work outside the scope of the Task Order without prior written authorization, the Prime Contractor will not reimburse the Subcontractor for costs associated with that work.

(e) The Prime Contractor will generate all documents incidental to the preparation of the Task Order and submit them to the Client. Under no circumstances shall the Subcontractor provide task information directly to the Client.

(f) In performing a Task Order, the Subcontractor may not exceed the Task Order value. Work performed in excess of the Task Order value will be considered work performed at risk and may not be reimbursed.

**1.3.** __Accounting and Invoicing__

(a) _Submission of Invoices_

  (1) The Subcontractor shall submit to the Prime Contractor individual invoices for, or in accordance with, each Task Order under which work was performed. Invoices shall be submitted monthly and

must be received by the Prime Contractor by the 5th day of the month following the month in which services were performed.

(2) Invoices will identify, at a minimum, the following information:

   (A) Subcontract and Task Order Numbers;

   (B) Description of Work;

   (C) Period of Performance;

   (D) Travel should be separately identified; receipts are required for travel;

   (E) Materials and Other Directs Costs (ODCs) should be separately identified; receipts are required.

   (F) Cumulative values inclusive of all billings against this Subcontract or applicable Task Order; and

   (G) Any additional information that would be required for the Subcontractor's invoice in accordance with the Prime Contract.

   (H) All invoices shall include the following certification statement:

   *"All services invoiced were properly delivered in support of the effort identified, within the Period of Performance of the contract, are allowable and properly allocable, in accordance with the subcontract terms and conditions, reflect true and accurate accounting of the labor and other costs incurred, and the employee(s) meet the requirements of the labor category to which assigned and invoiced hereunder."*

(3) Invoices shall be submitted to:

   Six Mile NIKA JV, LLC
   Attn: Accounts Payable
   3900 C Street Suite 100
   Anchorage, AK 99503
   payable@ganaayoo.com

(4) Within ten (10) days of the Prime Contractor's receipt of a properly completed invoice from the Subcontractor, the Prime Contractor shall invoice the Client for the Subcontractor's services.

(b) <u>Payment</u>. The Prime Contractor will pay the Subcontractor within ten (10) days after the Prime Contractor's receipt from the Client of payment for the Subcontractor's invoices.

(c) <u>Limitation of Prime Contractor's Liability</u>. Any performance by the Subcontractor in excess of funding levels or cost limitations contained in any Task Order shall be at the Subcontractor's own risk, and the Prime Contractor and the Client shall not be liable for such performance or to pay any invoices related to such performance.

(d) <u>Closeout and Financial Settlement</u>. Upon receipt and approval of the invoice designated by the Subcontractor as the "Final Invoice" and upon compliance by the Subcontractor with all the provisions of this Subcontract, the Prime Contractor shall pay any balance which has not been paid to the Subcontractor, provided the Prime Contractor has received final payment from the Client. The Final Invoice shall be submitted by the Subcontractor promptly following completion of the work. Prime Contractor shall have no obligation to pay any balance to the Subcontractor until Prime Contractor has received final payment from the Client.

(e) Quick Closeout. The Prime Contractor may request a "quick closeout" of this subcontract and/or task order(s) performed under this agreement in accordance with FAR 42.708. If requested, within ninety (90) calendar days after the earlier to occur of: (i) the conclusion of the Subcontractor's accounting year corresponding to the completion of the Subcontract Period of Performance; or (ii) the Subcontractor's submission of its closeout invoice, the Subcontractor shall submit a closeout package that includes (as applicable): Subcontractor's assignment of refunds, rebates, credits and other amounts, and Government property disposition, if any; and Subcontractor's release of claims, which shall waive, release and discharge the Prime, it's officer's and agents, of and from any and all liabilities, obligations, disputes, claims and demands whatsoever arising under or relating to the relevant Period of Performance under this Subcontract.

**1.4.** Disallowance

(a) If at any time or times the Contracting Officer or other duly authorized government official shall determine that any amount paid by the Prime Contractor to the Subcontractor pursuant to this Subcontract does not constitute an allowable cost under the Prime Contract, the Prime Contractor shall, at Prime Contractor's sole discretion, either (1) offset the amount of such overpayment against any future payments due to the Subcontractor hereunder or (2) submit to the Subcontractor's Contractual Point of Contact an invoice in accordance with the "Notice Provisions", in the amount of such overpayment which shall be paid by the Subcontractor within thirty (30) days from receipt of the notice. The Subcontractor may dispute such determination that such costs were not allowable, in accordance with "Disputes" provision herein.

(b) If at any time or times the Contracting Officer or other duly authorized government official shall determine that the Subcontractor was not paid by the Prime Contractor for certain allowable costs incurred in the performance of the Subcontract, then the Prime Contractor shall promptly pay to the Subcontractor an amount equal to such underpayment within ten (10) days of receipt of payment from the Client.

(c) If the Client withholds any payments to the Prime Contractor for reasons relating to performance (or lack thereof) of the Prime Contractor that are not the fault of the Subcontractor, payment shall not be withheld from the Subcontractor, but shall be paid to the Subcontractor within ten (10) days of the Client's notification to the Prime Contractor that payment is being withheld.

(d) If the Client withholds any payments to the Prime Contractor for reasons relating to performance (or lack thereof) of the Prime Contractor that are the fault of the Subcontractor, payment shall be withheld from the Subcontractor, and shall only be paid to the Subcontractor within ten (10) days after payment of the subject amounts by the Client.

(e) The Prime Contractor shall provide the Subcontractor with copies of all documentation obtained from the Client relating to any deductions from the amounts owed the Subcontractor.

**1.5. Deliverable Requirements**.  The Subcontractor shall provide to the designated Prime Technical Point of Contact for each month a progress/status report due no later than the 10th calendar day of the following month for work performed in the prior month.

**1.6. Deliveries/Performance**. The Subcontractor shall be cognizant of, and comply with, the deliverable schedule in the Prime Contract and each Task Order with the same force and effect as if it was given in full text.  In order to effectuate timely deliveries to the Client in accordance with the terms of the Prime Contract, the Subcontractor's

deliverables shall, unless otherwise set forth in an agreed Task Order, be presented to the Prime at least five (5) calendar days prior to the applicable delivery deadlines as set forth in the Prime Contract.

**1.7.** <u>**Inspection and Acceptance.**</u> The Subcontractor shall permit such audits and inspections by the Client as may be required to be made pursuant to the terms of the Prime Contract, or as may be required by the clauses incorporated herein by reference pursuant to the "Flow Down Provisions" provided herein. The Prime Contractor agrees to provide written notice of an audit request ten (10) days prior to the audit date and agrees to only audit documents related to this Subcontract or which may be the subject of a Client inquiry. Proprietary documents unrelated to this Subcontract will not be the subject of an audit unless they are deemed pertinent by the Client and/or subject to a Client request for an audit. The Subcontractor agrees that Client has the right to audit and inspect the Subcontractor's records in accordance with this clause until such time as provided in the Prime Contract.

# SECTION 2: CONTRACT ADMINISTRATION

**2.1.** <u>**Contract Administration Data**</u>

(a) <u>Technical Point of Contact</u>. Each individual listed below (or another individual designated pursuant to the Notice Provision shall serve as the respective company's central coordinator for all technical efforts performed under this Subcontract ("Technical Point of Contact"). The Technical Point of Contact listed for the Prime Contractor shall review all the Subcontractor deliverables and provide technical direction in accordance with the executed Task Order. All notices required to be given hereunder shall be sufficient if sent in accordance with the Notice Provision and addressed to the individual at the address set forth as such:

| Prime Contractor POC | The Subcontractor POC: |
|---|---|
| Ryan Kegley | Mike Giacona |
| 3900 C Street, Ste 100 | 400 Russell Ave, Bldg 123A |
| Anchorage, AK 99503 | New Orleans, LA 70143 |
| 907-229-7443 | 504-373-3608 |
| rkegley@ganaayoo.com | Mike.giacona@kinggeorge.us |

(b) <u>Contractual Point of Contact</u>. Each individual listed below (or another individual designated pursuant to the Notice Provision shall serve as the respective company's authorized representative with authority to contractually bind the company for purposes of this Subcontract and any Task Order hereunder ("Contractual Point of Contact"). The terms and conditions of this Subcontract, including any Task Order, cannot be changed, modified, or altered without the express written agreement of each party's Contractual Point of Contact. All notices required to be given hereunder shall be sufficient if sent in accordance with the Notice Provision and addressed to the individual at the address set forth as such:

| Prime Contractor POC | The Subcontractor POC: |
|---|---|
| Ryan Kegley | Carla Shupp |
| 3900 C Street, Ste 100 | 320 Hemphill Street |
| Anchorage, AK 99503 | Fort Worth, TX 76104 |
| 907-229-7443 | 682-499-2542 |
| rkegley@ganaayoo.com | contracts@kinggeorge.us |

**2.2. Subcontracting.** The Subcontractor shall not further subcontract any portion of the work to be performed by it under this Subcontract without the prior written approval of the Prime Contractor.

**2.3. Client Contact.**

(a) Throughout the term of this Subcontract, the Prime Contractor shall be primarily responsible for communicating with the Client concerning the terms of this Subcontract or the Prime Contract. The Subcontractor may communicate with the Client's technical representatives as required for performing the work contemplated by this Subcontract but shall not communicate with the Client regarding the Prime Contract or any Task Order. The Prime Contractor agrees to provide the Subcontractor with copies of any notices from the Client to the Prime Contractor that relate to the Subcontractor's performance under this Subcontract.

(b) This Subcontract shall not preclude either party from competing for, or contracting independently from the other on, any other government contract in the general area of services and deliverables contemplated by this Subcontract.

**2.4. Independent Contractor.** The Subcontractor's relationship to the Prime Contractor in the performance of this Subcontract is that of an independent contractor, and not of a partnership, joint venture, employee, partner, co-venturer, servant, or agent of the Prime Contractor. Nothing herein shall be construed as creating a formal business association of any kind, nor as providing for the sharing of profits or losses arising out of the efforts of either or both of the parties. Nothing in this Subcontract shall be construed to grant either the Prime Contractor or the Subcontractor the right to make commitments of any kind for or on behalf of the other party, without the prior written consent of the other party. The Subcontractor's personnel performing services under this Subcontract shall at all times be under the Subcontractor's exclusive direction and control and shall be employees of the Subcontractor and not employees of the Prime Contractor. The Prime Contractor shall not have any direct managerial or supervisory authority over the Subcontractor's employees in the performance of their work under this Subcontract. The Subcontractor shall pay all wages, salaries, and other amounts due its employees in connection with this Subcontract and shall be responsible for all reports and obligations to Social Security, income tax withholding, unemployment compensation, Worker's Compensation and similar matters.

**2.5. No Conflict; Right To Use And Provide Information; Ability To Perform The Work.** the Subcontractor represents and warrants that, as of the date of this Subcontract during the performance any work under this Subcontract, that:

(a) The Subcontractor is not aware of any organizational conflict of interest related to its conduct of the work under this Subcontract. The parties agree that this Subcontract may be terminated if an organizational conflict of interest exists or if the government advises either party that such a conflict may exist and the conflict cannot be properly mitigated, said termination to be effective immediately upon written notice to the conflicted party from the non-conflicted party.

(b) The Subcontractor's performance of its work under this Subcontract does not and will not (i) conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which it is a party or is otherwise bound; or (ii) violate any non-solicitation, non-competition, or other similar covenant or agreement to which that party or any of its employees, owners, or agents are bound; and

(c) The Subcontractor has the technical capabilities and legal ability to perform their portion of its work under this Subcontract in a manner that is in compliance with all applicable laws and regulations.

**2.6.** **Indemnification.**

(a) Each party (the "Indemnifying Party") agrees to fully protect, defend, indemnify and hold harmless the other party, its members, shareholders, affiliates, employees, officers, and directors (the "Indemnified Party"), from all claims, liabilities, demands, losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses, including reasonable attorneys' fees, the cost of defense, all costs of investigation, and the cost of enforcing any right to indemnification hereunder and the unreimbursed cost of pursuing any insurance providers ("Losses"), for injuries to or death of any person and/or for loss of or damage to any property to the extent in any way arising out of or concocted with the negligent acts or omissions of the indemnifying party. Where any bodily injury or death, or any damage to or destruction of property, is the result of the joint or concurrent negligence of the parties, each party's duty of indemnification and defense shall be in proportion to its allocable share of such joint or concurrent negligence.

(b) The Subcontractor further agrees to defend, indemnify, and hold harmless the Prime Contractor, its members, shareholders, affiliates, employees, officers, and directors from and against any and all Losses suffered by any of the foregoing arising out of any violation or breach of any term, representation, covenant, or warranty in this Agreement, including but not limited to Section 2.5 and/or Section 2.7.

(c) The amount of any Losses subject to indemnification under this Section 2.6 shall be calculated net of (i) any tax benefit inuring to the Indemnified Party on account of such Losses; and (ii) any insurance proceeds or any indemnity, contribution or other similar payment received by the Indemnified Party from any third party with respect thereto (a "Collateral Source"); provided, however, that the Indemnified Party shall be entitled to seek as Losses hereunder any sums that are not recovered by Indemnified Party under such insurance policies or other arrangements on account of any provisions for co-payments, deductibles, caps, stop-loss limits or other similar coverage limits (including aggregate limits set forth in such policies or arrangements). No right of subrogation shall accrue or inure as a result of the provisions hereof to the benefit of any Collateral Source hereunder.

**2.7.** **Performance Standards.** The Subcontractor agrees to perform all services

(a) in a timely, professional and workmanlike manner in accordance with generally accepted industry standards and the labor category requirements contained in the SOW;

(b) using personnel of required skill, experience, and qualifications;

(c) in accordance with generally recognized industry standards;

(d) in compliance with all applicable laws and regulations; and

(e) in compliance with all material Prime Contractor rules, regulations, and policies of which it has been made aware.

**2.8.** **Insurance Requirements.**

(a) At all times during the term of this Agreement, the Subcontractor shall procure and maintain, at its expense the insurance coverage that is required by law or regulation.

(b) The Subcontractor shall also procure, at its expense, and maintain for the duration of this Agreement, the following insurance policies from insurance companies lawfully authorized to issue such insurance coverage in the jurisdiction(s) where this Agreement is being performed:

| | |
|---|---|
| **Comprehensive General Liability Insurance** | Including products and completed operations coverage, fire legal liability, personal/advertising injury, and standard contractual liability with a per occurrence of $1,000,000 and a general aggregate limit of $2,000,000. |
| **Workmen's Compensation as Required by state laws** | Workers' Compensation/Employers' Liability - Insurance for statutory obligations imposed by law including, coverage under United States Longshoremen's and Harbor Workers' Act for employees who work on or over navigable waters, and, where applicable, the Jones Act, and Defense Base Act for those employees working on a U.S. Military installation outside of the United States. Minimum Employers' Liability limit of $1,000,000 (covering bodily injury by accident and bodily injury by disease). |
| **Umbrella Liability** | An aggregate limit of at least $1,000,000. Umbrella, at a minimum, must provide excess coverage over the General Liability, Auto Liability, and Employers' Liability. |
| **Auto Liability Insurance** | Coverage for bodily injury and property damage liability for all owned, hired or non-owned vehicles, with each accident limit of $1,000,000. |
| ~~**Professional Liability**~~ | ~~$1,000,000 per claim and aggregate providing coverage for claims arising out of the performance of professional services, resulting from any act, error, or omission of the Subcontractor. This coverage may be purchased as a part of a package that includes cyber liability.~~ |
| **Marine General Liability** | $1,000,000 per occurrence |

(c) The Subcontractor's Commercial General Liability and Business Auto Liability policies shall be primary and non-contributory to any insurance maintained by the Prime Contractor. The Subcontractor's Workers Compensation/Employers Liability policy shall include a waiver of subrogation in favor of the Client.

(d) In addition to the insurance required by Section 2.8(b), the Subcontractor shall also:

(1) maintain any additional insurance in the amounts specified in the Prime's contract flow-down clauses, which are provided in Attachment 2 to this Agreement.

(2) maintain insurance for all Prime Contractor's property in the Subcontractor's possession against loss or damage resulting from fire or theft, including extended coverage, malicious mischief, and vandalism.

(e) The Subcontractor shall furnish Prime Contractor certificates of showing all insurance required by this Section 2.8 prior to commencement of work. Prime Contractor shall be given at least thirty (30) days advance written notice of cancellation of any such insurance. The policies listed in (a) above shall name Prime Contractor as an additional insured.

(f) All policies of insurance held or obtained by the Subcontractor and each of its Subcontractors at any tier, whether required by this Agreement or not, shall be sufficiently endorsed to waive any and all claims by the underwriters or insurers against the Prime Contractor, its co-owners and joint ventures (if any) and its officers,

directors, agents, employees, members, parent company, subsidiaries, affiliates and invitees, for injuries, deaths, losses or damages covered by such policies.

**2.9. <u>Changes.</u>**

(a) The Prime Contractor may at any time, by a written order, and without notice to any sureties or insurers, make changes within the general scope of this Subcontract in any one or more of the following: (1) drawings, design, or specifications where the supplies and materials are to be furnished to the Subcontractor in accordance therewith; (2) method of shipping or packing; and (3) place of delivery, provided that all such changes are provided to the Subcontractor's Contractual Point of Contact in accordance with Section 2.1(b). If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this Subcontract, an equitable adjustment shall be made in the Subcontract price or delivery schedule or both, and the Subcontractor shall be notified in writing accordingly. Any claim by the Subcontractor for adjustment under this Section must be asserted within twenty-five (25) days from the date of receipt by the Subcontractor of the change or be forever barred.

(b) The Prime Contractor's scientific, technical and other personnel may from time to time render assistance or give technical advice to, or exchange information with the Subcontractor's personnel concerning this Subcontract or the supplies and materials to be furnished hereunder. However, such assistance, advice, statements, or exchange of information shall not constitute a waiver with respect to any of the Subcontractor's obligations or the Prime Contractor's rights, nor is it authority for any change in the articles or services called for hereunder. For any such waiver or change to be valid and binding upon the Prime Contractor or the Subcontractor, it must be in writing and signed by the Contractual Point of Contact for both the Prime Contractor and the Subcontractor. In case of any doubt, the Subcontractor shall promptly consult the Prime Contractor's Contractual Point of Contact for further instructions.

(c) In connection with any claim for adjustment under this Section, the Subcontractor shall submit cost data in reasonable form and detail. Additionally, because the Subcontract relates to a Prime Contract with the Client, the Subcontractor shall, upon the Prime Contractor's request, submit a certificate of cost and pricing data in accordance with FAR 15.406-2 with detailed supporting data.

# SECTION 3: GENERAL PROVISIONS

**3.1. <u>Proprietary Data</u>**

(a) To the extent that work under this Subcontract requires access to proprietary information of the other, each party agrees to protect the other party's proprietary information from unauthorized use or disclosure. Each party agrees to execute agreements regarding proprietary information with any company to which such information may be furnished and provide to the other party a copy of any such agreement executed in accordance with this Subcontract. As for proprietary information exchanged by the Prime Contractor and the Subcontractor, it must be, where the proprietary information lends itself to written form: (1) in writing; (2) clearly identified as proprietary information by each page having been marked with a legend identifying it as such; and (3) delivered to an individual designated as provided in Section 3.1(d), below. Where such proprietary information does not lend itself to written form (i.e., magnetic recording or to other machine readable form), the transmittal thereof shall be documented by the disclosing party in a separate

memorandum within ten (10) days of such transmittal to be entitled to the confidentiality required by this Section.

(b) Neither party shall identify as proprietary any information which is not in good faith believed by such party to constitute privileged data, a trade secret, or otherwise entitled to be so identified.

(c) The receiving party shall not disclose proprietary information of the other to any third party or use proprietary information of the other for any purpose other than as expressly allowed by this Subcontract. Each party shall take reasonable precautions to prevent disclosure to any third party or unauthorized use of proprietary information. A party shall be considered to have taken reasonable precautions to prevent disclosure if the party receiving such proprietary information utilizes the same controls it employs to avoid disclosure, publication, or dissemination of its own proprietary information.

(d) Each party shall designate in writing one or more individuals within its organization as the only person(s) authorized to receive proprietary information exchanged between the parties under this Subcontract. The exclusive points of contact with respect to the transmittal and control of proprietary information exchanged hereunder are now designated by the parties as follows: **Dan Pickett** for the Prime Contractor and Mike Giacona for the Subcontractor. Each party may change its designation at any time by written notice to the other in accordance with the Notice Provision set forth herein.

(e) The obligation with respect to handling and using proprietary information as set forth in this Subcontract is not applicable to the following:

(1) Information that is or becomes available to third parties or the general public without restriction and without breach of this Subcontract by the receiving party;

(2) Information that is or becomes known to the receiving party independently of the disclosing party;

(3) Information that is independently developed by the receiving party; or

(4) Information that is received by a party from a third party without breach of this Subcontract by the receiving party.

(f) Neither the execution and delivery of this Subcontract, nor the furnishing of any proprietary information by either party shall be construed as granting to the other party either expressly, by implication, estoppel, or otherwise, any license under any invention or patent, hereafter owned or controlled by the party furnishing same.

(g) This Section shall survive termination of the Subcontract.

**3.2. Disputes**

(a) Disputes involving the Client shall be resolved by the applicable procedures required by the Prime Contract. If such dispute involves rejection by the Client of costs claimed by the Subcontractor or work performed by the Subcontractor which involves a material issue, then the Prime Contractor shall sponsor any non-frivolous appeal by the Subcontractor to the Client in the Prime Contractor's name, provided however, that the Subcontractor shall be solely responsible for the costs and expenses associated with such action/appeal. Should the disputed costs be found on appeal to be allowable under the Prime Contract, the Prime Contractor shall promptly pay to the Subcontractor any such amount determined to be allowable no later than ten (10)

days after the Prime Contractor receives payment from the Client for such costs. Prime Contractor shall have no obligation to sponsor any appeal or claim by the Subcontractor in Prime Contractor's name that Prime Contractor determines, in good faith, to be frivolous.

(b) The parties shall exercise their best efforts to settle disputes not involving the Client by mutual agreement. Within fifteen (15) days of the date that a dispute concerning the terms and conditions of this Subcontract arises, the Contractual Points of Contact of the parties hereto shall meet in person in an effort to resolve such dispute. If the Contractual Points of Contact are unable to resolve such dispute, then within thirty (30) days of the date that the dispute arose, the presidents of the parties hereto shall meet in person in an effort to resolve such dispute.

(c) In the event that a dispute concerning the terms and conditions of this Subcontract cannot be resolved by mutual agreement between the parties hereto, either party to the Subcontract may pursue any right or remedy it may have in equity or law by initiating a civil action in any state or federal court of competent jurisdiction within the State of Alaska. In this regard, the parties hereby consent to the personal jurisdiction of any such state or federal court within the State of Alaska.

(d) Notwithstanding the pendency of any dispute, the Prime Contractor and the Subcontractor shall proceed diligently with their obligations under this Subcontract.

(e) In the event Prime Contractor invoices or amounts owed to the Subcontractor are the subject of a dispute, the Prime Contractor shall not withhold any payments to the Subcontractor of amounts that are not in dispute.

(f) Prime Contractor shall have the right to (i) set-off any Losses against any payments to be made by Prime Contractor to the Subcontractor under this Subcontract and (ii) recover from the Subcontractor any additional Losses that is proper under this Subcontract.

**3.3.** **Assignment.** The Subcontractor shall not delegate or assign any of its rights, duties or responsibilities under this Subcontract without the prior written approval of the Prime Contractor.

**3.4.** **Taxes.** Except as may be otherwise provided in this Subcontract, the prices set forth for each Task Order include all applicable Federal, State and Local taxes.

**3.5.** **Release of Information.** No release of information, or confirmation or denial of same with respect to this Subcontract or subject matter thereof, will be made without the prior express written approval of the other party. This restriction includes, but is not limited to, advertisements, brochures, and the like.

**3.6.** **Term and Termination.**

(a) Subject to Section 3.6(b) and (c), the term of this Subcontract shall commence on the effective date written above. Should the Prime Contract include any option periods, the option periods shall be exercised through the issuance of a modification to this subcontract.

(b) In the event Subcontractor consistently fails to meet staffing requirements, Prime Contractor shall have the right to terminate this Subcontract or any Task Order issued under this Subcontract at any time for its convenience.

(c) Prime Contractor may, by written notice to the Subcontractor, terminate this Subcontract for default in the event of any of the following circumstances:

(1) if the Subcontractor fails to perform any of the other provisions of this Subcontract in accordance with the terms, and in either of these two circumstances does not cure such failure within a period of ten (10) days (or such longer period as Prime Contractor may authorize in writing) after receipt of notice from Prime Contractor specifying such failure; or

(2) if the Subcontractor becomes insolvent or the subject of proceedings under any law relating to bankruptcy or the relief of debtors or admits in writing its inability to pay its debts as they become due.

(d) In the event of termination for default, Prime Contractor shall be liable to pay the Subcontractor only for accepted goods delivered or services performed before the effective date of termination. A termination settlement proposal shall be prepared in accordance with the requirements of Section 1.3(a) and 1.3(b) (Accounting and Invoicing and Payment).

(e) In the event of termination for default, Prime Contractor may procure or otherwise obtain, upon commercially reasonable terms, supplies and services similar to those terminated, and the Subcontractor shall be liable to the Prime Contractor for any reasonable excess costs of such similar supplies or services.

(f) Upon termination of this Subcontract or any Task Order, the Subcontractor shall transfer title and deliver to Prime Contractor, in the manner and to the extent requested in writing by Prime at or after termination, such complete articles, partially completed articles and materials, parts, tools, dies, patterns, plans, drawings, information and contract rights as the Subcontractor has produced or acquired for the performance of the Subcontract and/or Task Order.

(g) The respective obligations of the parties under Sections 1.3(c), 1.4, 1.7, 2.4, 2.6, 3.1, 3.2, 3.10, 3.18, 3.19, 3.20, 3.22 and 3.24 and any right or obligation of the Parties in this Subcontract which, by its nature, should survive termination or expiration of this Subcontract, shall survive termination or expiration of this Subcontract.

(h) Upon receipt of a Notice of Termination under Section 3.6(b) or (c), except as otherwise directed in writing by a corporate officer of the Prime Contractor, the Subcontractor shall:

(1) Stop work on the date and to the extent specified in the Notice of Termination;

(2) Place no further orders or subcontracts for materials, services, or facilities except only to the extent necessary for completion of any portion of the work under this Subcontract which has not been terminated;

(3) Terminate all orders and subcontracts to the extent that they relate to the performance of work terminated by the Notice of Termination;

(4) Assign to the Prime Contractor or to the Client, all right, title, and interest of the Subcontractor under all orders and subcontracts so terminated, in which event the Prime Contractor or the Client shall have the right, in its direction, to settle or pay any or all claims arising out of the terminations of such orders and subcontracts;

(5) With the prior written approval of a corporate officer of the Prime Contractor, settle all outstanding liabilities and claims arising out of such termination of orders and subcontracts, the cost of which would be reimbursable in whole or in part, in accordance with the provisions of this Subcontract;

(6) To the extent that the Prime Contract requires deliverables and services to become property of the Client, transfer title and deliver to the Prime Contractor or the Client, in the manner, to the extent then completed, and at the time directed in writing by the Prime Contractor (1) all work in process, completed work, and other materials produced or acquired with respect to the Subcontractor's performance of all or such portion of this Subcontract terminated by the Notice of Termination; and (2) all other data, reports and other property which, if this Subcontract had been completed, would have been required to be furnished to the Prime Contractor or the Client; and

(7) Complete performance of such portions of this Subcontract that have not been terminated by the Notice of Termination.

(i) Following termination of this Subcontract or any Task Order, the Prime Contractor shall make payment to the Subcontractor for any outstanding invoices relating to services rendered or materials supplied prior to the effective date of termination on the respective Task Order, pursuant to the terms of the Task Order.

**3.7. Stop Work Order.** Prime Contractor has the right to immediately suspend performance by the Subcontractor under this Subcontract with a written Stop Work Order. In the event of such direction, the Subcontractor shall immediately cease all performance. Prime Contractor shall not be liable to the Subcontractor for any expenses incurred by the Subcontractor during any Stop Work period. Prime Contractor shall provide the Subcontractor a written order for performance to resume.

**3.8. Flow Down Provisions**

(a) The Subcontractor acknowledges that it is a Subcontractor of the Prime Contractor for work to be performed by the Prime Contractor under its Prime Contract. The Subcontractor agrees that it has reviewed the provisions, terms and conditions of the Prime Contract, including all FAR clauses required by the Prime Contract, which are set forth in Attachment (2). The Subcontractor agrees that all clauses of the Prime Contract, as well as the provisions of law applicable thereto, are incorporated herein by reference with the same force and effect as if they were given in full text. The Subcontractor agrees that it will perform this Subcontract in a manner, which is consistent in every way with the requirements of the Prime Contract. A copy of the Prime Contract or any sections therein is available upon request.

(b) Where the words "Contracting Officer" and "Government" appear in the Prime Contract or any clauses incorporated by reference into the Prime Contract, such terms shall be deemed to refer to the Prime Contractor's "Technical Point of Contact" and "the Prime Contractor," respectively, as applicable. Where the word "Contractor" appears in the Prime Contract or in any clauses incorporated by reference into the Prime Contract, such word shall be deemed to refer to the Subcontractor. Where the word "the Subcontractor" appears in the Prime Contract or in any clauses incorporated by reference into the Prime Contract, such word shall be deemed to refer to the Subcontractor's the Subcontractor s, if any.

(c) The clauses incorporated herein, as described in 3.1 above, shall, to the greatest extent possible, be deemed to be cumulative to the terms, conditions and requirements of this Subcontract. If a dispute arises between this Subcontract and any relevant and applicable clause in the Prime Contract incorporated herein, then the relevant and applicable clause in the Prime Contract shall control. If a dispute arises between this Subcontract and any clause required by the Prime Contractor applicable law to be incorporated herein, then the clause required by the Prime Contractor applicable law to be incorporated herein shall control.

**3.9.** <u>Service Contract Act.</u>  This Subcontract is subject to all requirements of the Service Contract Act, 41 U.S.C. § 351 et seq.

**3.10.** <u>Equitable Relief.</u>  With respect to Section 3.1 ("Proprietary Data") above, the parties acknowledge and agree that it will be difficult to measure in money damages the injury resulting from the failure of any party to comply with the obligation or restrictions imposed by this Section, and that in the event of such failure, the non-breaching party will suffer irreparable injury and will not have an adequate remedy at law.  Therefore, the parties agree and consent to the issuance of an injunction or the enforcement of other equitable remedies against the breaching party, its successors or assigns, to compel performance of the terms of this Section, and waive any defenses that damages are an adequate remedy at law. Notwithstanding the foregoing, any party may also pursue legal remedies deemed to be appropriate in the event of a breach of such Section.

**3.11.** <u>Cumulative Remedies.</u>  The rights and remedies under this Subcontract are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise

**3.12.** <u>Improper Influence of Government Officials.</u>  Each party hereby represents and covenants that neither it, nor any of its employees or representatives, has or shall have, directly or indirectly, an agreement or arrangement with any official, employee, or representative of any customer or any government or government agency, or any political party under which such official, employee, or representative, or political party shall receive anything of value, whether monetary or otherwise, as a result of any actual or contemplated sale of any product of itself or any of its affiliates.

**3.13.** <u>Severability.</u>  If any part, term, or provision of this Subcontract shall be held void, illegal, unenforceable, or in conflict with any law of a federal, state or local government having jurisdiction over this Subcontract, the validity of the remaining portions or provisions of this Subcontract shall not be affected thereby.

**3.14.** <u>Entire Agreement.</u>  This Subcontract, and the attachments hereto, constitutes the entire agreement between the parties hereto and supersedes all prior communications, representations, agreements, understandings, and arrangements, oral or written, between the parties hereto with respect to the subject matter herein.  This Subcontract is binding upon and shall accrue to the benefit of the parties' successors and permitted assigns.

**3.15.** <u>Amendments and Waivers.</u>  This Subcontract may not be modified or amended except in writing and signed by duly authorized representatives of the Prime Contractor and the Subcontractor.  Either party hereto may, by an instrument in writing, waive compliance by the other party with any term or provision of this Subcontract on the part of such other party.  The waiver by any party hereto of a breach of any term or provision of this Subcontract shall not be construed as a waiver of any subsequent breach.

**3.16.** <u>Order of Precedence.</u>  In the event of a conflict in terms between documents the following documents will prevail in the following order:

   (a)  Subcontract Agreement
   (b)  Task Order (if applicable)
   (c)  Prime Contract Flow-down Provisions

**3.17.** <u>Binding Authority.</u>  Each of the persons executing this Subcontract hereby represents and warrants that he or she is fully authorized to bind his or her respective corporation or institution according to the terms of this Subcontract.

**3.18. <u>Governing Law.</u>** All questions concerning the construction, validity, and interpretation of this Subcontract and the performance of the obligations imposed by this Subcontract shall be governed by the laws of the State of Alaska, without regard to conflicts of law or principles thereof.

**3.19. <u>Forum</u>.** Any legal suit, action, or proceeding arising out of or relating to this Subcontract and/or any Task Order or the transactions contemplated thereby shall be instituted in the federal courts of the United States of America or the courts of the State of Alaska in each case located in Anchorage, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

**3.20. <u>Waiver of Jury Trial</u>.** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**3.21. <u>Captions.</u>** The captions herein are inserted solely as a matter of convenience and for purposes of reference and do not define, limit or describe the scope of this Subcontract or the intent of any provision herein.

**3.22. <u>Limitation of Liability</u>.**

(a) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE, OR PROFIT OR LOSS OF DATA OR DIMINUTION IN VALUE, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE. THE LIMITATIONS AND EXCLUSIONS SET FORTH IN THIS SECTION 3.22 SHALL NOT APPLY TO THIRD-PARTY CLAIMS THAT ARE SUBJECT TO INDEMNIFICATION UNDER SECTION 2.6.

(b) THE MAXIMUM LIABILITY BY EITHER PARTY TO THE OTHER UNDER THIS SUBCONTRACT SHALL IN NO EVENT EXCEED THE TOTAL AMOUNT OF THIS SUBCONTRACT.

**3.23. <u>Non-Solicitation of Personnel.</u>** The parties agree that during the period of performance of this subcontract neither party shall, directly or indirectly, attempt to solicit any of the employees of the other, who have been substantially involved in the performance of this Subcontract Agreement. This paragraph shall not preclude employees of either party from independently pursuing employment opportunities with the other party on their own initiative or in response to general solicitations, including but not limited to job postings published in newspapers, trade publications or websites.

**3.24. <u>Attorney's Fees.</u>** In the event of any dispute between the parties hereto in connection with this Subcontract, the prevailing party shall be entitled to recover from the losing party all of its costs and expenses, including without limitation, court costs and reasonable attorneys' fees.

**3.25. <u>Interpretation.</u>** This Subcontract shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The schedules and exhibits referred to herein shall be construed with, and as an integral part of, this Subcontract to the same extent as if they were set forth verbatim herein.

**3.26. Counterparts.** This Subcontract and any Task Order may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Subcontract or any Task Order delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Subcontract or any Task Order.

In witness, thereof, the parties have executed this Subcontract on the day and year first written above.

| | |
|---|---|
| **Prime Contractor** | **Subcontractor** |
| Six Mile NIKA JV, LLC | King & George, LLC |
| 3900 C Street, Suite 100 | 320 Hemphill St. |
| Anchorage, Alaska 99503 | Fort Worth, TX 76104 |
| By: _____ | By: _____ |
| Date: __8-5-2024__ | Date: __07/31/2024__ |
| Name: Ryan Kegley | Name: George F. Bernard |
| Title: Chief Operating Officer | Title: CEO |
| Email: **rkgeley@ganaayoo.com** | Email: george@kinggeorge.us |
| Phone: 907-229-7443 | Phone: 817-820-0881 |

## LIST OF ATTACHMENTS AND EXHIBITS

=====================================================

| | | |
|---|---|---|
| ATTACHMENT (1) | - | Statement of Work |
| ATTACHMENT (2) | - | Wage Determinations |
| ATTACHMENT (2) | - | Contract Clauses |
| ATTACHMENT (3) | - | Health & Safety Requirements |
| ATTACHMENT (4) | - | Representations, Certifications, and Other Statements |

# Attachment (1)

## Statement of Work

All work under this Subcontract will be issued in Task Orders to the Subcontractor that will further detail the SOW.

King & George ("K&G" or "Subcontractor") will provide qualified personnel to support the recurring and nonrecurring PWS for Base Operation Support Services at USCG Base Kodiak, AK. K&G shall provide staffing (inclusive of all labor, fringe, and G&A and fee), labor, and materials to support the roads and grounds/heavy equipment shop, fuels and general maintenance workers operations, as provided in as specified in Task Order 2-0002-08-01. As further specified in Task Order 2-0002-08-01, an approximate total of 44 employees will be provided by K&G based on the current revision of the PWS, provided that, if at any time K&G provides fewer than 39 employees, Prime Contractor reserves the right to make a line-item-by-line-item reduction to the firm-fixed-price, monthly amount invoiced by Subcontractor.

K&G will also supply all labor and materials to support the programing, implementation, training and ongoing maintenance of the sites cloud based Maximo and Maximo mobile software system, as specified in Task Order 2-0002-08-02.

The Subcontractor shall provide labor hours worked under each task order for Prime Contractor to complete Service Contract Reporting as required.

In no event shall the portion of the Subcontractor's services violate C.F.R Title 13, Chapter 1, Part 125, Section 125.6 Prime Contractor performance requirements (limitations on subcontracting).

# Attachment (2)

# Wage Determinations

- SCA WD No. 2015-5687

- DBA WD No. AK20230001 Dated 19 May 2023

- DBA WD No. AK20230005 Dated 05 May 2023

- CBA 2022-2024 Dated 04 Mar 2022

Contractor reserves the right to modify this Attachment (2) to include updated Wage Determinations applicable to the Prime Contract.

The full text of the Wage Determination may be accessed electronically at www.sam.gov.

# Attachment (3)

# Contract Clauses

**FAR 52.252-2 Clauses Incorporated by Reference (FEB 1998)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the full text of a clause may be accessed electronically at this/these address(es): Home | Acquisition.GOV

In all clauses listed by reference or in full text the word "Government" shall mean "Contractor", the word "Contractor" shall mean "Subcontractor", and the word "Contracting Officer" shall mean "Prime Contractor POC".

| Clause | Title | Eff. Date |
|---|---|---|
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards. | JUN 2020 |
| 52.204-14 | Service Contract Reporting Requirements. | OCT 2016 |
| 52.219-8 | Utilization of Small Business Concerns. | OCT 2018 |
| 52.219-14 | Limitations on Subcontracting. | MAR 2020 |
| 52.219-33 | Nonmanufacturer Rule | MAR 2020 |
| 52.222-3 | Convict Labor. | JUN 2003 |
| 52.222-21 | Prohibition of Segregated Facilities. | APR 2015 |
| 52.222-26 Alt I | Equal Opportunity. | SEP 2016 |
| 52.222-35 Alt I | Equal Opportunity Veterans. | JUN 2020 |
| 52.222-36 Alt I | Equal Opportunity for Workers with Disabilities. | JUN 2020 |
| 52.222-37 | Employment Reports on Veterans. | JUN 2020 |
| 52.222-54 | Employment Eligibility Verification. | OCT 2015 |
| 52.223-2 | Affirmative Procurement of Biobased Products Under Service and Construction Contracts. | SEP 2013 |
| 52.223-3 Alt I | Hazardous Material Identification and Material Safety Data. | Jul 1995 |
| 52.223-6 | Drug-Free Workplace. | MAY 2001 |
| 52.223-10 | Waste Reduction Program. | MAY 2011 |
| 52.223-20 | Aerosols. | JUN 2016 |
| 52.223-21 | Foams. | JUN 2016 |
| 52.224-3 | Privacy Training. | JAN 2017 |
| 52.225-1 | Buy American - Supplies. | JAN 2021 |
| 52.225-13 | Restrictions on Certain Foreign Purchases. | FEB 2021 |
| 52.225-26 | Contractors Performing Private Security Functions Outside the United States. | OCT 2016 |
| 52.226-6 | Promoting Excess Food Donation to Nonprofit Organizations. | JUN 2020 |
| 52.239-1 | Privacy or Security Safeguards. | AUG 1996 |
| 52.247-64 | Preference for Privately Owned U.S.-Flag Commercial Vessels. | FEB 2006 |
| 52.248-1 | Value Engineering. | JUN 2020 |
| 52.252-2 | Clauses Incorporated by Reference. | FEB 1998 |
| 52.252-6 | Authorized Deviations in Clauses. | APR 1984 |
| 3052.204-71 | Contractor employee access. | SEP 2012 |

| 3052.205-70 | Advertisements Publicizing Awards and Releases. | SEP 2012 |
| 3052.212-70 | Contract Terms and Conditions Applicable to DHS Acquisition of Commercial Items. | SEP 2012 |
| 3052.222-70 | Strikes or picketing affecting timely completion of the contract work. | DEC 2003 |
| 3052.223-70 | Removal or disposal of hazardous substances - applicable licenses and permits. | JUN 2006 |
| 3052.223-90 | Accident and fire reporting (USCG). | DEC 2003 |
| 3052.228-70 | Insurance. | |

## 52.203-6 RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUN 2020)

(a) Except as provided in (b) of this clause, the Contractor shall not enter into any agreement with an actual or prospective subcontractor, nor otherwise act in any manner, which has or may have the effect of restricting sales by such subcontractors directly to the Government of any item or process (including computer software) made or furnished by the subcontractor under this contract or under any follow-on production contract.

(b) The prohibition in (a) of this clause does not preclude the Contractor from asserting rights that are otherwise authorized by law or regulation.

(c) The Contractor agrees to incorporate the substance of this clause, including this paragraph (c), in all subcontracts under this contract which exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award.

*(End of clause)*

## 52.203-12 LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS. (JUN 2020)

(a) *Definitions.* As used in this clause-

*Agency* means "*executive agency*" as defined in Federal Acquisition Regulation (FAR) 2.101.

*Covered Federal action* means any of the following actions:

(1) Awarding any Federal contract.

(2) Making any Federal grant.

(3) Making any Federal loan.

(4) Entering into any cooperative agreement.

(5) Extending, continuing, renewing, amending, or modifying any Federal contract, grant, loan, or cooperative agreement.

*Indian tribe* and "tribal organization" have the meaning provided in section 4 of the Indian Self-Determination and Education Assistance Act ( 25 U.S.C. 450b) and include Alaskan Natives.

*Influencing or attempting to influence* means making, with the intent to influence, any communication to or appearance before an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any covered Federal action.

*Local government* means a unit of government in a State and, if chartered, established, or otherwise recognized by a State for the performance of a governmental duty, including a local public authority, a special district, an intrastate district, a council of governments, a sponsor group representative organization, and any other instrumentality of a local government.

*Officer or employee of an agency* includes the following individuals who are employed by an agency:

(1) An individual who is appointed to a position in the Government under Title 5, United States Code, including a position under a temporary appointment.

(2) A member of the uniformed services, as defined in subsection 101(3), Title 37, United States Code.

(3) A special Government employee, as defined in section 202, Title 18, United States Code.

(4) An individual who is a member of a Federal advisory committee, as defined by the Federal Advisory Committee Act, Title 5, United States Code, appendix 2.

*Person* means an individual, corporation, company, association, authority, firm, partnership, society, State, and local government, regardless of whether such entity is operated for profit, or not for profit. This term excludes an Indian tribe, tribal organization, or any other Indian organization eligible to receive Federal contracts, grants, cooperative agreements, or loans from an agency, but only with respect to expenditures by such tribe or organization that are made for purposes specified in paragraph (b) of this clause and are permitted by other Federal law.

*Reasonable compensation* means, with respect to a regularly employed officer or employee of any person, compensation that is consistent with the normal compensation for such officer or employee for work that is not furnished to, not funded by, or not furnished in cooperation with the Federal Government.

*Reasonable payment* means, with respect to professional and other technical services, a payment in an amount that is consistent with the amount normally paid for such services in the private sector.

*Recipient* includes the Contractor and all subcontractors. This term excludes an Indian tribe, tribal organization, or any other Indian organization eligible to receive Federal contracts, grants, cooperative agreements, or loans from an agency, but only with respect to expenditures by such tribe or organization that are made for purposes specified in paragraph (b) of this clause and *are* permitted by other Federal law.

*Regularly employed* means, with respect to an officer or employee of a person requesting or receiving a Federal contract, an officer or employee who is employed by such person for at least 130 working days within 1 year immediately preceding the date of the submission that initiates agency consideration of such person for receipt of such contract. An officer or employee who is employed by such person for less than 130 working days within 1 year immediately preceding the date of the submission that initiates agency consideration of such person shall be considered to be regularly employed as soon as he or she is employed by such person for 130 working days.

*State* means a State of the United States, the District of Columbia, or an outlying area of the United States, an agency or instrumentality of a State, and multi-State, regional, or interstate entity having governmental duties and powers.

(b) *Prohibition.* 31 U.S.C. 1352 prohibits a recipient of a Federal contract, grant, loan, or cooperative agreement from using appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any covered Federal actions. In accordance with 31 U.S.C. 1352 the Contractor shall not use

appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the award of this contractor the extension, continuation, renewal, amendment, or modification of this contract.

(1) The term *appropriated funds* does not include profit or fee from a covered Federal action.

(2) To the extent the Contractor can demonstrate that the Contractor has sufficient monies, other than Federal appropriated funds, the Government will assume that these other monies were spent for any influencing activities that would be unallowable if paid for with Federal appropriated funds.

(c) *Exceptions.* The prohibition in paragraph (b) of this clause does not apply under the following conditions:

(1) *Agency and legislative liaison by Contractor employees.*

(i) Payment of reasonable compensation made to an officer or employee of the Contractor if the payment is for agency and legislative liaison activities not directly related to this contract. For purposes of this paragraph, providing any information specifically requested by an agency or Congress is permitted at any time.

(ii) Participating with an agency in discussions that are not related to a specific solicitation for any covered Federal action, but that concern–

(A) The qualities and characteristics (including individual demonstrations) of the person's products or services, conditions or terms of sale, and service capabilities; or

(B) The application or adaptation of the person's products or services for an agency's use.

(iii) Providing prior to formal solicitation of any covered Federal action any information not specifically requested but necessary for an agency to make an informed decision about initiation of a covered Federal action;

(iv) Participating in technical discussions regarding the preparation of an unsolicited proposal prior to its official submission; and

(v) Making capability presentations prior to formal solicitation of any covered Federal action by persons seeking awards from an agency pursuant to the provisions of the Small Business Act, as amended by Pub. L. 95-507, and subsequent amendments.

(2) *Professional and technical services.*

(i) A payment of reasonable compensation made to an officer or employee of a person requesting or receiving a covered Federal action or an extension, continuation, renewal, amendment, or modification of a covered Federal action, if payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal action or for meeting requirements imposed by or pursuant to law as a condition for receiving that Federal action.

(ii) Any reasonable payment to a person, other than an officer or employee of a person requesting or receiving a covered Federal action or an extension, continuation, renewal, amendment, or modification of a covered Federal action if the payment is for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application for that Federal action or for meeting requirements imposed by or pursuant to law as a condition for receiving that Federal action. Persons other than officers or employees of a person requesting or receiving a covered Federal action include consultants and trade associations.

(iii) As used in paragraph (c)(2) of this clause, "professional and technical services" are limited to advice and analysis directly applying any professional or technical discipline (for examples, see FAR 3.803(a)(2)(iii)).

(iv) Requirements imposed by or pursuant to law as a condition for receiving a covered Federal award include those required by law or regulation and any other requirements in the actual award documents.

(3) Only those communications and services expressly authorized by paragraphs (c)(1) and (2) of this clause are permitted.

(d) *Disclosure.*

(1) If the Contractor did not submit OMB Standard Form LLL, Disclosure of Lobbying Activities, with its offer, but registrants under the Lobbying Disclosure Act of 1995 have subsequently made a lobbying contact on behalf of the Contractor with respect to this contract, the Contractor shall complete and submit OMB Standard Form LLL to provide the name of the lobbying registrants, including the individuals performing the services.

(2) If the Contractor did submit OMB Standard Form LLL disclosure pursuant to paragraph (d) of the provision at FAR 52.203-11, Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions, and a change occurs that affects Block 10 of the OMB Standard Form LLL (name and address of lobbying registrant or individuals performing services), the Contractor shall, at the end of the calendar quarter in which the change occurs, submit to the Contracting Officer within 30 days an updated disclosure using OMB Standard Form LLL.

(e) *Penalties.*

(1) Any person who makes an expenditure prohibited under paragraph (b) of this clause or who fails to file or amend the disclosure to be filed or amended by paragraph (d) of this clause shall be subject to civil penalties as provided for by 31 U.S.C. 1352. An imposition of a civil penalty does not prevent the Government from seeking any other remedy that may be applicable.

(2) Contractors may rely without liability on the representation made by their subcontractors in the certification and disclosure form.

(f) *Cost allowability.* Nothing in this clause makes allowable or reasonable any costs which would otherwise be unallowable or unreasonable. Conversely, costs made specifically unallowable by the requirements in this clause will not be made allowable under any other provision.

(g) *Subcontracts.*

(1) The Contractor shall obtain a declaration, including the certification and disclosure in paragraphs (c) and (d) of the provision at 52.203-11, Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions, from each person requesting or receiving a subcontract under this contract that exceeds the threshold specified in FAR 3.808 on the date of subcontract award. The Contractor or subcontractor that awards the subcontract shall retain the declaration.

(2) A copy of each subcontractor disclosure form (but not certifications) shall be forwarded from tier to tier until received by the prime Contractor. The prime Contractor shall, at the end of the calendar quarter in which the disclosure form is submitted by the subcontractor, submit to the Contracting Officer within 30 days a copy of all disclosures. Each subcontractor certification shall be retained in the subcontract file of the awarding Contractor.

(3) The Contractor shall include the substance of this clause, including this paragraph (g), in any subcontract that exceeds the threshold specified in FAR 3.808 on the date of subcontract award.

(End of clause)

## 52.203-13 CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT (NOV 2021)

(a) *Definitions. As used in this clause—*

*Agent* means any individual, including a director, an officer, an employee, or an independent Contractor, authorized to act on behalf of the organization.

*Full cooperation—*

    (1) Means disclosure to the Government of the information sufficient for law enforcement to identify the nature and extent of the offense and the individuals responsible for the conduct. It includes providing timely and complete response to Government auditors' and investigators' request for documents and access to employees with information;

    (2) Does not foreclose any Contractor rights arising in law, the FAR, or the terms of the contract. It does not require-

        (i) A Contractor to waive its attorney-client privilege or the protections afforded by the attorney work product doctrine; or

        (ii) Any officer, director, owner, or employee of the Contractor, including a sole proprietor, to waive his or her attorney client privilege or Fifth Amendment rights; and

    (3) Does not restrict a Contractor from-

        (i) Conducting an internal investigation; or

        (ii) Defending a proceeding or dispute arising under the contract or related to a potential or disclosed violation.

*Principal* means an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (*e.g.*, general manager; plant manager; head of a division or business segment; and similar positions).

*Subcontract* means any contract entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract.

*Subcontractor* means any supplier, distributor, vendor, or firm that furnished supplies or services to or for a prime contractor or another subcontractor.

*United States*, means the 50 States, the District of Columbia, and outlying areas.

(b) *Code of business ethics and conduct.*

    (1) Within 30 days after contract award, unless the Contracting Officer establishes a longer time period, the Contractor shall—

        (i) Have a written code of business ethics and conduct; and

        (ii) Make a copy of the code available to each employee engaged in performance of the contract.

    (2) *The Contractor shall-*

        (i) Exercise due diligence to prevent and detect criminal conduct; and

        (ii) Otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.

    (3)

        (i) The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed-

            (A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or

            (B) A violation of the civil False Claims Act ( 31 U.S.C. 3729-3733).

        (ii) The Government, to the extent permitted by law and regulation, will safeguard and treat information obtained pursuant to the Contractor's disclosure as confidential where the information has been marked "confidential" or "proprietary" by the company. To the extent permitted by law and regulation, such information will not be released by the Government to the public pursuant to a Freedom of Information Act request, 5 U.S.C. Section 552, without prior notification to the Contractor. The Government may transfer documents provided by the Contractor to any department or agency within the Executive Branch if the information relates to matters within the organization's jurisdiction.

        (iii) If the violation relates to an order against a Governmentwide acquisition contract, a multi-agency contract, a multiple-award schedule contract such as the Federal Supply Schedule, or any other procurement instrument intended for use by multiple agencies, the Contractor shall notify the OIG of the ordering agency and the IG of the agency responsible for the basic contract.

(c) Business ethics awareness and compliance program and internal control system. This paragraph (c) does not apply if the Contractor has represented itself as a small business concern pursuant to the award of this contract or if this contract is for the acquisition of a commercial product or commercial service as defined at FAR 2.101. The Contractor shall establish the following within 90 days after contract award, unless the Contracting Officer establishes a longer time period:

    (1) An ongoing business ethics awareness and compliance program.

        (i) This program shall include reasonable steps to communicate periodically and in a practical manner the Contractor's standards and procedures and other aspects of the Contractor's business ethics awareness and compliance program and internal control system, by conducting effective training programs and otherwise disseminating information appropriate to an individual's respective roles and responsibilities.

        (ii) The training conducted under this program shall be provided to the Contractor's principals and employees, and as appropriate, the Contractor's agents and subcontractors.

    (2) An internal control system.

        (i) The Contractor's internal control system shall—

            (A) Establish standards and procedures to facilitate timely discovery of improper conduct in connection with Government contracts; and

            (B) Ensure corrective measures are promptly instituted and carried out.

        (ii) At a minimum, the Contractor's internal control system shall provide for the following:

            (A) Assignment of responsibility at a sufficiently high level and adequate resources to ensure effectiveness of the business ethics awareness and compliance program and internal control system.

            (B) Reasonable efforts not to include an individual as a principal, whom due diligence would have exposed as having engaged in conduct that is in conflict with the Contractor's code of business ethics and conduct.

(C) Periodic reviews of company business practices, procedures, policies, and internal controls for compliance with the Contractor's code of business ethics and conduct and the special requirements of Government contracting, including-
    (1) Monitoring and auditing to detect criminal conduct;
    (2) Periodic evaluation of the effectiveness of the business ethics awareness and compliance program and internal control system, especially if criminal conduct has been detected; and
    (3) Periodic assessment of the risk of criminal conduct, with appropriate steps to design, implement, or modify the business ethics awareness and compliance program and the internal control system as necessary to reduce the risk of criminal conduct identified through this process.
(D) An internal reporting mechanism, such as a hotline, which allows for anonymity or confidentiality, by which employees may report suspected instances of improper conduct, and instructions that encourage employees to make such reports.
(E) Disciplinary action for improper conduct or for failing to take reasonable steps to prevent or detect improper conduct.
(F) Timely disclosure, in writing, to the agency OIG, with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of any Government contract performed by the Contractor or a subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 U.S.C. or a violation of the civil False Claims Act ( 31 U.S.C. 3729-3733).
    (1) If a violation relates to more than one Government contract, the Contractor may make the disclosure to the agency OIG and Contracting Officer responsible for the largest dollar value contract impacted by the violation.
    (2) If the violation relates to an order against a Governmentwide acquisition contract, a multi-agency contract, a multiple-award schedule contract such as the Federal Supply Schedule, or any other procurement instrument intended for use by multiple agencies, the contractor shall notify the OIG of the ordering agency and the IG of the agency responsible for the basic contract, and the respective agencies' contracting officers.
    (3) The disclosure requirement for an individual contract continues until at least 3 years after final payment on the contract.
    (4) The Government will safeguard such disclosures in accordance with paragraph (b)(3)(ii) of this clause.
(G) Full cooperation with any Government agencies responsible for audits, investigations, or corrective actions.
(d) *Subcontracts*.
    (1) The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts that exceed the threshold specified in FAR 3.1004(a) on the date of subcontract award and a performance period of more than 120 days.
    (2) In altering this clause to identify the appropriate parties, all disclosures of violation of the civil False Claims Act or of Federal criminal law shall be directed to the agency Office of the Inspector General, with a copy to the Contracting Officer.

<div align="center">(End of clause)</div>

## 52.203-15 WHISTLEBLOWER PROTECTIONS UNDER THE AMERICAN RECOVERY AND REINVESTMENT ACT OF 2009 (JUNE 2010)

(a) The Contractor shall post notice of employees rights and remedies for whistleblower protections provided under section 1553 of the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) (Recovery Act).
(b) The Contractor shall include the substance of this clause, including this paragraph (b), in all subcontracts that are funded in whole or in part with Recovery Act funds.

<div align="center">(End of clause)</div>

## 52.203-19 PROHIBITION ON REQUIRING CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS OR STATEMENTS (Jan 2017)

(a) *Definitions.* As used in this clause-
*Internal confidentiality agreement or statement* means a confidentiality agreement or any other written statement that the contractor requires any of its employees or subcontractors to sign regarding nondisclosure of contractor information, except that it does not include confidentiality agreements arising out of civil litigation or confidentiality agreements that contractor employees or subcontractors sign at the behest of a Federal agency.
*Subcontract* means any contract as defined in subpart 2.1 entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract. It includes but is not limited to purchase orders, and changes and modifications to purchase orders.
*Subcontractor* means any supplier, distributor, vendor, or firm (including a consultant) that furnishes supplies or services to or for a prime contractor or another subcontractor.
(b) The Contractor shall not require its employees or subcontractors to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting waste, fraud, or abuse related to the performance of a Government contract to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information (*e.g.*, agency Office of the Inspector General).
(c) The Contractor shall notify current employees and subcontractors that prohibitions and restrictions of any preexisting internal confidentiality agreements or statements covered by this clause, to the extent that such prohibitions and restrictions are inconsistent with the prohibitions of this clause, are no longer in effect.
(d) The prohibition in paragraph (b) of this clause does not contravene requirements applicable to Standard Form 312 (Classified Information Nondisclosure Agreement), Form 4414 (Sensitive Compartmented Information Nondisclosure Agreement), or any other form issued by a Federal department or agency governing the nondisclosure of classified information.
(e) In accordance with section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015, (Pub. L. 113-235), and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions) use of funds appropriated (or otherwise made available) is prohibited, if the Government determines that the Contractor is not in compliance with the provisions of this clause.
(f) The Contractor shall include the substance of this clause, including this paragraph (f), in subcontracts under such contracts.

<div align="center">(End of clause)</div>

## 52.204-9 PERSONAL IDENTITY VERIFICATION OF CONTRACTOR PERSONNEL (JAN 2011)

(a) The Contractor shall comply with agency personal identity verification procedures identified in the contract that implement Homeland Security Presidential Directive-12 (HSPD-12), Office of Management and Budget (OMB) guidance M-05-24 and Federal Information Processing Standards Publication (FIPS PUB) Number 201.

(b) The Contractor shall account for all forms of Government-provided identification issued to the Contractor employees in connection with performance under this contract. The Contractor shall return such identification to the issuing agency at the earliest of any of the following, unless otherwise determined by the Government:

    (1) When no longer needed for contract performance.

    (2) Upon completion of the Contractor employee's employment.

    (3) Upon contract completion or termination.

(c) The Contracting Officer may delay final payment under a contract if the Contractor fails to comply with these requirements.

(d) The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts when the subcontractor's employees are required to have routine physical access to a Federally-controlled facility and/or routine access to a Federally-controlled information system. It shall be the responsibility of the prime Contractor to return such identification to the issuing agency in accordance with the terms set forth in paragraph (b) of this section, unless otherwise approved in writing by the Contracting Officer.

*(End of clause)*

## 52.204-23 PROHIBITION ON CONTRACTING FOR HARDWARE, SOFTWARE, AND SERVICES DEVELOPED OR PROVIDED BY KASPERSKY LAB COVERED ENTITIES. (DEC 2023)

(a) *Definitions.* As used in this clause—

*Kaspersky Lab covered article* means any hardware, software, or service that–

    (1) Is developed or provided by a Kaspersky Lab covered entity;

    (2) Includes any hardware, software, or service developed or provided in whole or in part by a Kaspersky Lab covered entity; or

    (3) Contains components using any hardware or software developed in whole or in part by a Kaspersky Lab covered entity.

*Kaspersky Lab covered entity* means–

    (1) Kaspersky Lab;

    (2) Any successor entity to Kaspersky Lab, including any change in name, e.g., "Kaspersky";

    (3) Any entity that controls, is controlled by, or is under common control with Kaspersky Lab; or

    (4) Any entity of which Kaspersky Lab has a majority ownership.

(b) *Prohibition.* Section 1634 of Division A of the National Defense Authorization Act for Fiscal Year 2018 (Pub. L. 115-91) prohibits Government use of any Kaspersky Lab covered article. The Contractor is prohibited from—

    (1) Providing any Kaspersky Lab covered article that the Government will use on or after October 1, 2018; and

    (2) Using any Kaspersky Lab covered article on or after October 1, 2018, in the development of data or deliverables first produced in the performance of the contract.

(c) *Reporting requirement.*

    (1) In the event the Contractor identifies a Kaspersky Lab covered article provided to the Government during contract performance, or the Contractor is notified of such by a subcontractor at any tier or any other source, the Contractor shall report, in writing, to the Contracting Officer or, in the case of the Department of Defense, to the website at https://dibnet.dod.mil. For indefinite delivery contracts, the Contractor shall report to the Contracting Officer for the indefinite delivery contract and the Contracting Officer(s) for any affected order or, in the case of the Department of Defense, identify both the indefinite delivery contract and any affected orders in the report provided at https://dibnet.dod.mil.

    (2) The Contractor shall report the following information pursuant to paragraph (c)(1) of this clause:

        (i) Within 3 business days from the date of such identification or notification: the contract number; the order number(s), if applicable; supplier name; brand; model number (Original Equipment Manufacturer (OEM) number, manufacturer part number, or wholesaler number); item description; and any readily available information about mitigation actions undertaken or recommended.

        (ii) Within 10 business days of submitting the report pursuant to paragraph (c)(1) of this clause: any further available information about mitigation actions undertaken or recommended. In addition, the Contractor shall describe the efforts it undertook to prevent use or submission of a Kaspersky Lab covered article, any reasons that led to the use or submission of the Kaspersky Lab covered article, and any additional efforts that will be incorporated to prevent future use or submission of Kaspersky Lab covered articles.

(d) Subcontracts. The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts including subcontracts for the acquisition of commercial products or commercial services.

*(End of clause)*

## 52.204-25 PROHIBITION ON CONTRACTING FOR CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT (AUG 2020)

(a) *Definitions.* As used in this clause -

*Backhaul* means intermediate links between the core network, or backbone network, and the small subnetworks at the edge of the network (*e.g.,* connecting cell phones/towers to the core telephone network). Backhaul can be wireless (*e.g.,* microwave) or wired (*e.g.,* fiber optic, coaxial cable, Ethernet).

*Covered foreign country* means The People's Republic of China.

*Covered telecommunications equipment or services* means -

    (1) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities);

(2) For the purpose of public safety, security of Government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities);

(3) Telecommunications or video surveillance services provided by such entities or using such equipment; or

(4) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

*Critical technology* means -

(1) Defense articles or defense services included on the United States Munitions List set forth in the International Traffic in Arms Regulations under subchapter M of chapter I of title 22, Code of Federal Regulations;

(2) Items included on the Commerce Control List set forth in Supplement No. 1 to part 774 of the Export Administration Regulations under subchapter C of chapter VII of title 15, Code of Federal Regulations, and controlled -

    (i) Pursuant to multilateral regimes, including for reasons relating to national security, chemical and biological weapons proliferation, nuclear nonproliferation, or missile technology; or

    (ii) For reasons relating to regional stability or surreptitious listening;

(3) Specially designed and prepared nuclear equipment, parts and components, materials, software, and technology covered by part 810 of title 10, Code of Federal Regulations (relating to assistance to foreign atomic energy activities);

(4) Nuclear facilities, equipment, and material covered by part 110 of title 10, Code of Federal Regulations (relating to export and import of nuclear equipment and material);

(5) Select agents and toxins covered by part 331 of title 7, Code of Federal Regulations, part 121 of title 9 of such Code, or part 73 of title 42 of such Code; or

(6) Emerging and foundational technologies controlled pursuant to section 1758 of the Export Control Reform Act of 2018 (50 U.S.C. 4817).

*Interconnection arrangements* means arrangements governing the physical connection of two or more networks to allow the use of another's network to hand off traffic where it is ultimately delivered (*e.g.,* connection of a customer of telephone provider A to a customer of telephone company B) or sharing data and other information resources.

*Reasonable inquiry* means an inquiry designed to uncover any information in the entity's possession about the identity of the producer or provider of covered telecommunications equipment or services used by the entity that excludes the need to include an internal or third-party audit.

*Roaming* means cellular communications services (*e.g.,* voice, video, data) received from a visited network when unable to connect to the facilities of the home network either because signal coverage is too weak or because traffic is too high.

*Substantial or essential component* means any component necessary for the proper function or performance of a piece of equipment, system, or service.

(b) *Prohibition.*

(1) Section 889(a)(1)(A) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Pub. L. 115-232) prohibits the head of an executive agency on or after August 13, 2019, from procuring or obtaining, or extending or renewing a contract to procure or obtain, any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. The Contractor is prohibited from providing to the Government any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, unless an exception at paragraph (c) of this clause applies or the covered telecommunication equipment or services are covered by a waiver described in FAR 4.2104.

(2) Section 889(a)(1)(B) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Pub. L. 115-232) prohibits the head of an executive agency on or after August 13, 2020, from entering into a contract, or extending or renewing a contract, with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, unless an exception at paragraph (c) of this clause applies or the covered telecommunication equipment or services are covered by a waiver described in FAR 4.2104. This prohibition applies to the use of covered telecommunications equipment or services, regardless of whether that use is in performance of work under a Federal contract.

(c) *Exceptions.* This clause does not prohibit contractors from providing -

(1) A service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(2) Telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(d) *Reporting requirement.*

(1) In the event the Contractor identifies covered telecommunications equipment or services used as a substantial or essential component of any system, or as critical technology as part of any system, during contract performance, or the Contractor is notified of such by a subcontractor at any tier or by any other source, the Contractor shall report the information in paragraph (d)(2) of this clause to the Contracting Officer, unless elsewhere in this contract are established procedures for reporting the information; in the case of the Department of Defense, the Contractor shall report to the website at https://dibnet.dod.mil. For indefinite delivery contracts, the Contractor shall report to the Contracting Officer for the indefinite delivery contract and the Contracting Officer(s) for any affected order or, in the case of the Department of Defense, identify both the indefinite delivery contract and any affected orders in the report provided at https://dibnet.dod.mil.

(2) The Contractor shall report the following information pursuant to paragraph (d)(1) of this clause:

    (i) Within one business day from the date of such identification or notification: The contract number; the order number(s), if applicable; supplier name; supplier unique entity identifier (if known); supplier Commercial and Government Entity (CAGE) code (if known); brand; model number (original equipment manufacturer number, manufacturer part number, or wholesaler number); item description; and any readily available information about mitigation actions undertaken or recommended.

(ii) Within 10 business days of submitting the information in paragraph (d)(2)(i) of this clause: Any further available information about mitigation actions undertaken or recommended. In addition, the Contractor shall describe the efforts it undertook to prevent use or submission of covered telecommunications equipment or services, and any additional efforts that will be incorporated to prevent future use or submission of covered telecommunications equipment or services.

(e) *Subcontracts.* The Contractor shall insert the substance of this clause, including this paragraph (e) and excluding paragraph (b)(2), in all subcontracts and other contractual instruments, including subcontracts for the acquisition of commercial items.

<div align="center">(End of clause)</div>

### 52.209-6 Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment (JUN 2020)

(a) *Definition. Commercially available off-the-shelf (COTS)* item, as used in this clause -
(1) Means any item of supply (including construction material) that is -
(i) A commercial item (as defined in paragraph (1) of the definition in Federal Acquisition Regulation (FAR) 2.101);
(ii) Sold in substantial quantities in the commercial marketplace; and
(iii) Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace; and
(2) Does not include bulk cargo, as defined in 46 U.S.C. 40102(4), such as agricultural products and petroleum products.

(b) The Government suspends or debars Contractors to protect the Government's interests. Other than a subcontract for a commercially available off-the-shelf item, the Contractor shall not enter into any subcontract, in excess of the threshold specified in FAR 9.405-2(b) on the date of subcontract award, with a Contractor that is debarred, suspended, or proposed for debarment by any executive agency unless there is a compelling reason to do so.

(c) The Contractor shall require each proposed subcontractor whose subcontract will exceed the threshold specified in FAR 9.405-2(b) on the date of subcontract award, other than a subcontractor providing a commercially available off-the-shelf item, to disclose to the Contractor, in writing, whether as of the time of award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the Federal Government.

(d) A corporate officer or a designee of the Contractor shall notify the Contracting Officer, in writing, before entering into a subcontract with a party (other than a subcontractor providing a commercially available off-the-shelf item) that is debarred, suspended, or proposed for debarment (see FAR 9.404 for information on the System for Award Management (SAM) Exclusions). The notice must include the following:
(1) The name of the subcontractor.
(2) The Contractor's knowledge of the reasons for the subcontractor being listed with an exclusion in SAM.
(3) The compelling reason(s) for doing business with the subcontractor notwithstanding its being listed with an exclusion in SAM.
(4) The systems and procedures the Contractor has established to ensure that it is fully protecting the Government's interests when dealing with such subcontractor in view of the specific basis for the party's debarment, suspension, or proposed debarment.

(e) *Subcontracts.* Unless this is a contract for the acquisition of commercial items, the Contractor shall include the requirements of this clause, including this paragraph (e) (appropriately modified for the identification of the parties), in each subcontract that -
(1) Exceeds the threshold specified in FAR 9.405-2(b) on the date of subcontract award; and
(2) Is not a subcontract for commercially available off-the-shelf items.

<div align="center">(End of clause)</div>

### 52.212-15 Contract Terms and Conditions Required To Implement Statutes or Executive Orders - Commercial Items (JAN 2021)

(a) The Contractor shall comply with the following Federal Acquisition Regulation (FAR) clauses, which are incorporated in this contract by reference, to implement provisions of law or Executive orders applicable to acquisitions of commercial items:
(1) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (JAN 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).
(2) 52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (JUL 2018) (Section 1634 of Pub. L. 115-91).
(3) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. (AUG 2020) (Section 889(a)(1)(A) of Pub. L. 115-232).
(4) 52.209-10, Prohibition on Contracting with Inverted Domestic Corporations (NOV 2015).
(5) 52.233-3, Protest After Award (AUG 1996) (31 U.S.C. 3553).
(6) 52.233-4, Applicable Law for Breach of Contract Claim (OCT 2004) (Public Laws 108-77 and 108-78 (19 U.S.C. 3805 note)).

(b) The Contractor shall comply with the FAR clauses in this paragraph (b) that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items: [Contracting Officer check as appropriate.]

X__ (1) 52.203-6, Restrictions on Subcontractor Sales to the Government (JUN 2020), with *Alternate I* (OCT 1995) (41 U.S.C. 4704 and 10 U.S.C. 2402).
_X_ (2) 52.203-13, Contractor Code of Business Ethics and Conduct (JUN 2020) (41 U.S.C. 3509).
_X_ (3) 52.203-15, Whistleblower Protections under the American Recovery and Reinvestment Act of 2009 (JUN 2010) (Section 1553 of Pub. L. 111-5). (Applies to contracts funded by the American Recovery and Reinvestment Act of 2009.)
_X_ (4) 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards (JUN 2020) (Pub. L. 109-282) (31 U.S.C. 6101 note).
__ (5) [Reserved]

_X_ (6) 52.204-14, Service Contract Reporting Requirements (OCT 2016) (Pub. L. 111-117, section 743 of Div. C).

_X_ (7) 52.204-15, Service Contract Reporting Requirements for Indefinite-Delivery Contracts (OCT 2016) (Pub. L. 111-117, section 743 of Div. C).

_X_ (8) 52.209-6, Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment. (JUN 2020) (31 U.S.C. 6101 note).

__ (9) 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters (OCT 2018) (41 U.S.C. 2313).

__ (10) [Reserved]

__ (11)(i) 52.219-3, Notice of HUBZone Set-Aside or Sole Source Award (MAR 2020) (15 U.S.C. 657a).

__ (ii) Alternate I (MAR 2020) of 52.219-3.

__ (12)(i) 52.219-4, Notice of Price Evaluation Preference for HUBZone Small Business Concerns (MAR 2020) (if the offeror elects to waive the preference, it shall so indicate in its offer) (15 U.S.C. 657a).

__ (ii) Alternate I (MAR 2020) of 52.219-4.

__ (13) [Reserved]

__ (14)(i) 52.219-6, Notice of Total Small Business Set-Aside (NOV 2020) (15 U.S.C. 644).

__ (ii) Alternate I (MAR 2020) of 52.219-6.

__ (15)(i) 52.219-7, Notice of Partial Small Business Set-Aside (NOV 2020) (15 U.S.C. 644).

__ (ii) Alternate I (MAR 2020) of 52.219-7.

__ (16) 52.219-8, Utilization of Small Business Concerns (OCT 2018) (15 U.S.C. 637(d)(2) and (3)).

__ (17)(i) 52.219-9, Small Business Subcontracting Plan (JUN 2020) (15 U.S.C. 637(d)(4)).

__ (ii) Alternate I (NOV 2016) of 52.219-9.

__ (iii) Alternate II (NOV 2016) of 52.219-9.

__ (iv) Alternate III (JUN 2020) of 52.219-9.

__ (v) Alternate IV (JUN 2020) of 52.219-9.

__ (18)(i) 52.219-13, Notice of Set-Aside of Orders (MAR 2020) (15 U.S.C. 644(r)).

__ (ii) Alternate I (MAR 2020) of 52.219-13.

__ (19) 52.219-14, Limitations on Subcontracting (MAR 2020) (15 U.S.C. 637(a)(14)).

__ (20) 52.219-16, Liquidated Damages - Subcontracting Plan (JAN 1999) (15 U.S.C. 637(d)(4)(F)(i)).

__ (21) 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (MAR 2020) (15 U.S.C. 657f).

__ (22)(i) 52.219-28, Post-Award Small Business Program Rerepresentation (NOV 2020) (15 U.S.C. 632(a)(2)).

__ (ii) Alternate I (MAR 2020) of 52.219-28.

__ (23) 52.219-29, Notice of Set-Aside for, or Sole Source Award to, Economically Disadvantaged Women-Owned Small Business (EDWOSB) Concerns (MAR 2020) (15 U.S.C. 637(m)).

__ (24) 52.219-30, Notice of Set-Aside for, or Sole Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (MAR 2020) (15 U.S.C. 637(m)).

__ (25) 52.219-32, Orders Issued Directly Under Small Business Reserves (MAR 2020) (15 U.S.C. 644(r)).

__ (26) 52.219-33, Nonmanufacturer Rule (MAR 2020) (15 U.S.C. 637(a)(17)).

__ (27) 52.222-3, Convict Labor (JUN 2003) (E.O. 11755).

__ (28) 52.222-19, Child Labor - Cooperation with Authorities and Remedies (JAN 2020) (E.O. 13126).

__ (29) 52.222-21, Prohibition of Segregated Facilities (APR 2015).

__ (30)(i) 52.222-26, Equal Opportunity (SEPT 2016) (E.O. 11246).

__ (ii) Alternate I (Feb 1999) of 52.222-26.

__ (31)(i) 52.222-35, Equal Opportunity for Veterans (JUN 2020) (38 U.S.C. 4212).

__ (ii) Alternate I (July 2014) of 52.222-35.

__ (32)(i) 52.222-36, Equal Opportunity for Workers with Disabilities (JUN 2020) (29 U.S.C. 793).

__ (ii) Alternate I (July 2014) of 52.222-36.

__ (33) 52.222-37, Employment Reports on Veterans (JUN 2020) (38 U.S.C. 4212).

__ (34) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496).

__ (35)(i) 52.222-50, Combating Trafficking in Persons (OCT 2020) (22 U.S.C. chapter 78 and E.O. 13627).

__ (ii) *Alternate I* (Mar 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

__ (36) 52.222-54, Employment Eligibility Verification (Oct 2015). (E. O. 12989). (Not applicable to the acquisition of commercially available off-the-shelf items or certain other types of commercial items as prescribed in 22.1803.)

__ (37)(i) 52.223-9, Estimate of Percentage of Recovered Material Content for EPA-Designated Items (MAY 2008) (42 U.S.C. 6962(c)(3)(A)(ii)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (ii) Alternate I (MAY 2008) of 52.223-9 (42 U.S.C. 6962(i)(2)(C)). (Not applicable to the acquisition of commercially available off-the-shelf items.)

__ (38) 52.223-11, Ozone-Depleting Substances and High Global Warming Potential Hydrofluorocarbons (JUN 2016) (E.O. 13693).

__ (39) 52.223-12, Maintenance, Service, Repair, or Disposal of Refrigeration Equipment and Air Conditioners (JUN 2016) (E.O. 13693).

__ (40)(i) 52.223-13, Acquisition of EPEAT®-Registered Imaging Equipment (JUN 2014) (E.O.s 13423 and 13514).

__ (ii) Alternate I (OCT 2015) of 52.223-13.

__ (41)(i) 52.223-14, Acquisition of EPEAT®-Registered Televisions (Jun 2014) (E.O.s 13423 and 13514).

(ii) Alternate I (Jun 2014) of 52.223-14.

__ (42) 52.223-15, Energy Efficiency in Energy-Consuming Products (MAY 2020) (42 U.S.C. 8259b).

__ (43)(i) 52.223-16, Acquisition of EPEAT®-Registered Personal Computer Products (OCT 2015) (E.O.s 13423 and 13514).

__ (ii) Alternate I (Jun 2014) of 52.223-16.
__ (44) 52.223-18, Encouraging Contractor Policies to Ban Text Messaging While Driving (JUN 2020) (E.O. 13513).
__ (45) 52.223-20, Aerosols (JUN 2016) (E.O. 13693).
__ (46) 52.223-21, Foams (JUN 2016) (E.O. 13693).
__ (47)(i) 52.224-3, Privacy Training (JAN 2017) (5 U.S.C. 552a).
__ (ii) Alternate I (JAN 2017) of 52.224-3.
__ (48) 52.225-1, Buy American - Supplies (JAN 2021)) (41 U.S.C. chapter 83).
__ (49)(i) 52.225-3, Buy American - Free Trade Agreements - Israeli Trade Act (JAN 2021) (41 U.S.C. chapter 83, 19 U.S.C. 3301 note, 19 U.S.C. 2112 note, 19 U.S.C. 3805 note, 19 U.S.C. 4001 note, Pub. L. 103-182, 108-77, 108-78, 108-286, 108-302, 109-53, 109-169, 109-283, 110-138, 112-41, 112-42, and 112-43.
__ (ii) Alternate I (JAN 2021) of 52.225-3.
__ (iii) Alternate II (JAN 2021) of 52.225-3.
__ (iv) Alternate III (JAN 2021) of 52.225-3.
__ (50) 52.225-5, Trade Agreements (OCT 2019) (19 U.S.C. 2501, *et seq.*, 19 U.S.C. 3301 note).
__ (51) 52.225-13, Restrictions on Certain Foreign Purchases (JUNE 2008) (E.O.'s, proclamations, and statutes administered by the Office of Foreign Assets Control of the Department of the Treasury).
__ (52) 52.225-26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).
__ (53) 52.226-4, Notice of Disaster or Emergency Area Set-Aside (NOV 2007) (42 U.S.C. 5150).
__ (54) 52.226-5, Restrictions on Subcontracting Outside Disaster or Emergency Area (NOV 2007) (42 U.S.C. 5150).
__ (55) 52.229-12, Tax on Certain Foreign Procurements (JUN 2020).
__ (56) 52.232-29, Terms for Financing of Purchases of Commercial Items (FEB 2002) (41 U.S.C.4505, 10 U.S.C. 2307(f)).
__ (57) 52.232-30, Installment Payments for Commercial Items (JAN 2017) (41 U.S.C. 4505, 10 U.S.C. 2307(f)).
__ (58) 52.232-33, Payment by Electronic Funds Transfer - System for Award Management (OCT 2018) (31 U.S.C. 3332).
__ (59) 52.232-34, Payment by Electronic Funds Transfer - Other than System for Award Management (JUL 2013) (31 U.S.C. 3332).
__ (60) 52.232-36, Payment by Third Party (MAY 2014) (31 U.S.C. 3332).
__ (61) 52.239-1, Privacy or Security Safeguards (AUG 1996) (5 U.S.C. 552a).
__ (62) 52.242-5, Payments to Small Business Subcontractors (JAN 2017)(15 U.S.C. 637(d)(13)).
__ (63)(i) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631).
__ (ii) Alternate I (Apr 2003) of 52.247-64.
__ (iii) Alternate II (Feb 2006) of 52.247-64.
(c) The Contractor shall comply with the FAR clauses in this paragraph (c), applicable to commercial services, that the Contracting Officer has indicated as being incorporated in this contract by reference to implement provisions of law or Executive orders applicable to acquisitions of commercial items: [Contracting Officer check as appropriate.]
_X_ (1) 52.222-41, Service Contract Labor Standards (AUG 2018) (41 U.S.C. chapter 67).
X__ (2) 52.222-42, Statement of Equivalent Rates for Federal Hires (MAY 2014) (29 U.S.C. 206 and 41 U.S.C. chapter 67).
_X_ (3) 52.222-43, Fair Labor Standards Act and Service Contract Labor Standards-Price Adjustment (Multiple Year and Option Contracts) (AUG 2018) (29 U.S.C. 206 and 41 U.S.C. chapter 67).
_X_ (4) 52.222-44, Fair Labor Standards Act and Service Contract Labor Standards - Price Adjustment (MAY 2014) (29 U.S.C 206 and 41 U.S.C. chapter 67).
__ (5) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment - Requirements (MAY 2014) (41 U.S.C. chapter 67).
__ (6) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services - Requirements (MAY 2014) (41 U.S.C. chapter 67).
X__ (7) 52.222-55, Minimum Wages Under Executive Order 13658 (NOV 2020).
_X_ (8) 52.222-62, Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).
_X_ (9) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (JUN 2020) (42 U.S.C. 1792).
(d) *Comptroller General Examination of Record.* The Contractor shall comply with the provisions of this paragraph (d) if this contract was awarded using other than sealed bid, is in excess of the simplified acquisition threshold, as defined in FAR 2.101, on the date of award of this contract, and does not contain the clause at 52.215-2, Audit and Records - Negotiation.
   (1) The Comptroller General of the United States, or an authorized representative of the Comptroller General, shall have access to and right to examine any of the Contractor's directly pertinent records involving transactions related to this contract.
   (2) The Contractor shall make available at its offices at all reasonable times the records, materials, and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in FAR Subpart 4.7, Contractor Records Retention, of the other clauses of this contract. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved.
   (3) As used in this clause, records include books, documents, accounting procedures and practices, and other data, regardless of type and regardless of form. This does not require the Contractor to create or maintain any record that the Contractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e)(1) Notwithstanding the requirements of the clauses in paragraphs (a), (b), (c), and (d) of this clause, the Contractor is not required to flow down any FAR clause, other than those in this paragraph (e)(1) of this paragraph in a subcontract for commercial items. Unless otherwise indicated below, the extent of the flow down shall be as required by the clause -

    (i) 52.203-13, Contractor Code of Business Ethics and Conduct (JUN 2020) (41 U.S.C. 3509).

    (ii) 52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (JAN 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

    (iii) 52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (JUL 2018) (Section 1634 of Pub. L. 115-91).

    (iv) 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment. (AUG 2020) (Section 889(a)(1)(A) of Pub. L. 115-232).

    (v) 52.219-8, Utilization of Small Business Concerns (OCT 2018) (15 U.S.C. 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities. If the subcontract (except subcontracts to small business concerns) exceeds the applicable threshold specified in FAR 19.702(a) on the date of subcontract award, the subcontractor must include 52.219-8 in lower tier subcontracts that offer subcontracting opportunities.

    (vi) 52.222-21, Prohibition of Segregated Facilities (APR 2015).

    (vii) 52.222-26, Equal Opportunity (SEP 2016) (E.O. 11246).

    (viii) 52.222-35, Equal Opportunity for Veterans (JUN 2020) (38 U.S.C. 4212).

    (ix) 52.222-36, Equal Opportunity for Workers with Disabilities (JUN 2020) (29 U.S.C. 793).

    (x) 52.222-37, Employment Reports on Veterans (JUN 2020) (38 U.S.C. 4212).

    (xi) 52.222-40, Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) (E.O. 13496). Flow down required in accordance with paragraph (f) of FAR clause 52.222-40.

    (xii) 52.222-41, Service Contract Labor Standards (AUG 2018)(41 U.S.C. chapter 67).

    (xiii) _ (A) 52.222-50, Combating Trafficking in Persons (OCT 2020) (22 U.S.C. chapter 78 and E.O. 13627).

    _ (B) Alternate I (Mar 2015) of 52.222-50 (22 U.S.C. chapter 78 and E.O. 13627).

    (xiv) 52.222-51, Exemption from Application of the Service Contract Labor Standards to Contracts for Maintenance, Calibration, or Repair of Certain Equipment - Requirements (MAY 2014) (41 U.S.C. chapter 67).

    (xv) 52.222-53, Exemption from Application of the Service Contract Labor Standards to Contracts for Certain Services - Requirements (MAY 2014) (41 U.S.C. chapter 67).

    (xvi) 52.222-54, Employment Eligibility Verification (Oct 2015) (E. O. 12989).

    (xvii) 52.222-55, Minimum Wages Under Executive Order 13658 (NOV 2020).

    (xviii) 52.222-62 Paid Sick Leave Under Executive Order 13706 (JAN 2017) (E.O. 13706).

    (xix)(A) 52.224-3, Privacy Training (JAN 2017) (5 U.S.C. 552a).

    (B) Alternate I (JAN 2017) of 52.224-3.

    (xx) 52.225-26, Contractors Performing Private Security Functions Outside the United States (OCT 2016) (Section 862, as amended, of the National Defense Authorization Act for Fiscal Year 2008; 10 U.S.C. 2302 Note).

    (xxi) 52.226-6, Promoting Excess Food Donation to Nonprofit Organizations (JUN 2020) (42 U.S.C. 1792). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6.

    (xxii) 52.247-64, Preference for Privately Owned U.S.-Flag Commercial Vessels (FEB 2006) (46 U.S.C. Appx. 1241(b) and 10 U.S.C. 2631). Flow down required in accordance with paragraph (d) of FAR clause 52.247-64.

(2) While not required, the Contractor May include in its subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations.

<div align="center">(End of clause)</div>

<div align="center">

**52.222-40 NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT (Dec 2010)**

</div>

(a) During the term of this contract, the Contractor shall post an employee notice, of such size and in such form, and containing such content as prescribed by the Secretary of Labor, in conspicuous places in and about its plants and offices where employees covered by the National Labor Relations Act engage in activities relating to the performance of the contract, including all places where notices to employees are customarily posted both physically and electronically, in the languages employees speak, in accordance with 29 CFR471.2 (d) and (f).

    (1) Physical posting of the employee notice shall be in conspicuous places in and about the Contractor's plants and offices so that the notice is prominent and readily seen by employees who are covered by the National Labor Relations Act and engage in activities related to the performance of the contract.

    (2) If the Contractor customarily posts notices to employees electronically, then the Contractor shall also post the required notice electronically by displaying prominently, on any website that is maintained by the Contractor and is customarily used for notices to employees about terms and conditions of employment, a link to the Department of Labor's website that contains the full text of the poster. The link to the Department's website, as referenced in (b)(3) of this section, must read, "Important Notice about Employee Rights to Organize and Bargain Collectively with Their Employers."

(b) This required employee notice, printed by the Department of Labor, may be-

    (1) Obtained from the Division of Interpretations and Standards, Office of Labor-Management Standards, U.S. Department of Labor, 200 Constitution Avenue, NW., Room N-5609, Washington, DC 20210, (202) 693-0123, or from any field office of the Office of Labor–Management Standards or Office of Federal Contract Compliance Programs;

    (2) Provided by the Federal contracting agency if requested;

    (3) Downloaded from the Office of Labor–Management Standards Web site at http://www.dol.gov/olms/regs/compliance/EO13496.htm; or

(4) Reproduced and used as exact duplicate copies of the Department of Labor's official poster.
(c) The required text of the employee notice referred to in this clause is located at Appendix A, Subpart A, 29 CFR Part 471.
(d) The Contractor shall comply with all provisions of the employee notice and related rules, regulations, and orders of the Secretary of Labor.
(e) In the event that the Contractor does not comply with the requirements set forth in paragraphs (a) through (d) of this clause, this contract may be terminated or suspended in whole or in part, and the Contractor may be suspended or debarred in accordance with 29 CFR 471.14 and subpart 9.4. Such other sanctions or remedies may be imposed as are provided by 29 CFR part 471, which implements Executive Order 13496 or as otherwise provided by law.
(f) Subcontracts.
(1) The Contractor shall include the substance of this clause, including this paragraph (f), in every subcontract that exceeds $10,000 and will be performed wholly or partially in the United States, unless exempted by the rules, regulations, or orders of the Secretary of Labor issued pursuant to section 3 of Executive Order 13496 of January 30, 2009, so that such provisions will be binding upon each subcontractor.
(2) The Contractor shall not procure supplies or services in a way designed to avoid the applicability of Executive Order 13496 or this clause.
(3) The Contractor shall take such action with respect to any such subcontract as may be directed by the Secretary of Labor as a means of enforcing such provisions, including the imposition of sanctions for noncompliance.
(4) However, if the Contractor becomes involved in litigation with a subcontractor, or is threatened with such involvement, as a result of such direction, the Contractor may request the United States, through the Secretary of Labor, to enter into such litigation to protect the interests of the United States.
(End of clause)

## 52.222-41 SERVICE CONTRACT LABOR STANDARDS (Aug 2018)

(a) *Definitions.* As used in this clause—
*Contractor,* when this clause is used in any subcontract, shall be deemed to refer to the subcontractor, except in the term "Government Prime Contractor."
*Service employee* means any person engaged in the performance of this contract other than any person employed in a bona fide executive, administrative, or professional capacity, as these terms are defined in Part 541 of Title 29, *Code of Federal Regulations,* as revised. It includes all such persons regardless of any contractual relationship that may be alleged to exist between a Contractor or subcontractor and such persons.
(b) *Applicability.* This contract is subject to the following provisions and to all other applicable provisions of 41 U.S.C. chapter 67, Service Contract Labor Standards, and regulations of the Secretary of Labor (29 CFR Part 4). This clause does not apply to contracts or subcontracts administratively exempted by the Secretary of Labor or exempted by 41 U.S.C. 6702, as interpreted in Subpart C of 29 CFR Part 4.
(c) *Compensation.*
(1) Each service employee employed in the performance of this contract by the Contractor or any subcontractor shall be paid not less than the minimum monetary wages and shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract.
(2)
(i) If a wage determination is attached to this contract, the Contractor shall classify any class of service employee which is not listed therein and which is to be employed under the contract (*i.e.,* the work to be performed is not performed by any classification listed in the wage determination) so as to provide a reasonable relationship (*i.e.,* appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination. Such conformed class of employees shall be paid the monetary wages and furnished the fringe benefits as are determined pursuant to the procedures in this paragraph (c).
(ii) This conforming action shall be initiated by the Contractor prior to the performance of contract work by the unlisted class of employee. The Contractor shall submit Standard Form (SF) 1444, Request For Authorization of Additional Classification and Rate, to the Contracting Officer no later than 30 days after the unlisted class of employee performs any contract work. The Contracting Officer shall review the proposed classification and rate and promptly submit the completed SF 1444 (which must include information regarding the agreement or disagreement of the employees' authorized representatives or the employees themselves together with the agency recommendation), and all pertinent information to the Wage and Hour *Division, U.S.* Department of Labor. The Wage and Hour Division will approve, modify, or disapprove the action or render a final determination in the event of disagreement within 30 days of receipt or will notify the Contracting Officer within 30 days of receipt that additional time is necessary.
(iii) The final determination of the conformance action by the Wage and Hour Division shall be transmitted to the Contracting Officer who shall promptly notify the Contractor of the action taken. Each affected employee shall be furnished by the Contractor with a written copy of such determination or it shall be posted as a part of the wage determination.
(iv)
(A) The process of establishing wage and fringe benefit rates that bear a reasonable relationship to those listed in a wage determination cannot be reduced to any single formula. The approach used may vary from wage determination to wage determination depending on the circumstances. Standard wage and salary administration practices which rank various job classifications by pay grade pursuant to point schemes or other job factors may, for example, be relied upon. Guidance may also be obtained from the way different jobs are rated under Federal pay systems (Federal Wage Board Pay System and the General Schedule) or from other wage determinations issued in the same locality. Basic to the establishment of any conformable wage rate(s) is the concept that a pay relationship should be maintained between job classifications based on the skill required and the duties performed.
(B) In the case of a contract modification, an exercise of an option, or extension of an existing contract, or in any other case where a Contractor succeeds a contract under which the classification in question was previously conformed pursuant to paragraph (c) of this clause, a new conformed wage rate and fringe benefits may be assigned to the conformed classification by indexing (*i.e.,* adjusting) the previous conformed rate and fringe benefits by an amount equal to the average (mean) percentage increase (or decrease, where appropriate) between the wages and fringe benefits specified for all classifications to be used on the contract which are listed in the current wage determination, and those specified for the corresponding classifications in the previously applicable wage determination. Where conforming actions are accomplished in accordance with this paragraph prior to the performance of contract work by the unlisted class of employees, the Contractor shall advise the Contracting Officer of the action taken but the other procedures in subdivision (c)(2)(ii) of this clause need not be followed.

(C) No employee engaged in performing work on this contract shall in any event be paid less than the currently applicable minimum wage specified under section 6(a)(1) of the Fair Labor Standards Act of 1938, as amended.

(v) The wage rate and fringe benefits finally determined under this paragraph (c)(2) of this clause shall be paid to all employees performing in the classification from the first day on which contract work is performed by them in the classification. Failure to pay the unlisted employees the compensation agreed upon by the interested parties and/or finally determined by the Wage and Hour Division retroactive to the date such class of employees commenced contract work shall be a violation of the Service Contract Labor Standards statute and this contract.

(vi) Upon discovery of failure to comply with paragraph (c)(2) of this clause, the Wage and Hour Division shall make a final determination of conformed classification, wage rate, and/or fringe benefits which shall be retroactive to the date such class or classes of employees commenced contract work.

(3) *Adjustment of compensation.* If the term of this contract is more than 1 year, the minimum monetary wages and fringe benefits required to be paid or furnished thereunder to service employees under this contract shall be subject to adjustment after 1 year and not less often than once every 2 years, under wage determinations issued by the Wage and Hour Division.

(d) *Obligation to furnish fringe benefits.* The Contractor or subcontractor may discharge the obligation to furnish fringe benefits specified in the attachment or determined under paragraph (c)(2) of this clause by furnishing equivalent combinations of bona fide fringe benefits, or by making equivalent or differential cash payments, only in accordance with Subpart D of 29 CFR Part 4.

(e) *Minimum wage.* In the absence of a minimum wage attachment for this contract, neither the Contractor nor any subcontractor under this contract shall pay any person performing work under this contract (regardless of whether the person is a service employee) less than the minimum wage specified by section 6(a)(1) of the Fair Labor Standards Act of 1938. Nothing in this clause shall relieve the Contractor or any subcontractor of any other obligation under law or contract for payment of a higher wage to any employee.

(f) *Successor contracts.* If this contract succeeds a contract subject to the Service Contract Labor Standards statute under which substantially the same services were furnished in the same locality and service employees were paid wages and fringe benefits provided for in a collective bargaining agreement, in the absence of the minimum wage attachment for this contract setting forth such collectively bargained wage rates and fringe benefits, neither the Contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work (regardless of whether or not such employee was employed under the predecessor contract), less than the wages and fringe benefits provided for in such collective bargaining agreement, to which such employee would have been entitled if employed under the predecessor contract, including accrued wages and fringe benefits and any prospective increases in wages and fringe benefits provided for under such agreement. No Contractor or subcontractor under this contract may be relieved of the foregoing obligation unless the limitations of 29 CFR 4.1 b(b) apply or unless the Secretary of Labor or the Secretary's authorized representative finds, after a hearing as provided in 29 CFR 4.10 that the wages and/or fringe benefits provided for in such agreement are substantially at variance with those which prevail for services of a character similar in the locality, or determines, as provided in 29 CFR 4.11, that the collective bargaining agreement applicable to service employees employed under the predecessor contract was not entered into as a result of arm's length negotiations. Where it is found in accordance with the review procedures provided in 29 CFR 4.10 and/or 4.11 and Parts6 and 8 that some or all of the wages and/or fringe benefits contained in a predecessor Contractor's collective bargaining agreement are substantially at variance with those which prevail for services of a character similar in the locality, and/or that the collective bargaining agreement applicable to service employees employed under the predecessor contract was not entered into as a result of arm's length negotiations, the Department will issue a new or revised wage determination setting forth the applicable wage rates and fringe benefits. Such determination shall be made part of the contract or subcontract, in accordance with the decision of the Administrator, the Administrative Law Judge, or the Administrative Review Board, as the case may be, irrespective of whether such issuance occurs prior to or after the award of a contract or subcontract (53 Comp. Gen. 401 (1973)). In the case of a wage determination issued solely as a result of a finding of substantial variance, such determination shall be effective as of the date of the final administrative decision.

(g) *Notification to employees.* The Contractor and any subcontractor under this contract shall notify each service employee commencing work on this contract of the minimum monetary wage and any fringe benefits required to be paid pursuant to this contract, or shall post the wage determination attached to this contract. The poster provided by the Department of Labor (Publication WH 1313) shall be posted in a prominent and accessible place at the work site. Failure to comply with this requirement is a violation of 41 U.S.C. 6703 and of this contract.

(h) *Safe and sanitary working conditions.* The Contractor or subcontractor shall not permit any part of the services called for by this contract to be performed in buildings or surroundings or under working conditions provided by or under the control or supervision of the Contractor or subcontractor which are unsanitary, hazardous, or dangerous to the health or safety of the service employees. The Contractor or subcontractor shall comply with the safety and health standards applied under 29 CFR Part 1925.

(i) *Records.*

(1) The Contractor and each subcontractor performing work subject to the Service Contract Labor Standards statute shall make and maintain for 3 years from the completion of the work, and make them available for inspection and transcription by authorized representatives of the Wage and Hour *Division, a* record of the following:

(i) For each employee subject to the Service Contract Labor Standards statute–

(A) Name and address and social security number;

(B) Correct work classification or classifications, rate or rates of monetary wages paid and fringe benefits provided, rate or rates of payments in lieu of fringe benefits, and total daily and weekly compensation;

(C) Daily and weekly hours worked by each employee; and

(D) Any deductions, rebates, or refunds from the total daily or weekly compensation of each employee.

(ii) For those classes of service employees not included in any wage determination attached to this contract, wage rates or fringe benefits determined by the interested parties or by the Administrator or authorized representative under the terms of paragraph (c) of this clause. A copy of the report required by subdivision (c)(2)(ii) of this clause will fulfill this requirement.

(iii) Any list of the predecessor Contractor's employees which had been furnished to the Contractor as prescribed by paragraph (n) of this clause.

(2) The Contractor shall also make available a copy of this contract for inspection or transcription by authorized representatives of the Wage and Hour Division.

(3) Failure to make and maintain or to make available these records for inspection and transcription shall be a violation of the regulations and this contract, and in the case of failure to produce these records, the Contracting Officer, upon direction of the Department of Labor and notification to the Contractor, shall take action to cause suspension of any further payment or advance of funds until the violation ceases.

(4) The Contractor shall permit authorized representatives of the Wage and Hour Division to conduct interviews with employees at the work site during normal working hours.

(j) *Pay periods.* The Contractor shall unconditionally pay to each employee subject to the Service Contract Labor Standards statute all wages due free and clear and without subsequent deduction (except as otherwise provided by law or regulations, 29 CFR Part 4), rebate, or kickback on any account. These payments shall be made no later than one pay period following the end of the regular pay period in which the wages were earned or accrued. A pay period under this statute may not be of any duration longer than semi-monthly.

(k) *Withholding of payments and termination of contract.* The Contracting Officer shall withhold or cause to be withheld from the Government Prime Contractor under this or any other Government contract with the Prime Contractor such sums as an appropriate official of the Department of Labor requests or such sums as the Contracting Officer decides may be necessary to pay underpaid employees employed by the Contractor or subcontractor. In the event of failure to pay any employees subject to the Service Contract Labor Standards statute all or part of the wages or fringe benefits due under the Service Contract Labor Standards statute, the Contracting Officer may, after authorization or by direction of the Department of Labor and written notification to the Contractor, take action to cause suspension of any further payment or advance of funds until such violations have ceased. Additionally, any failure to comply with the requirements of this clause may be grounds for termination of the right to proceed with the contract work. In such event, the Government may enter into other contracts or arrangements for completion of the work, charging the Contractor in default with any additional cost.

(l) *Subcontracts.* The Contractor agrees to insert this clause in all subcontracts subject to the Service Contract Labor Standards statute.

(m) *Collective bargaining agreements applicable to service employees.* If wages to be paid or fringe benefits to be furnished any service employees employed by the Government Prime Contractor or any subcontractor under the contract are provided for in a collective bargaining agreement which is or will be effective during any period in which the contract is being performed, the Government Prime Contractor shall report such fact to the Contracting Officer, together with full information as to the application and accrual of such wages and fringe benefits, including any prospective increases, to service employees engaged in work on the contract, and a copy of the collective bargaining agreement. Such report shall be made upon commencing performance of the contract, in the case of collective bargaining agreements effective at such time, and in the case of such agreements or provisions or amendments thereof effective at a later time during the period of contract performance such agreements shall be reported promptly after negotiation thereof.

(n) *Seniority list.* Not less than 10 days prior to completion of any contract being performed at a Federal facility where service employees may be retained in the performance of the succeeding contract and subject to a wage determination which contains vacation or other benefit provisions based upon length of service with a Contractor (predecessor) or successor (29 CFR 4.173), the incumbent Prime Contractor shall furnish the Contracting Officer a certified list of the names of all service employees on the Contractor's or subcontractor's payroll during the last month of contract performance. Such list shall also contain anniversary dates of employment on the contract either with the current or predecessor Contractors of each such service employee. The Contracting Officer shall turn over such list to the successor Contractor at the commencement of the succeeding contract.

(o) *Rulings and interpretations.* Rulings and interpretations of the Service Contract Labor Standards statute are contained in Regulations, 29 CFR Part 4.

(p) *Contractor's certification.*

(1) By entering into this contract, the Contractor (and officials thereof) certifies that neither it nor any person or firm who has a substantial interest in the Contractor's firm is a person or firm ineligible to be awarded Government contracts by virtue of the sanctions imposed under 41 U.S.C. 6706.

(2) No part of this contract shall be subcontracted to any person or firm ineligible for award of a Government contract under 41 U.S.C. 6706.

(3) The penalty for making false statements is prescribed in the U.S. Criminal Code, 18 U.S.C. 1001.

(q) *Variations, tolerances, and exemptions involving employment.* Notwithstanding any of the provisions in paragraphs (b) through (o) of this clause, the following employees may be employed in accordance with the following variations, tolerances, and exemptions, which the Secretary of Labor, pursuant to 41 U.S.C. 6707 prior to its amendment by Pub.L.92-473, found to be necessary and proper in the public interest or to avoid serious impairment of the conduct of Government business:

(1) Apprentices, student-learners, and workers whose earning capacity is impaired by age, physical or mental deficiency, or injury may be employed at wages lower than the minimum wages otherwise required by 41 U.S.C. 6703(1) without diminishing any fringe benefits or cash payments in lieu thereof required under 41 U.S.C. 6703(2), in accordance with the conditions and procedures prescribed for the employment of apprentices, student-learners, persons with disabilities, and disabled clients of work centers under section 14 of the Fair Labor Standards Act of 1938, in the regulations issued by the Administrator (29 CFR parts 520, 521, 524, and 525).

(2) The Administrator will issue certificates under the statute for the employment of apprentices, student-learners, persons with disabilities, or disabled clients of work centers not subject to the Fair Labor Standards Act of 1938, or subject to different minimum rates of pay under the two statutes, authorizing appropriate rates of minimum wages (but without changing requirements concerning fringe benefits or supplementary cash payments in lieu thereof), applying procedures prescribed by the applicable regulations issued under the Fair Labor Standards Act of 1938 (29 CFR parts 520, 521, 524, and 525).

(3) The Administrator will also withdraw, annul, or cancel such certificates in accordance with the regulations in 29 CFR parts 525 and 528.

(r) *Apprentices.* Apprentices will be permitted to work at less than the predetermined rate for the work they perform when they are employed and individually registered in a bona fide apprenticeship program registered with a State Apprenticeship Agency which is recognized by the U.S. Department of Labor, or if no such recognized agency exists in a State, under a program registered with the Office of Apprenticeship Training, Employer, and Labor Services (OATELS), U.S. Department of Labor. Any employee who is not registered as an apprentice in an approved program shall be paid the wage rate and fringe benefits contained in the applicable wage determination for the journeyman classification of work actually performed. The wage rates paid apprentices shall not be less than the wage rate for their level of progress set forth in the registered program, expressed as the appropriate percentage of the journeyman's rate contained in the applicable wage determination. The allowable ratio of apprentices to journeymen employed on the contract work in any craft classification shall not be greater than the ratio permitted to the Contractor as to his entire work force under the registered program.

(s) *Tips.* An employee engaged in an occupation in which the employee customarily and regularly receives more than $30 a month in tips may have the amount of these tips credited by the employer against the minimum wage required by 41 U.S.C. 6703(1), in accordance with section 3(m) of the Fair Labor Standards Act and Regulations, 29 CFR Part 531. However, the amount of credit shall not exceed $1.34 per hour beginning January 1,1981. To use this provision-

(1) The employer must inform tipped employees about this tip credit allowance before the credit is utilized;

(2) The employees must be allowed to retain all tips (individually or through a pooling arrangement and regardless of whether the employer elects to take a credit for tips received);

(3) The employer must be able to show by records that the employee receives at least the applicable Service Contract Labor Standards minimum wage through the combination of direct wages and tip credit; and

(4) The use of such tip credit must have been permitted under any predecessor collective bargaining agreement applicable by virtue of 41 U.S.C. 6707(c).

(t) *Disputes concerning labor standards.* The U.S. Department of Labor has set forth in 29 CFR parts 4, 6, and 8 procedures for resolving disputes concerning labor standards requirements. Such disputes shall be resolved in accordance with those procedures and not the Disputes clause of this contract. Disputes within the meaning of this clause include disputes between the Contractor (or any of its subcontractors) and the contracting agency, the U.S. Department of Labor, or the employees or their representatives.

(End of clause)

## 52.222-50 COMBATING TRAFFICKING IN PERSONS (NOV 2021)

(a) *Definitions.* As used in this clause-

*Agent* means any individual, including a director, an officer, an employee, or an independent contractor, authorized to act on behalf of the organization.

*Coercion* means-

(1) Threats of serious harm to or physical restraint against any person;

(2) Any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

(3) The abuse or threatened abuse of the legal process.

*Commercial sex act* means any sex act on account of which anything of value is given to or received by any person.

*Commercially available off-the-shelf (COTS) item* —

(1) Means any item of supply (including construction material) that is—

(i) A commercial product (as defined in paragraph (1) of the definition of "commercial product" at Federal Acquisition Regulation (FAR) 2.101;

(ii)Sold in substantial quantities in the commercial marketplace; and

(iii)Offered to the Government, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace; and

(2)Does not include bulk cargo, as defined in 46 U.S.C. 40102(4), such as agricultural products and petroleum products.

*Debt bondage* means the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or of those of a person under his or her control as a security for debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and nature of those services are not respectively limited and defined.

*Employee* means an employee of the Contractor directly engaged in the performance of work under the contract who has other than a minimal impact or involvement in contract performance.

*Forced Labor* means knowingly providing or obtaining the labor or services of a person-

(1) By threats of serious harm to, or physical restraint against, that person or another person;

(2) By means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

(3) By means of the abuse or threatened abuse of law or the legal process.

*Involuntary servitude* includes a condition of servitude induced by means of-

(1) Any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such conditions, that person or another person would suffer serious harm or physical restraint; or

(2) The abuse or threatened abuse of the legal process.

*Recruitment fees* means fees of any type, including charges, costs, assessments, or other financial obligations, that are associated with the recruiting process, regardless of the time, manner, or location of imposition or collection of the fee.

(1) Recruitment fees include, but are not limited to, the following fees (when they are associated with the recruiting process) for-

(i) Soliciting, identifying, considering, interviewing, referring, retaining, transferring, selecting, training, providing orientation to, skills testing, recommending, or placing employees or potential employees;

(ii) Advertising

(iii) Obtaining permanent or temporary labor certification, including any associated fees;

(iv) Processing applications and petitions;

(v) Acquiring visas, including any associated fees;

(vi) Acquiring photographs and identity or immigration documents, such as passports, including any associated fees;

(vii) Accessing the job opportunity, including required medical examinations and immunizations; background, reference, and security clearance checks and examinations; and additional certifications;

(viii) An employer's recruiters, agents or attorneys, or other notary or legal fees;

(ix) Language interpretation or translation, arranging for or accompanying on travel, or providing other advice to employees or potential employees;

(x) Government-mandated fees, such as border crossing fees, levies, or worker welfare funds;

(xi) Transportation and subsistence costs-

(A) While in transit, including, but not limited to, airfare or costs of other modes of transportation, terminal fees, and travel taxes associated with travel from the country of origin to the country of performance and the return journey upon the end of employment; and

(B) From the airport or disembarkation point to the worksite;

(xii) Security deposits, bonds, and insurance; and

(xiii) Equipment charges.

(2) A recruitment fee, as described in the introductory text of this definition, is a recruitment fee, regardless of whether the payment is-

(i) Paid in property or money;

(ii) Deducted from wages;

(iii) Paid back in wage or benefit concessions;

(iv) Paid back as a kickback, bribe, in-kind payment, free labor, tip, or tribute; or

(v) Collected by an employer or a third party, whether licensed or unlicensed, including, but not limited to-

(A) Agents;

(B) Labor brokers;

(C) Recruiters;

(D) Staffing firms (including private employment and placement firms);

(E) Subsidiaries/affiliates of the employer;

(F) Any agent or employee of such entities; and

(G) Subcontractors at all tiers.

*Severe forms of trafficking in persons* means-

(1) Sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

(2) The recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

"Sex trafficking" means the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

*Subcontract* means any contract entered into by a subcontractor to furnish supplies or services for performance of a prime contract or a subcontract.

*Subcontractor* means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor or another subcontractor.

*United States* means the 50 States, the District of Columbia, and outlying areas.

(b) *Policy.* The United States Government has adopted a policy prohibiting trafficking in persons including the trafficking-related activities of this clause. Contractors, contractor employees, and their agents shall not-

(1) Engage in severe forms of trafficking in persons during the period of performance of the contract;

(2) Procure commercial sex acts during the period of performance of the contract;

(3) Use forced labor in the performance of the contract;

(4) Destroy, conceal, confiscate, or otherwise deny access by an employee to the employee's identity or immigration documents, such as passports or drivers' licenses, regardless of issuing authority;

(5)

(i) Use misleading or fraudulent practices during the recruitment of employees or offering of employment, such as failing to disclose, in a format and language understood by the employee or potential employee, basic information or making material misrepresentations during the recruitment of employees regarding the key terms and conditions of employment, including wages and fringe benefits, the location of work, the living conditions, housing and associated costs (if employer or agent provided or arranged), any significant costs to be charged to the employee or potential employee, and, if applicable, the hazardous nature of the work;

(ii) Use recruiters that do not comply with local labor laws of the country in which the recruiting takes place;

(6) Charge employees or potential employees recruitment fees;

(7)

(i) Fail to provide return transportation or pay for the cost of return transportation upon the end of employment-

(A) For an employee who is not a national of the country in which the work is taking place and who was brought into that country for the purpose of working on a U.S. Government contract or subcontract (for portions of contracts performed outside the United States); or

(B) For an employee who is not a United States national and who was brought into the United States for the purpose of working on a U.S. Government contract or subcontract, if the payment of such costs is required under existing temporary worker programs or pursuant to a written agreement with the employee (for portions of contracts performed inside the United States); except that-

(ii) The requirements of paragraphs (b)(7)(i) of this clause shall not apply to an employee who is-

(A) Legally permitted to remain in the country of employment and who chooses to do so; or

(B) Exempted by an authorized official of the contracting agency from the requirement to provide return transportation or pay for the cost of return transportation;

(iii) The requirements of paragraph (b)(7)(i) of this clause are modified for a victim of trafficking in persons who is seeking victim services or legal redress in the country of employment, or for a witness in an enforcement action related to trafficking in persons. The contractor shall provide the return transportation or pay the cost of return transportation in a way that does not obstruct the victim services, legal redress, or witness activity. For example, the contractor shall not only offer return transportation to a witness at a time when the witness is still needed to testify. This paragraph does not apply when the exemptions at paragraph (b)(7)(ii) of this clause apply.

(8) Provide or arrange housing that fails to meet the host country housing and safety standards; or

(9) If required by law or contract, fail to provide an employment contract, recruitment agreement, or other required work document in writing. Such written work document shall be in a language the employee understands. If the employee must relocate to perform the work, the work document shall be provided

to the employee at least five days prior to the employee relocating. The employee's work document shall include, but is not limited to, details about work description, wages, prohibition on charging recruitment fees, work location(s), living accommodations and associated costs, time off, roundtrip transportation arrangements, grievance process, and the content of applicable laws and regulations that prohibit trafficking in persons.

(c) *Contractor requirements.* The Contractor shall-

    (1) Notify its employees and agents of-

        (i) The United States Government's policy prohibiting trafficking in persons, described in paragraph (b) of this clause; and

        (ii) The actions that will be taken against employees or agents for violations of this policy. Such actions for employees may include, but are not limited to, removal from the contract, reduction in benefits, or termination of employment; and

    (2) Take appropriate action, up to and including termination, against employees, agents, or subcontractors that violate the policy in paragraph (b) of this clause.

(d) *Notification.*

    (1) The Contractor shall inform the Contracting Officer and the agency Inspector General immediately of-

        (i) Any credible information it receives from any source (including host country law enforcement) that alleges a Contractor employee, subcontractor, subcontractor employee, or their agent has engaged in conduct that violates the policy in paragraph (b) of this clause (see also 18 U.S.C. 1351, Fraud in Foreign Labor Contracting, and 52.203-13(b)(3)(i)(A), if that clause is included in the solicitation or contract, which requires disclosure to the agency Office of the Inspector General when the Contractor has credible evidence of fraud); and

        (ii) Any actions taken against a Contractor employee, subcontractor, subcontractor employee, or their agent pursuant to this clause.

    (2) If the allegation may be associated with more than one contract, the Contractor shall inform the contracting officer for the contract with the highest dollar value.

(e) *Remedies.* In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraphs (c), (d), (g), (h), or (i) of this clause may result in-

    (1) Requiring the Contractor to remove a Contractor employee or employees from the performance of the contract;

    (2) Requiring the Contractor to terminate a subcontract;

    (3) Suspension of contract payments until the Contractor has taken appropriate remedial action;

    (4) Loss of award fee, consistent with the award fee plan, for the performance period in which the Government determined Contractor non-compliance;

    (5) Declining to exercise available options under the contract;

    (6) Termination of the contract for default or cause, in accordance with the termination clause of this contract; or

    (7) Suspension or debarment.

(f) *Mitigating and aggravating factors.* When determining remedies, the Contracting Officer may consider the following:

    (1) *Mitigating factors.* The Contractor had a Trafficking in Persons compliance plan or an awareness program at the time of the violation, was in compliance with the plan, and has taken appropriate remedial actions for the violation, that may include reparation to victims for such violations.

    (2) *Aggravating factors.* The Contractor failed to abate an alleged violation or enforce the requirements of a compliance plan, when directed by the Contracting Officer to do so.

(g) *Full cooperation.*

    (1) The Contractor shall, at a minimum-

        (i) Disclose to the agency Inspector General information sufficient to identify the nature and extent of an offense and the individuals responsible for the conduct;

        (ii) Provide timely and complete responses to Government auditors' and investigators' requests for documents;

        (iii) Cooperate fully in providing reasonable access to its facilities and staff (both inside and outside the U.S.) to allow contracting agencies and other responsible Federal agencies to conduct audits, investigations, or other actions to ascertain compliance with the Trafficking Victims Protection Act of 2000 ( 22 U.S.C. chapter 78), E.O. 13627, or any other applicable law or regulation establishing restrictions on trafficking in persons, the procurement of commercial sex acts, or the use of forced labor; and

        (iv) Protect all employees suspected of being victims of or witnesses to prohibited activities, prior to returning to the country from which the employee was recruited, and shall not prevent or hinder the ability of these employees from cooperating fully with Government authorities.

    (2) The requirement for full cooperation does not foreclose any Contractor rights arising in law, the FAR, or the terms of the contract. It does not-

        (i) Require the Contractor to waive its attorney-client privilege or the protections afforded by the attorney work product doctrine;

        (ii) Require any officer, director, owner, employee, or agent of the Contractor, including a sole proprietor, to waive his or her attorney client privilege or Fifth Amendment rights; or

        (iii) Restrict the Contractor from-

            (A) Conducting an internal investigation; or

            (B) Defending a proceeding or dispute arising under the contract or related to a potential or disclosed violation.

    (h) *Compliance plan.*

    (1) This paragraph (h) applies to any portion of the contract that-

        (i) Is for supplies, other than commercially available off-the-shelf items, acquired outside the United States, or services to be performed outside the United States; and

        (ii) Has an estimated value that exceeds $550,000.

    (2) The Contractor shall maintain a compliance plan during the performance of the contract that is appropriate-

        (i) To the size and complexity of the contract; and

        (ii) To the nature and scope of the activities to be performed for the Government, including the number of non-United States citizens expected to be employed and the risk that the contract or subcontract will involve services or supplies susceptible to trafficking in persons.

    (3) *Minimum requirements.* The compliance plan must include, at a minimum, the following:

(i) An awareness program to inform contractor employees about the Government's policy prohibiting trafficking-related activities described in paragraph (b) of this clause, the activities prohibited, and the actions that will be taken against the employee for violations. Additional information about Trafficking in Persons and examples of awareness programs can be found at the website for the Department of State's Office to Monitor and Combat Trafficking in Persons at http://www.state.gov/j/tip/.

(ii) A process for employees to report, without fear of retaliation, activity inconsistent with the policy prohibiting trafficking in persons, including a means to make available to all employees the hotline phone number of the Global Human Trafficking Hotline at 1-844-888-FREE and its email address at help@befree.org.

(iii) A recruitment and wage plan that only permits the use of recruitment companies with trained employees, prohibits charging recruitment fees to the employees or potential employees and ensures that wages meet applicable host-country legal requirements or explains any variance.

(iv) A housing plan, if the Contractor or subcontractor intends to provide or arrange housing, that ensures that the housing meets host-country housing and safety standards.

(v) Procedures to prevent agents and subcontractors at any tier and at any dollar value from engaging in trafficking in persons (including activities in paragraph (b) of this clause) and to monitor, detect, and terminate any agents, subcontracts, or subcontractor employees that have engaged in such activities.

(4) *Posting.*

(i) The Contractor shall post the relevant contents of the compliance plan, no later than the initiation of contract performance, at the workplace (unless the work is to be performed in the field or not in a fixed location) and on the Contractor's Web site (if one is maintained). If posting at the workplace or on the Web site is impracticable, the Contractor shall provide the relevant contents of the compliance plan to each worker in writing.

(ii) The Contractor shall provide the compliance plan to the Contracting Officer upon request.

(5) *Certification.* Annually after receiving an award, the Contractor shall submit a certification to the Contracting Officer that-

(i) It has implemented a compliance plan to prevent any prohibited activities identified at paragraph (b) of this clause and to monitor, detect, and terminate any agent, subcontract or subcontractor employee engaging in prohibited activities; and

(ii) After having conducted due diligence, either-

(A) To the best of the Contractor's knowledge and belief, neither it nor any of its agents, subcontractors, or their agents is engaged in any such activities; or

(B) If abuses relating to any of the prohibited activities identified in paragraph (b) of this clause have been found, the Contractor or subcontractor has taken the appropriate remedial and referral actions.

(i) *Subcontracts.*

(1) The Contractor shall include the substance of this clause, including this paragraph (i), in all subcontracts and in all contracts with agents. The requirements in paragraph (h) of this clause apply only to any portion of the subcontract that-

(i) Is for supplies, other than commercially available off-the-shelf items, acquired outside the United States, or services to be performed outside the United States; and

(ii) Has an estimated value that exceeds $550,000.

(2) If any subcontractor is required by this clause to submit a certification, the Contractor shall require submission prior to the award of the subcontract and annually thereafter. The certification shall cover the items in paragraph (h)(5) of this clause.

(End of clause)

## 52.222-55 MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 (NOV 2020)

(a) *Definitions.* As used in this clause -

"Seasonal recreational equipment rental" means any equipment rental in connection with seasonal recreational services.

"Seasonal recreational services" means services that include: river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps.

"United States" means the 50 states and the District of Columbia.

"Worker" -

(1) Means any person engaged in performing work on, or in connection with, a contract covered by Executive Order 13658, and -

(i) Whose wages under such contract are governed by the Fair Labor Standards Act (29 U.S.C. chapter 8), the Service Contract Labor Standards statute (41 U.S.C. chapter 67), or the Wage Rate Requirements (Construction) statute (40 U.S.C. chapter 31, subchapter IV);

(ii) Other than individuals employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 CFR part 541; and

(iii) Regardless of the contractual relationship alleged to exist between the individual and the employer.

(2) Includes workers performing on, or in connection with, the contract whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c).

(3) Also includes any person working on, or in connection with, the contract and individually registered in a bona fide apprenticeship or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship.

(b) *Executive Order minimum wage rate.* (1) The Contractor shall pay to workers, while performing in the United States, and performing on, or in connection with, this contract, a minimum hourly wage rate of $10.10 per hour beginning January 1, 2015.

(2) The Contractor shall adjust the minimum wage paid, if necessary, beginning January 1, 2016, and annually thereafter, to meet the applicable annual E.O. minimum wage. The Administrator of the Department of Labor's Wage and Hour Division (the Administrator) will publish annual determinations in the Federal Register no later than 90 days before the effective date of the new E.O. minimum wage rate. The Administrator will also publish the applicable E.O. minimum wage on www.wdol.gov (or any successor Web site), and a general notice on all wage determinations issued

under the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, that will provide information on the E.O. minimum wage and how to obtain annual updates. The applicable published E.O. minimum wage is incorporated by reference into this contract.

(3)(i) The Contractor may request a price adjustment only after the effective date of the new annual E.O. minimum wage determination. Prices will be adjusted only for increased labor costs (including subcontractor labor costs) as a result of an increase in the annual E.O. minimum wage, and for associated labor costs (including those for subcontractors). Associated labor costs shall include increases or decreases that result from changes in social security and unemployment taxes and workers' compensation insurance, but will not otherwise include any amount for general and administrative costs, overhead, or profit.

    (ii) Subcontractors may be entitled to adjustments due to the new minimum wage, pursuant to paragraph (b)(2). Contractors shall consider any subcontractor requests for such price adjustment.

    (iii) The Contracting Officer will not adjust the contract price under this clause for any costs other than those identified in paragraph (b)(3)(i) of this clause, and will not provide duplicate price adjustments with any price adjustment under clauses implementing the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute.

(4) The Contractor warrants that the prices in this contract do not include allowance for any contingency to cover increased costs for which adjustment is provided under this clause.

(5) A pay period under this clause may not be longer than semi-monthly, but may be shorter to comply with any applicable law or other requirement under this contract establishing a shorter pay period. Workers shall be paid no later than one pay period following the end of the regular pay period in which such wages were earned or accrued.

(6) The Contractor shall pay, unconditionally to each worker, all wages due free and clear without subsequent rebate or kickback. The Contractor may make deductions that reduce a worker's wages below the E.O. minimum wage rate only if done in accordance with 29 CFR 10.23, Deductions.

(7) The Contractor shall not discharge any part of its minimum wage obligation under this clause by furnishing fringe benefits or, with respect to workers whose wages are governed by the Service Contract Labor Standards statute, the cash equivalent thereof.

(8) Nothing in this clause shall excuse the Contractor from compliance with any applicable Federal or State prevailing wage law or any applicable law or municipal ordinance establishing a minimum wage higher than the E.O. minimum wage. However, wage increases under such other laws or municipal ordinances are not subject to price adjustment under this subpart.

(9) The Contractor shall pay the E.O. minimum wage rate whenever it is higher than any applicable collective bargaining agreement(s) wage rate.

(10) The Contractor shall follow the policies and procedures in 29 CFR 10.24(b) and 10.28 for treatment of workers engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips.

(c)(1) This clause applies to workers as defined in paragraph (a). As provided in that definition -

    (i) Workers are covered regardless of the contractual relationship alleged to exist between the contractor or subcontractor and the worker;

    (ii) Workers with disabilities whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c) are covered; and

    (iii) Workers who are registered in a bona fide apprenticeship program or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship, are covered.

(2) This clause does not apply to -

    (i) Fair Labor Standards Act (FLSA)-covered individuals performing in connection with contracts covered by the E.O., *i.e.* those individuals who perform duties necessary to the performance of the contract, but who are not directly engaged in performing the specific work called for by the contract, and who spend less than 20 percent of their hours worked in a particular workweek performing in connection with such contracts;

    (ii) Individuals exempted from the minimum wage requirements of the FLSA under 29 U.S.C. 213(a) and 214(a) and (b), unless otherwise covered by the Service Contract Labor Standards statute, or the Wage Rate Requirements (Construction) statute. These individuals include but are not limited to -

        (A) Learners, apprentices, or messengers whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(a);

        (B) Students whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(b); and

        (C) Those employed in a bona fide executive, administrative, or professional capacity (29 U.S.C. 213(a)(1) and 29 CFR part 541); or

    (iii) Seasonal recreational services or seasonal recreational equipment rental for the general public on Federal lands, except for lodging and food services associated with seasonal recreational services, in accordance with Executive Order 13838, Exemption from Executive Order 13658 for Recreational Services on Federal Lands (3 CFR, 2018 Comp., p. 831), as implemented by the U.S. Department of Labor regulations at 29 CFR 10.4(g).

(d) *Notice.* The Contractor shall notify all workers performing work on, or in connection with, this contract of the applicable E.O. minimum wage rate under this clause. With respect to workers covered by the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, the Contractor may meet this requirement by posting, in a prominent and accessible place at the worksite, the applicable wage determination under those statutes. With respect to workers whose wages are governed by the FLSA, the Contractor shall post notice, utilizing the poster provided by the Administrator, which can be obtained at www.dol.gov/whd/govcontracts, in a prominent and accessible place at the worksite. Contractors that customarily post notices to workers electronically may post the notice electronically provided the electronic posting is displayed prominently on any Web site that is maintained by the contractor, whether external or internal, and customarily used for notices to workers about terms and conditions of employment.

(e) *Payroll Records.* (1) The Contractor shall make and maintain records, for three years after completion of the work, containing the following information for each worker:

    (i) Name, address, and social security number;

    (ii) The worker's occupation(s) or classification(s);

    (iii) The rate or rates of wages paid;

    (iv) The number of daily and weekly hours worked by each worker;

    (v) Any deductions made; and
    (vi) Total wages paid.
  (2) The Contractor shall make records pursuant to paragraph (e)(1) of this clause available for inspection and transcription by authorized representatives of the Administrator. The Contractor shall also make such records available upon request of the Contracting Officer.
  (3) The Contractor shall make a copy of the contract available, as applicable, for inspection or transcription by authorized representatives of the Administrator.
  (4) Failure to comply with this paragraph (e) shall be a violation of 29 CFR 10.26 and this contract. Upon direction of the Administrator or upon the Contracting Officer's own action, payment shall be withheld until such time as the noncompliance is corrected.
  (5) Nothing in this clause limits or otherwise modifies the Contractor's payroll and recordkeeping obligations, if any, under the Service Contract Labor Standards statute, the Wage Rate Requirements (Construction) statute, the Fair Labor Standards Act, or any other applicable law.
(f) *Access.* The Contractor shall permit authorized representatives of the Administrator to conduct investigations, including interviewing workers at the worksite during normal working hours.
(g) *Withholding.* The Contracting Officer, upon his or her own action or upon written request of the Administrator, will withhold funds or cause funds to be withheld, from the Contractor under this or any other Federal contract with the same Contractor, sufficient to pay workers the full amount of wages required by this clause.
(h) *Disputes.* Department of Labor has set forth in 29 CFR 10.51, Disputes concerning contractor compliance, the procedures for resolving disputes concerning a contractor's compliance with Department of Labor regulations at 29 CFR part 10. Such disputes shall be resolved in accordance with those procedures and not the Disputes clause of this contract. These disputes include disputes between the Contractor (or any of its subcontractors) and the contracting agency, the Department of Labor, or the workers or their representatives.
    (i) *Antiretaliation.* The Contractor shall not discharge or in any other manner discriminate against any worker because such worker has filed any complaint or instituted or caused to be instituted any proceeding under or related to compliance with the E.O. or this clause, or has testified or is about to testify in any such proceeding.
(j) *Subcontractor compliance.* The Contractor is responsible for subcontractor compliance with the requirements of this clause and may be held liable for unpaid wages due subcontractor workers.
(k) *Subcontracts.* The Contractor shall include the substance of this clause, including this paragraph (k) in all subcontracts, regardless of dollar value, that are subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and are to be performed in whole or in part in the United States.

<div align="center">(End of clause)</div>

## 52.222-62 PAID SICK LEAVE UNDER EXECUTIVE ORDER 13706 (JAN 2017)

(a) *Definitions.* As used in this clause (in accordance with 29 CFR 13.2) -
*Child, domestic partner,* and *domestic violence* have the meaning given in 29 CFR 13.2.
*Employee* - (1)(i) Means any person engaged in performing work on or in connection with a contract covered by Executive Order (E.O.) 13706; and
    (A) Whose wages under such contract are governed by the Service Contract Labor Standards statute (41 U.S.C. chapter 67), the Wage Rate Requirements (Construction) statute (40 U.S.C. chapter 31, subchapter IV), or the Fair Labor Standards Act (29 U.S.C. chapter 8);
    (B) Including employees who qualify for an exemption from the Fair Labor Standards Act's minimum wage and overtime provisions;
    (C) Regardless of the contractual relationship alleged to exist between the individual and the employer; and
    (ii) Includes any person performing work on or in connection with the contract and individually registered in a bona fide apprenticeship or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship.
  (2)(i) An employee performs "on" a contract if the employee directly performs the specific services called for by the contract; and
    (ii) An employee performs "in connection with" a contract if the employee's work activities are necessary to the performance of a contract but are not the specific services called for by the contract.
*Individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship* has the meaning given in 29 CFR 13.2.
*Multiemployer plan* means a plan to which more than one employer is required to contribute and which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer.
*Paid sick leave* means compensated absence from employment that is required by E.O. 13706 and 29 CFR part 13.
*Parent, sexual assault, spouse,* and *stalking* have the meaning given in 29 CFR 13.2.
*United States* means the 50 States and the District of Columbia.
(b) *Executive Order 13706.* (1) This contract is subject to E.O. 13706 and the regulations issued by the Secretary of Labor in 29 CFR part 13 pursuant to the E.O.
  (2) If this contract is not performed wholly within the United States, this clause only applies with respect to that part of the contract that is performed within the United States.
(c) *Paid sick leave.* The Contractor shall -
  (1) Permit each employee engaged in performing work on or in connection with this contract to earn not less than 1 hour of paid sick leave for every 30 hours worked;
  (2) Allow accrual and use of paid sick leave as required by E.O. 13706 and 29 CFR part 13;
  (3) Comply with the accrual, use, and other requirements set forth in 29 CFR 13.5 and 13.6, which are incorporated by reference in this contract;
  (4) Provide paid sick leave to all employees when due free and clear and without subsequent deduction (except as otherwise provided by 29 CFR 13.24), rebate, or kickback on any account;

(5) Provide pay and benefits for paid sick leave used no later than one pay period following the end of the regular pay period in which the paid sick leave was taken; and

(6) Be responsible for the compliance by any subcontractor with the requirements of E.O. 13706, 29 CFR part 13, and this clause.

(d) Contractors may fulfill their obligations under E.O. 13706 and 29 CFR part 13 jointly with other contractors through a multiemployer plan, or may fulfill their obligations through an individual fund, plan, or program (see 29 CFR 13.8).

(e) *Withholding.* The Contracting Officer will, upon his or her own action or upon written request of an authorized representative of the Department of Labor, withhold or cause to be withheld from the Contractor under this or any other Federal contract with the same Contractor, so much of the accrued payments or advances as may be considered necessary to pay employees the full amount owed to compensate for any violation of the requirements of E.O. 13706, 29 CFR part 13, or this clause, including -

(1) Any pay and/or benefits denied or lost by reason of the violation;

(2) Other actual monetary losses sustained as a direct result of the violation; and

(3) Liquidated damages.

(f) *Payment suspension/contract termination/contractor debarment.* (1) In the event of a failure to comply with E.O. 13706, 29 CFR part 13, or this clause, the contracting agency may, on its own action or after authorization or by direction of the Department of Labor and written notification to the Contractor take action to cause suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

(2) Any failure to comply with the requirements of this clause may be grounds for termination for default or cause.

(3) A breach of the contract clause may be grounds for debarment as a contractor and subcontractor as provided in 29 CFR 13.52.

(g) The paid sick leave required by E.O. 13706, 29 CFR part 13, and this clause is in addition to the Contractor's obligations under the Service Contract Labor Standards statute and Wage Rate Requirements (Construction) statute, and the Contractor may not receive credit toward its prevailing wage or fringe benefit obligations under those Acts for any paid sick leave provided in satisfaction of the requirements of E.O. 13706 and 29 CFR part 13.

(h) Nothing in E.O. 13706 or 29 CFR part 13 shall excuse noncompliance with or supersede any applicable Federal or State law, any applicable law or municipal ordinance, or a collective bargaining agreement requiring greater paid sick leave or leave rights than those established under E.O. 13706 and 29 CFR part 13.

(i) *Recordkeeping.* (1) The Contractor shall make and maintain, for no less than three (3) years from the completion of the work on the contract, records containing the following information for each employee, which the Contractor shall make available upon request for inspection, copying, and transcription by authorized representatives of the Administrator of the Wage and Hour Division of the Department of Labor:

(i) Name, address, and social security number of each employee.

(ii) The employee's occupation(s) or classification(s).

(iii) The rate or rates of wages paid (including all pay and benefits provided).

(iv) The number of daily and weekly hours worked.

(v) Any deductions made.

(vi) The total wages paid (including all pay and benefits provided) each pay period.

(vii) A copy of notifications to employees of the amount of paid sick leave the employee has accrued, as required under 29 CFR 13.5(a)(2).

(viii) A copy of employees' requests to use paid sick leave, if in writing, or, if not in writing, any other records reflecting such employee requests.

(ix) Dates and amounts of paid sick leave taken by employees (unless the Contractor's paid time off policy satisfies the requirements of E.O. 13706 and 29 CFR part 13 as described in 29 CFR 13.5(f)(5), leave shall be designated in records as paid sick leave pursuant to E.O. 13706).

(x) A copy of any written responses to employees' requests to use paid sick leave, including explanations for any denials of such requests, as required under 29 CFR 13.5(d)(3).

(xi) Any records reflecting the certification and documentation the Contractor may require an employee to provide under 29 CFR 13.5(e), including copies of any certification or documentation provided by an employee.

(xii) Any other records showing any tracking of or calculations related to an employee's accrual or use of paid sick leave.

(xiii) The relevant contract.

(xiv) The regular pay and benefits provided to an employee for each use of paid sick leave.

(xv) Any financial payment made for unused paid sick leave upon a separation from employment intended, pursuant to 29 CFR 13.5(b)(5), to relieve the Contractor from the obligation to reinstate such paid sick leave as otherwise required by 29 CFR 13.5(b)(4).

(2)(i) If the Contractor wishes to distinguish between an employee's covered and noncovered work, the Contractor shall keep records or other proof reflecting such distinctions. Only if the Contractor adequately segregates the employee's time will time spent on noncovered work be excluded from hours worked counted toward the accrual of paid sick leave. Similarly, only if the Contractor adequately segregates the employee's time may the Contractor properly refuse an employee's request to use paid sick leave on the ground that the employee was scheduled to perform noncovered work during the time he or she asked to use paid sick leave.

(ii) If the Contractor estimates covered hours worked by an employee who performs work in connection with contracts covered by the E.O. pursuant to 29 CFR 13.5(a)(1)(i) or (iii), the Contractor shall keep records or other proof of the verifiable information on which such estimates are reasonably based. Only if the Contractor relies on an estimate that is reasonable and based on verifiable information will an employee's time spent in connection with noncovered work be excluded from hours worked counted toward the accrual of paid sick leave. If the Contractor estimates the amount of time an employee spends performing in connection with contracts covered by the E.O., the Contractor shall permit the employee to use his or her paid sick leave during any work time for the Contractor.

(3) In the event the Contractor is not obligated by the Service Contract Labor Standards statute, the Wage Rate Requirements (Construction) statute, or the Fair Labor Standards Act to keep records of an employee's hours worked, such as because the employee is exempt from the Fair Labor Standards Act's minimum wage and overtime requirements, and the Contractor chooses to use the assumption permitted by 29 CFR 13.5(a)(1)(iii), the Contractor is excused from the requirement in paragraph (i)(1)(iv) of this clause and 29 CFR 13.25(a)(4) to keep records of the employee's number of daily and weekly hours worked.

(4)(i) Records relating to medical histories or domestic violence, sexual assault, or stalking, created for purposes of E.O. 13706, whether of an employee or an employee's child, parent, spouse, domestic partner, or other individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship, shall be maintained as confidential records in separate files/records from the usual personnel files.

(ii) If the confidentiality requirements of the Genetic Information Nondiscrimination Act of 2008 (GINA), section 503 of the Rehabilitation Act of 1973, and/or the Americans with Disabilities Act (ADA) apply to records or documents created to comply with the recordkeeping requirements in this contract clause, the records and documents shall also be maintained in compliance with the confidentiality requirements of the GINA, section 503 of the Rehabilitation Act of 1973, and/or ADA as described in 29 CFR 1635.9, 41 CFR 60-741.23(d), and 29 CFR 1630.14(c)(1), respectively.

(iii) The Contractor shall not disclose any documentation used to verify the need to use 3 or more consecutive days of paid sick leave for the purposes listed in 29 CFR 13.5(c)(1)(iv) (as described in 29 CFR 13.5(e)(1)(ii)) and shall maintain confidentiality about any domestic abuse, sexual assault, or stalking, unless the employee consents or when disclosure is required by law.

(5) The Contractor shall permit authorized representatives of the Wage and Hour Division to conduct interviews with employees at the worksite during normal working hours.

(6) Nothing in this contract clause limits or otherwise modifies the Contractor's recordkeeping obligations, if any, under the Service Contract Labor Standards statute, the Wage Rate Requirements (Construction) statute, the Fair Labor Standards Act, the Family and Medical Leave Act, E.O. 13658, their respective implementing regulations, or any other applicable law.

(j) *Interference/discrimination.* (1) The Contractor shall not in any manner interfere with an employee's accrual or use of paid sick leave as required by E.O. 13706 or 29 CFR part 13. Interference includes, but is not limited to -

(i) Miscalculating the amount of paid sick leave an employee has accrued;

(ii) Denying or unreasonably delaying a response to a proper request to use paid sick leave;

(iii) Discouraging an employee from using paid sick leave;

(iv) Reducing an employee's accrued paid sick leave by more than the amount of such leave used;

(v) Transferring an employee to work on contracts not covered by the E.O. to prevent the accrual or use of paid sick leave;

(vi) Disclosing confidential information contained in certification or other documentation provided to verify the need to use paid sick leave; or

(vii) Making the use of paid sick leave contingent on the employee's finding a replacement worker or the fulfillment of the Contractor's operational needs.

(2) The Contractor shall not discharge or in any other manner discriminate against any employee for -

(i) Using, or attempting to use, paid sick leave as provided for under E.O. 13706 and 29 CFR part 13;

(ii) Filing any complaint, initiating any proceeding, or otherwise asserting any right or claim under E.O. 13706 and 29 CFR part 13;

(iii) Cooperating in any investigation or testifying in any proceeding under E.O. 13706 and 29 CFR part 13; or

(iv) Informing any other person about his or her rights under E.O. 13706 and 29 CFR part 13.

(k) *Notice.* The Contractor shall notify all employees performing work on or in connection with a contract covered by the E.O. of the paid sick leave requirements of E.O. 13706, 29 CFR part 13, and this clause by posting a notice provided by the Department of Labor in a prominent and accessible place at the worksite so it may be readily seen by employees. Contractors that customarily post notices to employees electronically may post the notice electronically, provided such electronic posting is displayed prominently on any Web site that is maintained by the Contractor, whether external or internal, and customarily used for notices to employees about terms and conditions of employment.

(l) *Disputes concerning labor standards.* Disputes related to the application of E.O. 13706 to this contract shall not be subject to the general disputes clause of the contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR part 13. Disputes within the meaning of this contract clause include disputes between the Contractor (or any of its subcontractors) and the contracting agency, the Department of Labor, or the employees or their representatives.

(m) *Subcontracts.* The Contractor shall insert the substance of this clause, including this paragraph (m), in all subcontracts, regardless of dollar value, that are subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and are to be performed in whole or in part in the United States.

(End of clause)

## 52.223-18 Encouraging Contractor Policies to Ban Text Messaging While Driving (Jun 2020)

(a) *Definitions.* As used in this clause-

*"Driving"*–

(1) Means operating a motor vehicle on an active roadway with the motor running, including while temporarily stationary because of traffic, a traffic light, stop sign, or otherwise.

(2) Does not include operating a motor vehicle with or without the motor running when one has pulled over to the side of, or off, an active roadway and has halted in a location where one can safely remain stationary.

*Text messaging* means reading from or entering data into any handheld or other electronic device, including for the purpose of short message service texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to park.

(b) This clause implements Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving, dated October 1, 2009.

(c) The Contractor is encouraged to-

(1) Adopt and enforce policies that ban text messaging while driving-

(i) Company-owned or rented vehicles or Government-owned vehicles; or

(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.

(2) Conduct initiatives in a manner commensurate with the size of the business, such as-
    (i) Establishment of new rules and programs or reevaluation of existing programs to prohibit text messaging while driving; and
    (ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.
(d) *Subcontracts.* The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts that exceed the micro-purchase threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award.

<div align="center">(End of clause)</div>

## 52.228-5 INSURANCE-WORK ON A GOVERNMENT INSTALLATION (Jan 1997)

(a) The Contractor shall, at its own expense, provide and maintain during the entire performance of this contract, at least the kinds and minimum amounts of insurance required in the Schedule or elsewhere in the contract.
(b) Before commencing work under this contract, the Contractor shall notify the Contracting Officer in writing that the required insurance has been obtained. The policies evidencing required insurance shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the Government's interest shall not be effective-
    (1) For such period as the laws of the State in which this contract is to be performed prescribe; or
    (2) Until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer, whichever period is longer.
(c) The Contractor shall insert the substance of this clause, including this paragraph (c), in subcontracts under this contract that require work on a Government installation and shall require subcontractors to provide and maintain the insurance required in the Schedule or elsewhere in the contract. The Contractor shall maintain a copy of all subcontractors' proofs of required insurance, and shall make copies available to the Contracting Officer upon request.

<div align="center">(End of clause)</div>

## 52.237-2 PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT, AND VEGETATION (Apr 1984)

The Contractor shall use reasonable care to avoid damaging existing buildings, equipment, and vegetation on the Government installation. If the Contractor's failure to use reasonable care causes damage to any of this property, the Contractor shall replace or repair the damage at no expense to the Government as the Contracting Officer directs. If the Contractor fails or refuses to make such repair or replacement, the Contractor shall be liable for the cost, which may be deducted from the contract price.

<div align="center">(End of clause)</div>

# Attachment (4)

## Health & Safety Requirements

The below stated requirements are in addition to other health and safety requirements defined and referenced elsewhere in this Subcontract and are as follows:

1. Subcontractor will be required to adhere to all owner safety requirements which apply to facilities and work areas.

2. Prior to the start of work, Subcontractor shall submit to Prime Contractor a complete list of all products that will be used incidental to performing Subcontractor's Work, including solvents and other incidentals that could cause hazard to life or property. Subcontractor shall provide the Prime Contractor an updated list from time to time when new materials are required. Subcontractor shall include with the list of products a current Material Safety Data Sheet (MSDS) for each product. No work shall start until such time as the above requirements are met.

3. If in the opinion of Prime Contractor's Corporate Safety Manager, Project General Manager, Project Managers, Project Safety Officer or Subcontract Administrator the work of the Subcontractor or his lower tier contractors is being conducted in an unsafe manner. Prime Contractor retains the right to verbally issue a Stop Work direction to Subcontractor. Subcontractor shall take immediate actions necessary to correct the condition and provide a safe workplace before work can resume. Subcontractor shall notify Prime Contractor when the condition has been corrected for Prime Contractor approval to resume work.

4. Subcontractor's personnel may be required to attend a safety orientation upon entering the jobsite.

5. Barricades. railing. opening covers, and other protective devices which have been installed by Prime Contractor or others and removed by the Subcontractor's workmen to accommodate their operations must be guarded by Subcontractor while open and replaced immediately by Subcontractor's forces prior to leaving the area. Additionally. in the areas where Subcontractor is vertically transporting materials or personnel, Subcontractor shall provide secondary railing, barricades, warning signs, spotters, and other protective measures as required by OSHA to secure the safety of the entire hoisting area.

6. No radios or personal electronics, (Headphones/earbuds) etc., are allowed on any Prime Contractor job sites.

7. Subcontractor shall bring no intoxicants on to any Prime Contractor Projects at any time. This includes liquor, beer, wine, drugs, or hallucinogens of any kind whatsoever. In addition, no person who is under the influence of any of the above shall be allowed on the job site. Workmen violating this rule will be removed from the Project immediately and shall not return.

8. In the event of a near miss, accident. injury, or fatality, the Subcontractor agrees to notify Prime Contractor immediately and to provide a copy of all Accident and Workmen's Compensation reports to Prime Contractor's Project General Manager within 24 hours and OSHA as required.

9. If the work required involves the use of scaffolding and/or elevated platforms, the scaffolding must be inspected daily by a competent person (trained in scaffolding safety) in the employ of Subcontractor. On a weekly basis, Subcontractor is required to certify to Prime Contractor that daily inspections have been made. Subcontractor's certifications must identify the name of Subcontractor's competent person making the inspection and the date of each inspection.

**Subcontractor agrees to notify Prime Contractor within one (1) hour of the start of any visit by an owner's, Federal, State, or local safety official.**

# Attachment (4)

# Representations, Certifications, and Other Statements

Please fill out the following information to the best of your knowledge. Please indicate all those that apply to your company. If a firm misrepresents the status of any category as listed below, be aware that the Federal Government may impose a penalty against any firm misrepresenting their business size, disadvantaged status. and/or gender for the purpose of obtaining a subcontract under the provisions of Public Law 99-661 and the Code of Federal Regulations (CFR), Title 13, Part 124 and 125. This Exhibit C must be signed by a person who has ownership interest in the company listed below.

| | | | |
|---|---|---|---|
| Name of Business Concern: | King & George, LLC | | |
| Address: | 320 Hemphill St<br>Fort Worth, TX 76104 | | |
| Contact Person: | George F. Bernard | | |
| Telephone Number: | 817-898-8134 | Email Address: | george@kinggeorge.us |
| UEI: | D8WPNBKXRHB4 | CAGE: | 6FDL9 |

1. **Please indicate all those that apply to your company.**

   _____ **Small Business (SB) Concern**

   Small Business Concern, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is working on Government Contracts. The most common size standards applicable for the construction industry are listed below. Further information regarding size standards can be obtained from www.sba. ov/size.

   _____ **Small Disadvantaged Business (SDB) Concern**

   A small business that is at least 51% owned and controlled by a socially and economically disadvantaged individual or individuals. African Americans. Hispanic Americans. Asian Pacific Americans. Subcontinent Asian Americans, and Native Americans are presumed to qualify. The firm has received certification as a small disadvantaged business by the Small Business Administration (SBA).

   _____ **Women Owned Small Business (WOSB) Concern**

   A small business that is at least 51% owned by one or more women. The management and daily operations are controlled by one or more women.

   _____ **Veteran Owned Small Business (VOSB) Concern**

   A small business that is at least 51% owned and controlled by one or more veterans. The management and

daily operations are controlled by one or more veterans.

_____ **Service-Disabled Veteran Owned Small Business (SDVOSB) Concern**

A small business that is at least 51% owned by one or more service-disabled veterans. The management and daily operations are controlled by one or more service-disabled veterans.

_x____ **Historically Underutilized Business Zone (HUBZone)** — A small business, whose principle office is located within a HUBZone and 35% of its employees are also located in a HUBZone. The firm has received its certification from the Small Business Administration (SBA).

_____ **Large Business (LB)**

2. **Please indicate if your firm is registered with the following <u>Small Business Administration (SBA)</u> program:**

_____ 8(a) Certification Program    _____ 8(a) Certification #

_X____ Not Applicable

3. **Certification regarding debarment, suspension, and proposed debarment**

   a. I certify that the above-named company is ___ is not _X__ presently debarred, suspended, proposed for debarment, or declared ineligible for award of contracts by any Federal, State or local agency.

   b. I certify that the above-named company has ___ has not_X__, within the past three years. been convicted of or had a civil judgment rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal. state, or local) contract or subcontract: violation of Federal or state antitrust statutes relating to the submission of offers: or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property.

   c. I certify that the above-named company is ____ is not _X___ presently indicted for, or otherwise criminally or civilly charged by a governmental entity with commission of any of the offenses listed in the above certification.

   d. I certify that the above-named company has ____ has not __X__ , within the past three years, relative to tax, labor and employment, environmental, antitrust or consumer protection laws, been convicted of a Federal or state felony (or has any Federal or state felony indictments currently pending against them): had a Federal court judgment in a civil case brought by the United States rendered against them: or had an adverse decision by a Federal administrative law judge, board or commission indicating a willful violation of law.

   e. I certify that the above-named company has ___ has not _X__ within the past three years had one or more contracts terminated for default by any Federal, State or local Agency.

_____  07/31/2024

**Signature/Date**